Bennet D. Zurofsky (BZ 9405)
Reitman Parsonnet, PC
744 Broad Street, Suite 1807
Newark, NJ 07102
(973) 642-0885

Cyrus Mehri  (CM 3465)
Pamela Coukos (PC 4265)
Jeffery Whitney (JW 2470)
Mehri & Skalet, PLLC
1300 19th Street, NW, Suite 400
Washington, DC 20037
(202) 822-5100

Johnnie L. Cochran, Jr. (JC 4361)
Keith Givens (KG 5867)
Cameron Stewart (CS 7221)
The Cochran Firm
Woolworth Building
233 Broadway
New York, New York 10279-0003
(212) 553-9000

Bruce Ludwig (BL 4981)
Johnathan Shub (JS 2287)
Scott Johnson (SJ 7519)
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300

**RECEIVED**

MAY 2 4 2002

AT 8:30_____M
WILLIAM T. WALSH, CLERK

**FILED**

MAY 2 4 2002

AT 8:30_____M
WILLIAM T. WALSH
CLERK

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-----------------------------------------------------------X
:
**Nilda GUTIERREZ, Linda MORGAN and** :
**Courtney JENKINS,** :
:
     **Individually and as** :
     **Class Representatives,** :
:
        **Plaintiffs,** : **Civil Action No. 01-5302 (WHW)**
:
     **v.** : **First Amended Complaint**
: **- Class Action**
:
**JOHNSON & JOHNSON,** :
        **Defendant.** :
-----------------------------------------------------------X

1

## FIRST AMENDED COMPLAINT

Nilda Gutierrez, residing at 242 Talmadge Street, P.O. Box 1894, New Brunswick, New Jersey, 08901; Linda Morgan, residing at 30 Whispering Pines Way, Piscataway, New Jersey 08854; and Courtney Jenkins, residing at 1384 Sydney Pond Circle, Lawrenceville, Georgia 30045, on behalf of themselves individually and as class representatives, bring this action against Johnson & Johnson, a corporation with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08733.

## TABLE OF CONTENTS

I. NATURE OF THE CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

A. The Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

B. The Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV. CLASS ACTION ALLEGATIONS .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V. ALLEGATIONS OF CLASSWIDE DISCRIMINATION . . . . . . . . . . . . . . . . . . . . . . 19

A. Discrimination in Promotions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   1. Job Posting Is Not Objective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   2. The Corporate Search System Is Not Objective . . . . . . . . . . . . . . . 25
   3. "Glass Ceiling" and "Glass Walls" . . . . . . . . . . . . . . . . . . . . . . . . . . 28
   4. This Discriminatory System Penalizes the Named Plaintiffs . . . . . . 29

B. Discrimination in Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
   1. Entry Level Salary Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
   2. Merit Increases, Cash Bonuses, Stock Awards,
      and Stock Options . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
   3. This Discriminatory System Penalizes the Named Plaintiffs . . . . . . 34

C. Defendant's Failure to Monitor Practices and to Prevent and Remedy
Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VI. ALLEGATIONS OF THE INDIVIDUAL NAMED PLAINTIFFS . . . . . . . . . . . . . . . 37

A. Linda Morgan's Individual Claims ..................................... 37

B. Nilda Gutierrez's Individual Claims ................................... 40

C. Courtney Jenkins' Individual Claims................................... 44

COUNT ONE: INTENTIONAL DISCRIMINATION AGAINST THE NAMED PLAINTIFFS
AND THE CLASS IN VIOLATION OF SECTION 1981 ....................... 50

COUNT TWO: INTENTIONAL DISCRIMINATION AGAINST THE NAMED PLAINTIFFS
AND THE CLASS IN VIOLATION OF TITLE VII            .................50

COUNT THREE: INTENTIONAL DISCRIMINATION AGAINST THE NAMED PLAINTIFFS
AND THE CLASS IN VIOLATION OF N.J. STAT. § 10:5-1 et seq. .............. 51

COUNT FOUR: RACIALLY DISPARATE IMPACT IN VIOLATION OF TITLE
VII ............................................................... 51

COUNT FIVE: RACIALLY DISPARATE IMPACT IN VIOLATION OF N.J. STAT.
§ 10:5-1 et seq. ..................................................... 52

PRAYER FOR RELIEF ................................................. 52

JURY DEMAND ..................................................... 53

## I. **NATURE OF THE CLAIM**

1.      Plaintiffs in the above-styled action claim as follows:

2.      This is a class action, brought by Plaintiffs Nilda Gutierrez, Linda Morgan and

Courtney Jenkins (collectively, "the named Plaintiffs"), on behalf of themselves and other

similarly situated individuals against Johnson & Johnson ("J&J," "the Company," or

"Defendant").    Plaintiffs seek declaratory, injunctive and other equitable relief, and

compensatory and punitive damages, based on Defendant's continuing deprivation of

rights afforded to the named Plaintiffs and members of a class of African-American and

Hispanic-American salaried employees (as defined herein in paragraph 23) under Section

3

1981 of the Civil Rights Act of 1871, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq. ("Title VII"), and the New Jersey Law Against Discrimination, N.J. Stat. § 10:5-1 et seq.

3. The violations are systemic in nature, and constitute a pattern and practice of conduct that for many years has permeated, and continues to permeate, J&J's domestic operations. The employment policies and practices of J&J have the effect and have been undertaken with the purpose of denying promotional opportunities and equal compensation to qualified African-American and Hispanic-American employees. As evidence of Defendant's pattern and practice of race discrimination, Plaintiffs allege the following specific examples of disparate treatment and disparate impact:

  a. ***Discrimination in Promotions.*** J&J's policies are not applied uniformly or fairly and do not provide all employees an equal opportunity to advance. The Company's written and unwritten policies and practices regarding promotions provide that no positions up to and including Director or equivalent are required to be posted. J&J does not even purport to post job openings above Director level. Thus, scores of open positions throughout the Company are filled through an informal, behind-the-scenes process in which predominantly white managers handpick favored white candidates without fair and open competition and without adequate attempts to

4

ensure equal opportunity. Even when jobs are posted, the selection process can be highly subjective and easily manipulated.

Positions above the Director level are filled through the Corporate Search System, which relies heavily on the Company's inconsistent and excessively subjective career development program -- the Succession Planning Process. Although extremely critical to an employee's advancement within the Company, the Succession Planning Process utilizes a closed-door nomination process and relies on the highly subjective decisions of predominantly white senior managers. As a result of this kind of discrimination, African-Americans and Hispanic-Americans are denied the opportunity to advance to the same level and at the same rate as comparable Caucasian employees.

b. **High Potential System.** Part of J&J's Succession Planning Process includes a high potential system which is a secretive and excessively subjective system used to select employees with high potential for executive management. Despite the obvious importance of this system, J&J fails to conduct proper monitoring and fails to properly disclose the list of high potential candidates and the criteria for the list. African-American and Hispanic-American employees disproportionately fail to be selected.

c. **"Glass Ceiling."** At J&J, African-American and Hispanic-American

5

employees experience a "glass ceiling" -- a barrier to equal opportunity advancement. Few African-Americans or Hispanic-Americans advance to senior levels in the Company, especially when compared to the significant representation of African-Americans and Hispanic-Americans among all salaried employees. Currently, none of the 12 members of the Executive Committee (the principal management group responsible for the operations of the Company) are African-American or Hispanic-American, and as recently as 1998, none of the 25 highest-paid employees were African-American or Hispanic-American.

d.    ***"Glass Walls."*** Not only do barriers exist for African-American and Hispanic-American employees seeking upward advancement within the Company, but similar barriers virtually segregate the Company into divisions where African-American and Hispanic-American leadership is acceptable, and divisions where it is not. As recently as 1999, almost half of all African-Americans and Hispanic-Americans in senior positions were concentrated in less powerful and non-revenue-generating areas, such as Human Resources, while they have been effectively excluded from high-level positions of significant influence in the more powerful revenue-generating areas of the Company.

e.    ***Board of Directors.*** In 1943, none of the Company's Board members were persons of color. Nearly sixty years passed and there

6

was only one member who was a person of color (appointed in 1981) prior to the filing of this lawsuit. The current Board has failed to require proper reporting on equal opportunity matters, such as pay equity, stock option equity, and glass ceiling data from senior management. Moreover, the Board has failed to firmly link senior management compensation with equal opportunity performance.

f.     ***Entry Level Salary Bias.***  Discrimination at J&J often starts at the very beginning of an employee's tenure, when managers are free to establish entry level salaries without adequate written guidelines and with very little oversight. By overlooking the qualifications of its newest African-American and Hispanic-American employees, J&J sets these employees on a career-long path of lower salaries.

g.     ***Discrimination in Compensation.***  As time goes on, discrimination in compensation is compounded because each component of J&J's compensation system -- merit increases, cash bonuses, stock awards, and stock options -- is centered around the Company's flawed and unduly subjective performance rating system. In many instances, performance ratings are not even completed or disclosed which adds to the subjective nature of compensation decisions.

h.     ***Failure to Monitor or Remedy Discrimination.***  Finally, despite clear indications that African-American and Hispanic-American employees are unfairly treated under J&J's employment systems,

7

senior management and the Human Resources division have repeatedly failed to sufficiently monitor J&J's promotion and compensation practices for discriminatory effect. The absence of any meaningful oversight has exacerbated and prolonged the injury to J&J's African-American and Hispanic-American employees.

4.     Company management has been aware since at least 1997 that it was common knowledge throughout the organization that African-American and Hispanic-American employees were being treated in a discriminatory manner.  An internal diversity survey conducted in 1997 by an independent consultant revealed serious problems at the Company, including, among other things, that the Company's effort to retain minority employees was inadequate.  Further, in the same survey, one of J&J's operating companies complained of "**an undercurrent of intolerance and misunderstanding within pockets of the organization.**" Moreover, several of the highest-ranking African-Americans in the Company recently held a meeting where it was acknowledged (1) that African-Americans are under represented at senior levels in the Company and (2) that there are deficiencies in the Company's hiring, retention, and hiring promotion practices.  During the meeting, these high-ranking African-American executives announced that the Company had formed various committees to attempt to address these issues.

5.     This discrimination represents a company-wide pattern and practice, rather than a series of isolated incidents. Defendant's written and unwritten policies and practices regarding promotions and compensation subject the named Plaintiffs and the Class to

8

ongoing discrimination. J&J's actions constitute a continuing violation of the rights of the named Plaintiffs and the Class, and have been ongoing since November 15, 1999, and prior to that date.

5A.     Excessive subjectivity permeates many aspects of the process for making promotion and other internal job selections as well as the process for determining compensation. These policies and practices rely on excessively subjective decision-making practices. By entrusting its managers with broad discretion in these areas, J&J permits them to apply their own personal preferences and biases in making promotion and compensation decisions. Compounding this problem, J&J fails to monitor the promotion and compensation decisions of these managers effectively to ensure that they are made on non-discriminatory grounds. J&J thus essentially endorses the discriminatory behavior of its Caucasian managers by failing effectively to monitor or curb it. These practices reflect that discrimination is the standard operating procedure at J&J—the regular rather than the unusual practice. Collectively, this decision-making comprises a consistent employment practice that is excessively subjective and has no legitimate business justification. Accordingly, the practices identified herein are being challenged under systemic disparate treatment and disparate impact theories of discrimination.

6.     The leadership of J&J often refers to a corporate "Credo," which is essentially a mission statement/value system articulated in 1943 by then Chairman Robert Wood Johnson. This Credo, which is the guiding doctrine for the Company's management, provides in relevant part as follows:

9

## OUR CREDO

We are responsible to our employees, the men and women who work with us throughout the world. **Everyone must be considered as an individual. We must respect their dignity and recognize their merit.** They must have a sense of security in their jobs. **Compensation must be fair and adequate**, and working conditions clean, orderly and safe. We must be mindful of ways to help our employees fulfill their family responsibilities. Employees must feel free to make suggestions and complaints. **There must be equal opportunity for employment, development and advancement for those qualified.** We must provide competent management, and their actions must be just and ethical.

(Emphasis added). Although the Credo speaks directly to fair and equal employment opportunities and compensation, J&J hypocritically maintains and administers employment practices that systematically discriminate against its African-American and Hispanic-American employees. J&J has also failed to prevent and remedy the racial and ethnic disparities in promotions and compensation that exist inside the Company. Consequently, because the Credo's principles have not been put into practice with respect to the Company's African-American and Hispanic-American employees, the promise of the Credo remains unfulfilled for those employees.

    7.    In or about 1975, Richard B. Sellars, then Chairman of the Board and Chief Executive Officer, and James E. Burke, then President and Chairman of the Executive Committee, called for a rededication to the principles embodied in the Credo because they believed many managers were only paying lip service to it. The same

10

rededication is needed today with respect to the Company's treatment of its African-American and Hispanic-American employees.

## II. JURISDICTION

8.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(4), which confers original jurisdiction upon this Court in a civil action to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, and pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United States. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and § 1391(c), because Defendant has its headquarters, can be found and conducts business in the District of New Jersey, and because the cause of action has arisen and occurred in the District of New Jersey.

## III. THE PARTIES

### A. The Plaintiffs

10.     Plaintiff Nilda Gutierrez is a Hispanic-American adult citizen who resides in New Brunswick, New Jersey. She is a former employee of J&J, where she worked for over four years as a Recruiting Consultant and earned awards for her strong commitment to diversity. Gutierrez has an Associate's degree in Management from Middlesex County College (1994) and a Bachelor of Science degree in Industrial Relations from Douglas College (1997). Gutierrez alleges, *inter alia*, that she was significantly underpaid compared with comparable Caucasian employees.

11

11.     Plaintiff Linda Morgan is an African-American adult citizen who resides in Piscataway, New Jersey. She is a current employee of J&J, where she has worked for over twenty years, rising from a co-operative education student to a manager. In 1987 and 1988, Morgan's outstanding work earned her the Corporate Quality Award for improvements in needle quality and the Vice President of Engineering Award for developing a computer model that analyzed projects. She also received the New Jersey Black Achiever's Award for her work accomplishments and community activities and the YWCA Tribute to Women and Industry Award. Morgan holds a Bachelor of Science degree in Industrial Engineering from the New Jersey Institute of Technology (1982). Morgan alleges, *inter alia*, that she has been denied promotions on the basis of race, and has been repeatedly denied the opportunity to even apply for promotions because of the common practice of filling supervisory jobs without posting the positions.

12.     Plaintiff Courtney Jenkins is an African-American adult citizen who resides in Lawrenceville, Georgia. He is a former employee of J&J, where he worked for approximately two and one half years as a Quality Control Analyst and Chemist. During his tenure with the Company, Jenkins made significant contributions on the testing and release of products. Jenkins earned both a B.S. in Chemistry and a B.A. in History from Tufts University in 1992. Subsequently, he spent three and one half years at the University of Cincinnati's Medical School. Jenkins alleges, *inter alia*, that he has been denied promotions on the basis of race, and has been repeatedly denied the opportunity to even apply for promotions because of the common practice of filling supervisory jobs without

posting the positions.  Jenkins further alleges that he was paid thousands less than comparable Caucasian employees.

### B.  The Defendant

13.   Defendant J&J is a Delaware corporation and maintains its corporate headquarters in New Brunswick, New Jersey.  According to the Company's 2000 annual report and the current Company website, J&J is the world's most comprehensive and broadly-based manufacturer of health care products.  J&J has more than 195 operating companies in 51 countries around the world.  In the United States, the Company has 32 operating companies headquartered in eleven states.  Unless stated otherwise, Defendant J&J includes all entities within the United States.

14.   J&J's corporate headquarters ("J&J Corporate" or "the Corporate Office") oversees and supports the organization's global work and disseminates and administers common employment and human resources policies and practices for J&J's domestic operations.  Common policies and practices related to entry level salaries, promotions, and compensation – including but not limited to the compensation system, the job posting system, internal recruitment system, and succession planning  – are produced and disseminated by the Human Resources division at J&J's New Brunswick headquarters and apply to all U.S.-based staff.  J&J and the Operating Companies function with respect to employment practices as a single integrated enterprise.  J&J exercises control over labor relations at the Operating Companies.  All of the Operating Companies generally follow the same or substantially similar human resources policies and practices regarding promotion and compensation.  J&J expects the Operating Companies to carry out policy established

13

at the corporate headquarters.

15. J&J employs approximately 100,000 employees worldwide, with approximately 40,000 of those in the United States. J&J employs approximately 1,000 employees in the Corporate Office.

16. J&J engages in interstate and foreign commerce by the sale, manufacture, and distribution of health care products, as well as related services, for the consumer, pharmaceutical, and professional markets.

17. J&J's principal consumer products are personal care and hygienic products, including nonprescription drugs, adult skin and hair care products, baby care products, oral care products, first aid products, and sanitary protection products. Major brands include AVEENO, BAND-AID, IMODIUM A-D, LACT AID, MOTRIN, MYLANTA, PEPCID AC, NEUTROGENA, REACH (toothbrushes), STAYFREE (sanitary protection products), and TYLENOL.

18. In the pharmaceutical market, J&J produces or licences drugs in the anti-fungal, anti-infective, cardiovascular, contraceptive, dermatology, gastrointestinal, hematology, immunology, neurology, oncology, pain management, and psychotropic fields. Well-known brand-names produced by the pharmaceutical divisions include NIZORAL, FLOXIN, ORTHO-NOVUM, RETIN-A MICRO, IMODIUM, PROPULSID, PROCRIT, ULTRAM, and HALDOL.

19. J&J Products for the professional sector include a broad range of products used by or under the direction of health care professionals, including suture and mechanical wound closure products, surgical equipment and devices, wound management

and infection prevention products, interventional and diagnostic cardiology products, diagnostic equipment and supplies, joint replacements, and disposable contact lenses.

20.    J&J was ranked 57th by *Fortune* magazine in its Fortune 500 listings for 2001, and *Money* magazine listed J&J as currently being the fifth largest drug company in the United States.

## IV.  CLASS ACTION ALLEGATIONS

21.    Paragraphs 1 through 20 above are incorporated herein by reference.

22.    The named Plaintiffs bring this action on their own behalf, and on behalf of a class of persons under Rule 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

23.    The named Plaintiffs seek to represent a class of:

> all persons of African and/or Hispanic descent employed by Defendant J&J in permanent salaried positions (exempt and non-exempt) in the United States at any time from November 15, 1999, to the present.  (hereinafter "the Class").

Plaintiffs reserve the right to amend the definition of the Class following discovery.

24.    The individuals in the Class are so numerous that joinder of all members is impracticable.  Plaintiffs estimate that there are well over one thousand members of the Class.

25.    There are questions of law and fact common to the Class that predominate over any questions affecting only individuals.  Among these common questions are:

a.       Whether J&J's actions violated federal civil rights laws, in particular 42 U.S.C. § 1981 and Title VII;

b.       Whether J&J's actions violated state civil rights laws, in particular N.J. Stat. § 10:5-1 et seq.;

c.       Whether J&J maintains written and unwritten policies and/or practices for determining promotions that discriminate against the Class on the bases of race and ethnicity;

d.       Whether there are statistically significant disparities between the promotions awarded to African-American and Hispanic-American employees and the promotions awarded to similarly-situated Caucasian employees, sufficient to permit an inference of intentional discrimination;

e.       Whether J&J permits managers excessive subjectivity in determining promotions and other internal job selections;

f.       Whether this excessive subjectivity has a disparate impact on African-American and Hispanic-American employees in violation of Title VII;

g.       Whether this excessive subjectivity represents a deliberate action by J&J to block promotion of African-American and Hispanic-American employees, in violation of Title VII and § 1981;

h.       Whether J&J maintains written and unwritten policies and/or practices for determining compensation that discriminate against the Class on the bases of race and ethnicity;

16

i.      Whether there are statistically significant disparities between the compensation awarded to African-American and Hispanic-American employees and the compensation awarded to similarly situated Caucasian employees, sufficient to permit an inference of intentional discrimination;

j.      whether J&J permits managers excessive subjectivity in determining salary, bonuses and other compensation;

k.      Whether this excessive subjectivity has a disparate impact on African-American and Hispanic-American employees in violation of Title VII;

l.      Whether this excessive subjectivity represents a deliberate action by J&J to underpay African-American and Hispanic-American employees, in violation of Title VII and § 1981;

m.      Whether J&J maintains written and unwritten policies and/or practices for determining the entry level salaries of its employees that discriminate against the Class on the bases of race and ethnicity;

n.      Whether J&J has failed to monitor its human resources and employment policies and practices adequately to ensure equal employment opportunity;

o.      Whether senior management at J&J had knowledge of racial and ethnic disparities in entry level salaries, promotion, compensation and/or the organization's diversity performance, and what, if any, actions were taken as a result of that knowledge;

17

p.    If discrimination is found, whether injunctive relief, including changes to Company-wide written and unwritten policies and practices, is needed to adequately remedy past and present discrimination against the Class and prevent future discrimination against the Class;

q.    Whether J&J's conduct constitutes a pattern and practice of discrimination against the Class justifying an award of lost wages, benefits or other similar relief to the Class;

r.    Whether J&J's conduct constitutes a pattern and practice of discrimination against the Class justifying an award of compensatory and punitive damages to the Class;

s.    Whether J&J has failed to adhere to its Credo's principles in its treatment of African-American and Hispanic-American employees;

t.    Whether the Board of Directors has failed to require proper reporting on equal opportunity matters from senior management and failed to firmly link senior management compensation with equal opportunity performance; and

u.    Whether J&J's high potential system operates to the detriment of African-American and Hispanic-American employees?

26.    The claims of the representative parties are typical of the claims of the class. Plaintiff Gutierrez alleges, *inter alia,* discrimination in compensation; Plaintiff Morgan alleges, *inter alia,* discrimination in promotions; and Plaintiff Jenkins alleges, *inter alia*, discrimination in compensation and promotions.

27.     The named Plaintiffs will fairly and adequately represent the interests of the Class.  The named Plaintiffs have retained skilled and experienced counsel to represent them in class litigation.

28.     J&J has acted or refused to act on grounds generally applicable to the Class, as described in paragraphs 31 through 88 below, making final injunctive or declaratory relief appropriate.

29.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

30.     Issues common to the Class, as noted in paragraph 25 above, predominate over individual issues.

### V.  ALLEGATIONS OF CLASSWIDE DISCRIMINATION

31.     Paragraphs 1 through 30 are incorporated herein by reference.

32.     Defendant J&J has engaged in a continuing pattern and practice of racial discrimination against African-American salaried employees since at least November 15, 1999, and prior to that date.  J&J discriminates against African-American and Hispanic-American employees by (1) maintaining written and unwritten policies and practices regarding promotions, job postings, and other hiring practices that allow supervisors to handpick white candidates, resulting in fewer promotions for African-Americans and Hispanic-Americans and perpetuating a "glass ceiling" and "glass walls" that block the advancement of qualified African-Americans and Hispanic-Americans into visible and influential roles within the organization; (2) maintaining written and unwritten policies and practices for determining compensation that rely on unduly subjective decisions, resulting

19

in unequal compensation of African-American and Hispanic-American salaried employees throughout the Company; and (3) failing to monitor and oversee employment and human resources practices and failing to provide adequate training and oversight of supervisors to ensure that J&J policies are applied consistently and in a nondiscriminatory manner. J&J's Board of Directors has taken a hands off approach by failing to require proper reporting on equal opportunity matters, such as pay equity, stock option distributions and glass ceilings data, from senior management and by failing to firmly link senior management compensation with equal opportunity performance.

33.     Company management is aware of J&J's discrimination against African-Americans and Hispanic-Americans, yet has failed to take adequate measures to prevent or remedy it.     Upon information and belief, numerous African-American and Hispanic-American employees at the Company have filed internal complaints with either the EEO officer at their respective subsidiary or the Corporate EEO officer.  In addition, African-American and Hispanic-American employees have filed multiple EEOC charges against the company.  These actions should have put senior management on notice that the discrimination was systemic rather than merely a series of isolated events.

34.     In 1997, the Company hired an independent consultant to assess its diversity-related programs and initiatives, and to survey the extent and effectiveness of communications efforts about diversity.  Some of the major findings of the survey included the following: (1) J&J's diversity policy, training, and communication efforts lagged behind its minority recruitment efforts; (2) the Company did not have a strong company-wide policy statement on diversity; (3) the Company's effort to retain minority employees was

20

inadequate; and (4) the Company failed to have adequate employee mentoring programs in place. Upon information and belief, all of these problems still exists at the Company today.

35.    Several comments made in the 1997 survey by various operating companies indicate that company management was aware that the rights of African-American and Hispanic-American employees were being violated. These comments included the following:

(1)    "We see **an increased need for understanding diversity** of thought . . . across our worldwide franchise";

(2)    "Our company [needs] **more management training** to provide education/awareness in dealing with and managing a diverse workforce"; and

(3)    "[We need] [a] road map that would help us look at the behaviors we need to change and value in order to understand differences and similarities between groups. **Though we are ethnically diverse, there's an undercurrent of intolerance and misunderstanding within pockets of the organization. This creates a barrier as we move towards a team environment in the organization.**"

36.    The frequency that J&J has been offering its employees formal diversity sensitivity and equal employment opportunity training has dropped in recent years. Both the number of formal training sessions and the number of employees sent to training has dropped. The drop in training appears to have begun in 1998.

37.     About three years ago, the Company dropped equal opportunity and attention to diversity issues as separate and unique criterion upon which salaried employees were measured in their performance evaluations.  The criterion was used to document the annual performance of employees and, in part, determined compensation and bonuses. The diversity criterion was one of several criteria (each having a numerical scale on which the employee was rated for that factor) that were totaled up to arrive at the overall performance score or rating of the employee.

38.     The Company's senior management was formally advised on a number of occasions regarding the problem of unequal treatment in promotion and compensation for J&J's African-American and Hispanic-American salaried employees. The Gabbe & Gabbe Diversity Communications Study, the J&J Recruiting: Diversity Hiring Activity Report by Joe Shigo to Russ Deyo & Mike Carey, dated May 3, 1999, and company-wide annual Credo surveys provided the Company's leaders with notice of discrimination against African-American and Hispanic-American employees.

39.     In or about May 1998, Jeanne Hamway, Vice President of J&J Recruiting, stated that "diversity" is not necessarily a good thing for J&J.  This statement by a senior executive is indicative of the Company's reckless indifference to African-Americans and Hispanic-Americans.

40.     Upon information and belief, the Company became aware of the investigation by plaintiffs' counsel into the basis of this lawsuit in the Spring of 2001, and since that time, has taken numerous measures to examine its employment policies and

22

practices and has discovered numerous problems and deficiencies. For example, upon information and belief, J&J recently conducted a pay equity analysis and also examined its succession planning process and failure to provide adequate mentoring.

41.    Upon information and belief, J&J's examination revealed (1) that African-American employees, including those within the class, were being undercompensated for their work when compared to Caucasian employees and (2) that there are deficiencies in its Succession Planning Process resulting in thwarting the career development of minorities. Further, in recent weeks, the Company announced a new mentoring program to attempt to address glass ceiling and glass wall problems.

42.    Further, upon information and belief, on or about November 3, 2001, several of the highest-ranking African-Americans in the company, including Clarence Lockett, the highest-ranking African-American, and Frank Bolden, Vice President of Corporate Headquarter Services, held a meeting at Ortho-McNeil in Raritan, New Jersey. At this meeting, senior African-American executives acknowledged the under representation of African-Americans at senior levels in the Company as well as failures in the Company's hiring, retention and promotion practices. During the meeting, these high-ranking African-American executives also announced that the Company had formed various committees to attempt to address these issues. The senior African-American executives did not, and could not, say that the Company had rectified its longstanding failure of ensuring non-discriminatory practices in hiring, compensation, and promotions.

## A. Discrimination in Promotions

43.    J&J emphasizes that its employees are promoted "strictly on the

23

basis of the individual's qualifications to meet the needs of the position and the organization."  Further, J&J stresses that its promotion system supports the Credo's commitment to the advancement of qualified employees.  In reality, however, J&J's promotion system falls far short of its promise.

44.    J&J refuses to require its managers to make promotion decisions based on a competitive process with diverse candidate slates.  To the contrary, the Company's written and unwritten policies and practices allow supervisors to essentially handpick candidates through word-of-mouth for available positions and make promotion decisions on the basis of subjective criteria.  This system prevents qualified African-Americans and Hispanic-Americans from competing equally for positions or even knowing that they are available.  J&J has been aware of this system but has failed to effectively remedy its discriminatory effects.

### 1.    *Job Posting Is Not Objective*

45.    The Company's policy and practice is to fill positions either through the job posting system (the "GO NETWORK") or the Corporate Search System, depending upon the position.  According to information distributed to employees, positions up to and including Director or equivalent may be, but are not required to be, posted in the GO NETWORK.  Positions above Director level are filled entirely through the Corporate Search System.

46.    J&J's written policy stresses that its operating companies should attempt to fill positions from within before utilizing the formal posting system or looking outside the Company.  Thus, as a practical matter, scores of open positions at J&J are never filled

24

through the formal job posting system.  Rather, managers simply handpick individuals to fill positions without open and fair competition and without any attempt to ensure equal opportunity.  This informal promotion process works to the detriment of African-American and Hispanic-American employees, whose objective qualifications are overlooked by managers exercising excessively subjective discretion.  This "tap on the shoulder" system institutionalizes the good old boys' system already in place at the Company.  J&J is aware of this system and its discriminatory effects but has failed to remedy them.

47.    Even when open positions are posted, the posting system may be manipulated by hiring managers in a number of ways.  For example, job descriptions can be tailored to preselected candidates or to exclude applicants who are disfavored because of their race and/or ethnicity.  A position might also be posted even when a manager has already filled it.

48.    Once a job has been posted, it is at the sole discretion of the hiring manager to choose which applicants he or she wants to interview.  Subsequently, the hiring manager also has the final decision on which applicant is hired to fill the vacancy.  There are inadequate written guidelines to restrain this entire process, which can be unduly subjective.

## 2.    *The Corporate Search System Is Not Objective.*

49.    J&J does not post job openings for positions above the Director level.  Instead of providing open competition for these management-level positions, the Company's policy and practice is to fill such jobs through the Corporate Search System, which relies heavily on its inconsistent and excessively subjective career development

program -- the Succession Planning Process. The Succession Planning Process has the following objectives: (1) to provide senior management with an assessment of available management talent; (2) to identify highly promising future leaders; and (3) to review appropriate development plans for these individuals.

50.     The Succession Planning Process is extremely critical because employees identified as having executive level potential are given exposure to senior managers and provided with unique and challenging training opportunities to ensure that they acquire the necessary experience for future growth assignments. Despite the importance of this process, J&J has failed to ensure that it is fair and objective for all of its employees – resulting in African-American and Hispanic-American employees being disproportionately shut out of the benefits of this process.

51.     J&J's website boasts that its Succession Planning Process "ensures that [its] talent represents a diverse pool of leaders with global perspective." In practice, however, nothing could be further from the truth. The Succession Planning Process actually involves a closed-door nomination process in which predominantly white senior managers evaluate and promote favored candidates into highly sought-after positions.

52.     Part of J&J's Succession Planning Process includes a high potential system which is a secretive system to select employees with high potential for executive management. J&J fails to conduct proper monitoring and fails to properly disclose the list of high potential candidates and the criteria for the list.

53.     Managers are given little, if any, training on how to properly perform the Succession Planning Process. Instead, they are given unlimited discretion to rate

employees in a very subjective and unstructured manner for each of three criteria: Performance, Potential, and People Development.

54.     For Year 2000, J&J utilized a 5 point scale for each criteria; 1 being the lowest rating and 5 being the highest.  Of the three criteria, performance is the primary consideration in determining both promotions and compensation.  J&J's performance ratings for fiscal year 2000 were as follows: (1) 4.6 - 5.0 = Outstanding; (2) 3.6 - 4.5 = Superior; (3) 2.6 - 3.5 = Competent; (4) 1.6 - 2.5 = Needs Improvement; and (5) 1.0 - 1.5 = Unacceptable.  Recently, the Company changed its performance rating system to a 9 point scale (a 5 point scale remains for the other two criteria); 1 being the lowest rating and 9 being the highest rating.

55.     The manner in which J&J measures performance is excessively subjective and arbitrary.  As a result, the actual performance rating assigned to an employee cannot be satisfactorily regarded as an accurate measure of the employee's true objective performance.

56.     To avoid inconsistency and excessive subjectivity, this particular type of assessment approach requires, at a minimum, active monitoring and oversight of written evaluations and accountability for supervisors whose written evaluations are not consistent or objectively grounded.  J&J does not conduct such active oversight and monitoring and does not sufficiently hold its supervisors accountable for fairness and objectivity in the Succession Planning Process.

57.     Finally, the entire promotion process may be effectively short-circuited because a manager can block an employee from receiving a promotion and can prevent

27

an individual from advancing in the Company. For example, if a hiring manager makes a decision to interview a particular candidate already employed by the Company, the manager must first gain approval from the designated official (presumably the employee's current manager) at the candidate's company in order to interview the individual. Thus, the employee's current manager has the power to block the employee's promotion by refusing to release the employee.

58.    The result of all of the above promotional practices is that qualified African-Americans and Hispanic-Americans are disproportionately denied promotions while equally or less qualified white candidates continue to advance within the organization. The Company's white senior management thus continues to choose and develop successors who are much like themselves, perpetuating the status quo and limiting diversity.

### 3.    *"Glass Ceiling" and "Glass Walls"*

59.    J&J's promotional policies and practices create a glass ceiling for African-American and Hispanic-American employees at the organization. Currently, none of the 12 members of the Executive Committee (the principal management group responsible for the operation of the Company) are African-American or Hispanic-American. Moreover, as recently as 1998, none of the 25 highest-paid employees were African-American or Hispanic-American.

60.    The same promotional policies and practices not only prevent the advancement of African-Americans and Hispanic-Americans into senior positions, they also perpetuate artificial barriers or "glass walls" that virtually shut African-Americans and Hispanic-Americans out of key divisions and departments where the most visible and

28

strategically important work at J&J is performed.  For example, in 1999, there were 213 African-American and Hispanic-American employees holding Director level positions and above in the following nine divisions: Human Resources, Finance, Information Management, Quality Management, General Management, Marketing, Operations, Engineering, and Research and Development.  Of those 213 employees, there were more in Human Resources (34), than in Finance (17), Quality Management (2), General Management (5), and Engineering (6) combined.  Upon information and belief, these numbers have not changed dramatically to date.

### 4.   *This Discriminatory System Penalizes the Named Plaintiffs*

61.   Named Plaintiff Linda Morgan has been consistently denied promotional opportunities given to her Caucasian counterparts, despite her loyalty to the Company, her willingness to relocate and broaden her skill base, her extensive education and experience, and her consistently positive performance ratings.

62.   Morgan has sought a promotion to a director level position for many years and has expressed this aspiration in her career development plan.  Nonetheless, since early 2001, at least three director level positions have come open, but Morgan has not even been allowed to interview for any of the positions.  Rather, upon and information belief, the positions were not posted and were filled by white employees who Morgan was at least as qualified as, if not more so.

63.   Named Plaintiff Courtney Jenkins has been consistently denied promotional opportunities given to his Caucasian counterparts, despite his outstanding qualifications and experience, his consistently positive performance evaluations, his being

29

described by his supervisor as "the strongest member of our team," and his significant contributions to the Company.

64.     Although Jenkins had been performing the duties of a supervisor for some length of time (i.e., managing the workflow and providing guidance to analysts with less experience), he was never awarded a supervisory position.  On more than one occasion during his tenure at J&J, supervisory positions came open, but Jenkins was not even allowed to interview for the positions.  Instead, upon information and belief, the positions were never posted and were filled by white employees who Jenkins was at least as qualified as, if not more so.

65.     In summary, the promotion and internal hiring process at J&J gives a false hope of fair treatment.  Caucasian candidates are handpicked for positions.  African-Americans and Hispanic-Americans are unable to apply for promotions because they do not even know a position is open or they may believe it does not matter whether they apply because of the history of discriminatory selection.  This policy is no safeguard against discrimination and J&J's practices, including Defendant's perpetuation of a "glass ceiling" and "glass walls," significantly harm the opportunities for advancement of African-Americans and Hispanic-Americans at the Company.

## B.     Discrimination in Compensation

66.     J&J's Credo provides that "[c]ompensation must be fair and adequate." Despite this clear mandate, the Company's current compensation system allows excessively subjective managerial discretion and assigns significant weight to its unreliable, subjective and discriminatory performance rating system, leading to

discrimination on the bases of race and ethnicity.

67.    J&J determines the compensation of salaried employees, including base salaries, merit increases, cash bonuses, stock awards, and stock options, employing a variety of factors, including salary band placement and performance ratings.  However, under this system, managers and supervisors are given ranges and targets, leaving the final numerical amounts to be determined subjectively within their discretion.

### 1.    *Entry Level Salary Bias*

68.    J&J utilizes market pricing to establish the base salaries of its employees. The two key components of J&J's market pricing system are benchmarks and market data.

69.    Benchmarks are positions at outside companies that are similar to positions at J&J.  J&J collects market data on salaries paid for benchmark positions.  The result is a distribution of salaries paid to each of the positions across competitor companies.  J&J develops market data which reflects 80% of salaries paid for a benchmark – from the 10th percentile to the 90th percentile of the distribution.  While these percentiles are not necessarily minimum or maximum salaries, they serve as guideposts for setting salaries at J&J.  They provide managers with an extremely broad range of guidelines to follow in making compensation decisions which encourages disparate compensation of employees with the same title/job description.

70.    When an employee is first hired by the Company, J&J allows its managers to use their "sound judgment" to approximate what position in the market data is appropriate for each employee's salary.  Unfortunately, these approximations are made with inadequate written guidelines and very little oversight, which works to the detriment

31

of newly-hired African-American and Hispanic-American employees who often find their objective qualifications overlooked or undervalued by subjective determinations. For example, one African-American employee was hired as a Scientific Information Analyst at a J&J subsidiary in or about 1998. A few weeks after the employee started to work, her Caucasian manager downgraded her title which positioned her starting salary lower in the market data. The employee later learned from her colleagues, all of whom were white, that her starting salary was considerably low for someone with her level of education and experience.

71.    The result of this discriminatory process is that African-American and Hispanic-American employees are often awarded lower starting salaries than white employees with similar levels of education and work experience. Unfortunately, things do not get any better for African-Americans and Hispanic-Americans as they move "up the ladder" and have their entry level salaries adjusted. Because managers are given too much discretion without adequate guidelines or oversight, their salaries are still often positioned too low within the market data.

72.    In essence, Caucasian employees are given a "head start" with respect to salaries, and J&J's African-American and Hispanic-American employees are left to play a never-ending game of catch up.

### 2.    *Merit Increases, Cash Bonuses, Stock Awards, and Stock Options*

73.    According to company documents, for purposes of awarding compensation, J&J assigns its salaried employees to one of nine salary bands – A, B, and I through VII; A being the lowest salary band and VII being the highest salary band. Salary

32

bands A and B cover office and professional employees. Band I and above are reserved for managers and those employees on approved technical career ladders.

74.      An employee's eligibility for a merit increase as well as a cash bonus is determined by his or her performance rating. Employees with performance ratings below "Competent" (i.e., 2.6) are not eligible for either a merit increase or a cash bonus.

75.      Eligibility for stock awards and stock options (i.e., executive compensation) is determined by performance rating and salary band placement. According to Company documents, employees with salaries in Band I and above ($64,000 and above) and performance ratings above "Competent" are automatically eligible for stock awards.   Employees with salaries in Band II and above ($80,000 and above) and performance ratings above "Competent" are automatically eligible for stock options.

76.      Each component of J&J's compensation system is centered around the Company's flawed and unduly subjective performance rating system. As discussed more fully above, the inconsistency and excessive subjectivity of the performance rating system results in African-American and Hispanic-American employees receiving lower performance ratings than Caucasian employees. Consequently, African-Americans and Hispanic-Americans are often not even eligible to receive many of the compensation benefits awarded to Caucasian employees.

77.      Moreover, under the Company's guidelines relating to each component of the compensation system (except for stock options), managers are allowed to choose what percentage increase, out of a range of increases that correspond to particular performance ratings, an employee will receive.   For example, for Year 2000, with respect to stock

awards for employees in Salary Bands IV and V ($113,000 - $164,999), guidelines provide that managers should award stocks in the range of 5 - 9%. Thus, by controlling the actual percentages awarded, even when African-American and Hispanic-American employees do meet the eligibility requirements for additional compensation, a predominantly white senior management staff has the ability to reward similarly-situated Caucasian employees more handsomely. These decisions relating to increases are guided by inadequate written criteria and made without adequate oversight.

78. J&J also allow managers to recommend that certain employees who do not meet the requisite salary levels (i.e., do not have salaries within Band I or II) receive stock awards and stock options not otherwise available to them. However, this recommendation is guided by inadequate written criteria and is at the sole discretion of the employee's immediate supervisor.

### 3.   *This Discriminatory System Penalizes the Named Plaintiffs*

79. Named Plaintiff Nilda Gutierrez was grossly underpaid for her work at J&J because of her race, earning tens of thousands less than Caucasian employees in comparable positions. Gutierrez's final salary was approximately $41,400, an increase of only $1400 over a four year period. Meanwhile, Richard Martemucci, a white male recruiter who was no more qualified than Gutierrez, had his salary increase almost $20,000 over a four year period. Similarly, Lisa Trainer Bottin, a white female recruiter who was no more qualified than Gutierrez, received salary increases of approximately $42,000 over a four year period.

80. Until 1999, Gutierrez had always received a performance rating of at least

34

"Competent." In 1999 and 2000, Gutierrez's manager gave her a rating of "Competent," only to have the Caucasian Vice President of Recruiting lower the rating to "Needs Improvement." Consequently, Gutierrez was prevented from receiving a merit increase or cash bonus either year. Gutierrez also did not receive a merit increase or cash bonus in 2001.

81.     Beginning with his initial salary and continuing throughout his employment with named Plaintiff Courtney Jenkins was also grossly underpaid for his work at J&J, earning thousands less than Caucasian employees in comparable positions. J&J even paid Jenkins less than Caucasian employees whom he had trained.

82.     Jenkins' 2001 performance review noted that he was "instrumental in keeping the workflow going smoothly by prioritizing work requirements and providing guidance to analysts with less experience." It also clearly stated that "[w]ithout Courtney's willingness to go above and beyond the regular assigned work schedule, the [department] would not have met all of its goals." During 2001, Jenkins also made numerous significant contributions on the testing and release of products. Nevertheless, Jenkins was one of the lowest paid employees in his department.

83.     In summary, the result of J&J's discriminatory compensation system is that African-American and Hispanic-American employees are paid lower than their white counterparts.

### C.    Defendant's Failure to Monitor Its Practices and to Prevent and Remedy Discrimination

84.     Upon information and belief, J&J has failed to monitor its compensation and promotion systems for discriminatory practices based on race and ethnicity.

35

Defendant J&J maintains a pattern and practice of allowing supervisors to discriminate against African-American and Hispanic-American salaried employees in the terms and conditions of employment, and the Company fails to respond to complaints of unequal treatment, and fails to provide sufficient oversight or training of supervisors. J&J has not taken appropriate steps to ensure the effective and consistent implementation of nondiscriminatory employment and human resources practices.

85.     J&J has failed to place a premium on compliance with federal Equal Employment Opportunity ("EEO") requirements. For example, there is inadequate EEO training for supervisors. Thus, the current discriminatory practices are likely to continue into the future.

86.     J&J's practices and procedures for handling complaints of discrimination do not adequately ensure that complaints are investigated fairly, that prompt remedial action is taken in response to discrimination, that incidents of discrimination are prevented, and that all managers and supervisors are aware that discrimination based on race and ethnicity is taken seriously at all levels of the Company.

87.     J&J fails to provide sufficient monitoring, training, oversight or accountability to ensure that employees are treated in a nondiscriminatory manner in terms of initial hiring rates, promotions, and compensation and other conditions of employment.

88.     J&J's Board of Directors has also failed to require proper reporting on equal opportunity matters, such as pay equity, stock option equity, and glass ceiling data, from senior management. Moreover, the Board has failed to firmly link senior management compensation with equal opportunity performance.

36

## VI.  ALLEGATIONS OF THE INDIVIDUAL NAMED PLAINTIFFS

### A. Linda Morgan's Individual Claim

89.    Linda Morgan is a current African-American employee at Ethicon, a J&J subsidiary located in Somerville, New Jersey. She has worked for J&J her entire career, starting in 1979 as an engineering co-op student. Despite her loyalty to the Company, her willingness to relocate and broaden her skill base, her extensive education and experience, and her consistently positive performance ratings, because of her race, Morgan has been consistently denied promotional opportunities given to her Caucasian counterparts. In fact, Morgan has not received a promotion in ten years.

90.    Morgan earned her Bachelor of Science degree in Industrial Engineering from the New Jersey Institute of Technology (1982). Shortly thereafter, Morgan was hired as an industrial engineer at Ortho-Diagnostic Systems, a J&J subsidiary located in Raritan, New Jersey. In 1985, Morgan transferred to Ethicon, and has worked her way up to manager in various departments including engineering, manufacturing, materials management and purchasing.

91.    In 1987 and 1988, Morgan's outstanding work earned her the Corporate Quality Award for improvements in needle quality and the Vice President of Engineering Award for developing a computer model that analyzed projects. Morgan also received the New Jersey Black Achiever's Award for her work accomplishments and community activities and the YWCA Tribute to Women and Industry Award.

92.    To further advance within the Company, in October 1995, Morgan relocated to Ethicon's plant in Cornelia, Georgia. After gaining new skills and learning more about J&J's operations, Morgan returned to Ethicon's Somerville location in November

37

1996.    Despite her efforts, Morgan did not receive a promotion upon her return.

93.    In her present managerial position, Morgan formerly reported to the African-American Director of Purchasing, Transportation and Distribution.  In December 2000, the Director informed Morgan that he would be retiring in February 2001.  Morgan informed him that she was interested in filling his position.

94.    The Director of Materials Handling in Ethicon Operations, and the Vice President of Ethicon Operations, both Caucasian males, were in charge of hiring a new Director of Purchasing, Transportation and Distribution.  In January 2001, the former Director informed Morgan that a "short list" of five candidates, all of whom were white, had been selected to be interviewed to replace him and that she was not on the list.  Morgan, however, was "selected" to fill the position on an interim basis until a Caucasian male from the "short list" was selected in March 2001.

95.    Morgan clearly had equivalent or superior qualifications to the five white candidates -- four men and one woman -- who were considered for the position.   Of the candidates, one had no experience in purchasing; one had not been employed by J&J as long as Morgan; two were employed at other J&J subsidiaries and thus were not familiar with Ethicon's operations; and one only had one year of managerial experience.  Nevertheless, despite her strong qualifications and unambiguous statement of interest in the position, because of her race, Morgan did not even receive an interview and a Caucasian male from the "short list" was selected instead.

96.    In either June or July of 2001, Morgan learned that there was a vacancy in the position of Director of Operations in the Wound Management division of Ethicon.  Morgan notified her supervisor, a white male, of her desire to be considered for that Director

38

position. From prior experience, she knew that J&J fills positions such as the J&J Wound Management operations director, through an informal process rather than an open competitive process. By notifying her supervisor of her interest in the director opening, Morgan notified J&J of her wish to be considered for this open director position and other similar openings on that level. Morgan's supervisor was aware of the position opening and told her that the director position was going to be reclassified as a vice president level position and that she would not be qualified for the higher vice president position. In July, 2001, the Company filled the J&J Wound Management position with a white female. On or about September, 30, 2001, J&J promoted the white female, recently promoted to J&J Wound Management Director of Operations, to Vice President at Wound Management, leaving the Director of Operations position open again. On or about October 15, 2001, the Company filled the vacated Wound Management Director of Operations position with a white male. In spite of Morgan's expressed interest in this director position, neither her supervisor nor anyone else at J&J notified her of the opportunity. Upon information and belief, this promotional opportunity was never posted. Morgan is as qualified, if not more so, for the J&J Wound Management Director of Operations position as the white man that J&J promoted into that position.

97.     Morgan was also denied a promotion to a separate Director of Operations position at Ethicon. On or about September 24, 2001, or sometime shortly thereafter, Morgan learned that J&J had filled the position of Director of Operations for Gynecare, a division of Ethicon, Inc. The position, which is located in New Jersey, was filled by a white male. Despite her expressed interest in a director level position, neither her supervisor nor anyone else at J&J notified her of the opportunity to be considered for or bid on this Director

39

of Operations position at Gynecare. Upon information and belief, this position was not posted, and Morgan was not considered for this position. Morgan, however, is as qualified, if not more so, for this Director of Operations position in Gynecare as the white male that the Company promoted into the position.

98.     As a result of J&J's decisions to promote white males into the Director of Operations positions, Morgan was denied promotional opportunities for which she was well-qualified. She has sought a promotion to a director level position for many years and has expressed this aspiration in her career development plan. Johnson & Johnson knew or should have known of her interest in and her qualifications for the Director of Operations positions. By denying Morgan the promotions to both of the Director of Operations positions and to the Director of Purchasing position, J&J has acted consistently with its discriminatory pattern and practice regarding promotions, one that lacks formal notification of openings and open competitive selection.

### B.    Nilda Gutierrez's Individual Claim

99.     Nilda Gutierrez is a former Hispanic-American employee of J&J, where she worked for over four years as a Recruiting Consultant at J&J Recruiting and earned awards for her commitment to diversity. Gutierrez has an Associate's degree in Management from Middlesex County College (1994) and a Bachelor of Science degree in Industrial Relations from Douglas College (1997).

100.   Gutierrez has over seven years of experience with J&J. Gutierrez was first hired by J&J as an intern/co-operative education student in 1994. Her first regular full-time position came in 1997 when she was hired as a Recruiting Consultant. Before becoming employed at J&J, Gutierrez spent several years working in the Human Resources department of a bank.

101.   Gutierrez was grossly underpaid for her work at J&J, earning tens of thousands less than Caucasian employees in comparable positions.  Her hiring manager, a white male, attempted to award Gutierrez a starting salary of $38,000.  She negotiated and received $40,000.

102.   Gutierrez's entry-level salary adversely affected all subsequent levels of her compensation, because potential pay increases were calculated from a lower base salary, and because over time, her lower starting point caused her to fall further and further behind comparable white employees, continuing and compounding her losses. At the time of her departure, Gutierrez's salary was approximately $41,400, an increase of only $1,400 over a four year period.

103.   In contrast, in 1999, Richard Martemucci, a white male recruiter who was no more qualified than Gutierrez, earned $52,000.  Over a four year period, Martemucci saw his salary increase almost $20,000.  Lisa Trainer Bottin, a white female recruiter who was no more qualified than Gutierrez, earned approximately $65,000 in 1999.  Bottin's salary increased approximately $42,000 over a four year period.  Both Martemucci and Trainer, as well as several other of Gutierrez's white colleagues in the Recruiting department, have since received promotions.  Gutierrez, on the other hand, remained in the same position since 1997.

104.   Until 1999, Gutierrez had always received "Competent" ratings.  In 1999, when Gutierrez had her performance review with her manager, she was informed that her rating would be "Competent."  Subsequently, however, the manager lowered Gutierrez's rating to "Needs Improvement."  Upon information and belief, Jeanne Hamway, a white female and then Vice President of Recruiting, forced the manager, who was undoubtedly the person best able to assess Gutierrez's performance, to lower Gutierrez's rating, as well

41

as the rating of the only other minority employee in the department.  Moreover, upon information and belief, Hamway instructed the manager to fire Gutierrez and the other minority employee, which the manager declined to do.  Because Gutierrez's manager was forced to lower her rating to "Needs Improvement," Gutierrez was not eligible for a merit increase or cash bonus in 1999.

105.   On or about July 1, 1999, Gutierrez met with Russ Deyo, Vice President of Administration.  During the meeting, Gutierrez conveyed to Deyo that she was being treated unfairly.  Deyo promised to look into the situation and to get back to her within a few weeks, but he failed to do so.

106.   In 2000, Gutierrez met with the same manager and was again informed that she would receive a "Competent" rating.  However, once again, the manager was overruled by Hamway, and Gutierrez's rating was lowered to "Needs Improvement," a rating which did not fairly reflect her performance.  Accordingly, Gutierrez was again denied a merit increase and cash bonus.

107.   In early 2001, Gutierrez was placed on a Performance Improvement Plan ("PIP"), ostensibly to provide her with ongoing direction and feedback.  Upon information and belief, the PIP process has become a highly subjective and discriminatory method of terminating disfavored employees.

108.   While involved in the PIP process, Gutierrez was assigned a "Coach" to "help" improve her ratings.  Gutierrez's "Coach", Kevin Slater, informed her on more than one occasion that her performance was not an issue, that she was a very competent employee, and that he realized she was working in an extremely hostile environment.

109.   According to the Company's standard practice, annual salary increases go into effect on the employee's anniversary of his or her hire date.  J&J instructs its managers

to consider a number of factors in determining whether to increase an employee's salary, including internal equity (i.e., where an employee is paid significantly more or less than peers with comparable backgrounds, experience, performance, and time in position). Gutierrez's anniversary date was August 4th, and she did not receive any increase in salary at that time although she was being grossly underpaid in comparison to her Caucasian peers who were no more qualified than she was. By failing to increase Gutierrez's salary, J&J failed to remedy the inequity in her salary as well as the accumulated past inequity in pay since her initial hire.

110. On September 21, 2001, Hamway met with Gutierrez about her continued employment with J&J. Hamway presented Gutierrez with two options: (1) remain on the PIP until the end of the year and continue working with her "Coach" to obtain a competent level; or (2) be reassigned to the Corporate Career Center to search for another suitable position either within or outside the J&J Family of Companies. In an attempt to avoid continued discrimination against her in the Recruiting division, Gutierrez elected option 2 and ended her employment at J&J Recruiting.

111. In December of 2001, J&J awarded year-end bonuses to its employees. Although this was another opportunity for J&J to remedy its discriminatory conduct with respect to Gutierrez's compensation, it did not give Gutierrez a bonus.

112. On January 4, 2002, Michael Carey, J&J's Vice President of Human Resources, informed Gutierrez by letter that he was extending her assignment at the Corporate Career Center and that she would remain on payroll. Carey's letter represents another instance where Gutierrez's compensation was at issue, and the Company chose to maintain her salary at its unduly low and discriminatory level.

113. On March 18, 2002, Gutierrez resigned from J&J.

43

C. Courtney Jenkins' Individual Claim

114. Courtney Jenkins is a former J&J employee who worked at Noramco, a J&J operating company located in Athens, Georgia. He worked at Johnson & Johnson for over two and one half years. Despite having outstanding qualifications and experience, receiving consistently positive performance ratings, going above and beyond his required job duties, and being described by his supervisor as "the strongest member of our team," Jenkins was consistently denied promotional opportunities given to his white counterparts and was paid less than white employees in comparable positions.

115. Jenkins earned both a B.S. in Chemistry and a B.A. in History from Tufts University in 1992. Subsequently, he spent three years at the University of Cincinnati's Medical School.

116. From January 1997 to August 1997, Jenkins worked as an Analytical Chemist at Proctor & Gamble's Winton Hill International Building in Cincinnati, Ohio. In that position, he worked on formulating a new floor cleaner, a new stripper, a high-gloss finish, and a multi-purpose glass cleaner. He also performed analytical tests and recorded analytical data.

117. From September 1997 to August 1998, Jenkins worked as an Analytical Chemist at Proctor & Gamble's Sharon Woods Technical Center in Cincinnati, Ohio. In that position, he used Isocratic and Reverse Phase High Performance Light Chromatography ("HPLC") procedures in the testing of components of various Proctor & Gamble skin care products. He also used Hewlett-Packard Gas Chromatography ("GC") techniques involving the testing of absolute ethanol in Proctor & Gamble skin care products.

118. From August 1998 to April 1999, Jenkins worked as an Analytical Chemist at Environmental Chemical Corporation in Cincinnati, Ohio. In that position, he used

Waters' Isocratic HPLC to analyze water and soil samples.

119.   In late 1998, Jenkins' wife relocated to Atlanta, Georgia. He followed her to Atlanta in April 1999. Shortly thereafter, Jenkins was hired, through Kelly Scientific Services ("Kelly"), a temporary agency, to work on a temporary basis as a Quality Control Analyst at Noramco.

120.   Jenkins' starting salary was $15.50 per hour. Chris Laskey, a white co-worker who was also hired through Kelly two months prior to Jenkins and who was no more qualified than Jenkins, told Jenkins that he was hired at a rate of $16.83 per hour. Jenkins also saw a report from Human Resources that indicated he was being paid less than several white co-workers who were no more qualified than he was.

121.   In October 1999, four positions that were being filled on a temporary basis by Jenkins and three white co-workers were made permanent. Each person had to re-interview for the open positions, and the three white workers were immediately hired on a full-time basis.

122.   Jenkins, however, was forced to continue working on a temporary basis. The Quality Control Manager, James Pirkle, a white male, told Jenkins that he would keep the last position open until January 2000 to see how he performed. This decision was made despite Jenkins' performing satisfactorily and at the expected level. Indeed, while he was working on a temporary basis, Jenkins, on his own initiative, conducted a study on the effectiveness of the lab's testing of glycolide. Jenkins' findings led to the Company changing the way it tested glycolide. Moreover, Jenkins clearly had equivalent or superior qualifications to the three white employees who were hired. For example, one had only an associate's degree in chemistry, one had a degree in biology, and the other had a degree in zoology with only a minor in chemistry. When Jenkins asked Pirkle why his co-workers

obtained permanent status while he was forced to continue working on a temporary basis, Pirkle told Jenkins that he wanted to make sure Jenkins was the right person for the job. Pirkle also told Jenkins that he needed to concentrate on his own situation.

123.   In December 1999, all permanent employees received bonuses of $1000. Because Jenkins was forced to continue working on a temporary basis, he only received a $200 gift certificate to a local grocery store and a $200 gift certificate to a local mall.

124.   In January 2000, Jenkins was officially hired on a full-time basis as a Quality Control Analyst.  His starting salary was approximately $31,900 per year.  At the time Jenkins was hired, there were eight other people in the lab, all of who were white.  Through conversations with his white co-workers, Jenkins soon discovered that his salary was considerably less than theirs, even though he had equivalent or superior qualifications.

125.   In September 2000, Laskey, the white male who was hired as a temporary employee at approximately the same time as Jenkins, was promoted to the position of Technical Facilitator.  Jenkins was at least as qualified as Laskey for the position, if not more so.  However, Jenkins was not even allowed to interview for the position.   Upon information and belief, the position was not posted.

126.   In September 2000, Carolyn Nemeth, a white female, was promoted to Quality Control supervisor.  Jenkins was at least as qualified as Nemeth for the position, if not more so.  However, Jenkins was not even allowed to interview for the position.  Upon information and belief, the position was not posted.

127.   In October 2000, Jenkins was praised during a Quality Control staff meeting for having led all analysts in the amount of product tested in the lab.  Jenkins also had a high Right First Time (the percentage of times his analysis of a substance was accurate the first time which saves the Company time and money) number of 96%.

128.   In January 2001, Jenkins received his first pay raise, bringing his salary to $32,900. At this time, Jenkins was apparently still the lowest paid employee in the lab, earning thousands less than his white co-workers. For example, two white employees who Jenkins helped to train, Dennis Salatiello and Susan Busby, informed him that their annual salaries were approximately $36,000 and $37,000, respectively.

129.   In February 2001, the Quality Control Division was reorganized, creating four different positions in the lab: Analyst I, Analyst II, Chemist, and Technical Facilitator. Jenkins was given the title of Chemist, which had a salary range from $34,000 to $53,000. Despite having worked at Johnson & Johnson for almost two years, having nearly three years experience as an analytical chemist prior to his arrival at Johnson & Johnson, and making significant contributions to the Company, Jenkins' initial salary was set at $34,900—a mere $900 more than the minimum. Jenkins' initial salary was significantly less than the salaries of white Chemists, and in fact was also less than that of many white employees who were Analysts. For example, Shannon Garrett, a white female Chemist who was no more qualified than Jenkins, was awarded a salary of $48,000. Similarly, Dennis Salatiello, a white male who Jenkins helped to train, was given the title Analyst II and a salary of $39,000.

130.   In February 2001, Jenkins was praised again during a Quality Control staff meeting for having led all analysts in the amount of product tested in the lab. However, despite his strong performance, Jenkins still received neither a promotion nor a pay raise.

131.   In March 2001, a supervisory position came open, and it was given to Laskey. Jenkins was at least as qualified as Laskey for the position, if not more so. However, Jenkins was not even allowed to interview for the position. Upon information and belief, the position was not posted. In addition, Art Law, a white male, was hired into

47

the department as a Technical Facilitator at this same time. Jenkins was at least as qualified as Law for the position, if not more so. However, Jenkins was not even allowed to interview for the position.   Upon information and belief, the position was not posted.

132.   At this time, Jenkins asked Pirkle, the Quality Control Manager, for a raise in salary to $44,000.00.  Pirkle agreed to a salary increase to approximately $36,000 and promised to give Jenkins more raises in three-month increments.  Despite this promise, Jenkins never received another raise while he was employed by J&J.

133.   In May 2001, because of Jenkins' experience and strong performance level, he was selected to be an official trainer on all systems and techniques in the lab although he had not yet attended the Johnson & Johnson Analyst Training and Certification Program.

134.   In July 2001, Jenkins received an outstanding evaluation by his supervisor, Carolyn Nemeth.  In that evaluation, Nemeth indicated that Jenkins was "clearly the strongest member of our team" and would make a very good supervisor.

135.   In September 2001, Nemeth left Jenkins' department creating a supervisory opening.  Since that time, the position has been filled by two different white employees, one from outside the Company and one from inside (Art Law). Jenkins was at least as qualified as both of the white employees for the position, if not more so.  However, Jenkins was not even allowed to interview for the position.   Upon information and belief, the position was not posted on either occasion.

136.   In December 2001, a supervisory position came open, and Lee Feldman, a white male was hired from outside the Company to fill the position.  Upon information and belief, the position was not posted, and Jenkins was not allowed to interview for the position.  Feldman was no more qualified for the position than Jenkins.

137.   At this time, Jenkins spoke to Pirkle about being promoted to a supervisory

position. Pirkle informed Jenkins that he was actually in the process of being promoted to supervisor on second shift pending approval from the Human Resources Department.

138.   After waiting several weeks and not having heard anything more about this promotion, Jenkins again spoke with Pirkle. At this time, Pirkle informed Jenkins that he would not be promoted and would instead be moved to first shift to help out Feldman, the new supervisor. Pirkle also told Jenkins that he would not be promoted because he did not know what kind of work Jenkins did, despite the fact that he was the Quality Control Manager for the entire time Jenkins had been employed by J&J and had signed all of Jenkins' performance evaluations.

139.   Jenkins' 2001 performance review noted that he was "instrumental in keeping the workflow going smoothly by prioritizing work requirements and providing guidance to analysts with less experience." It also clearly stated that "[w]ithout Courtney's willingness to go above and beyond the regular assigned work schedule, the [department] would not have met all of its goals." During 2001, Jenkins also made numerous significant contributions on the testing and release of products. For example, Jenkins updated the way his department used the melting range instrument and trained the entire lab on the new method.   He also worked to strengthen test methods in regards to glycolic acid. Nevertheless, he was consistently denied promotions to positions for which he was qualified and which went instead to white employees.

140.   Jenkins resigned on or about January 21, 2002. During his exit interview, Jenkins asked the Human Resources representative about the promotional opportunity Pirkle had informed him about in December 2001. The representative told Jenkins that Pirkle had never mentioned anything whatsoever about him receiving a promotion.

49

## COUNT ONE: INTENTIONAL DISCRIMINATION AGAINST THE NAMED PLAINTIFFS AND THE CLASS IN VIOLATION OF SECTION 1981

141.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein in full.

142.   Defendant has intentionally discriminated against Plaintiffs and the Class in violation of Section 1981 by a pattern and practice of (1) compensating African-American and Hispanic-American salaried employees less than comparable Caucasian employees; and (2) denying promotions and other career advancement to qualified African-American and Hispanic-American salaried employees on the bases of race and ethnicity.

## COUNT TWO: INTENTIONAL DISCRIMINATION AGAINST THE NAMED PLAINTIFFS AND THE CLASS IN VIOLATION OF TITLE VII

143.   Plaintiffs repeat and re-allege each and every allegation above as if set forth herein in full.

144.   Plaintiffs Morgan and Gutierrez have timely filed charges with the EEOC making claims of classwide discrimination in compensation and promotions, and bringing individual claims.  Both Morgan and Gutierrez have received their Right-to-Sue notices on their charges.  These two plaintiffs have exhausted all administrative remedies on their behalf and on behalf of the other plaintiffs in this action and the class.

145.   Defendant has intentionally discriminated against Plaintiffs and the Class in violation of Title VII by a pattern and practice of (1) compensating African-American and Hispanic-American salaried employees less than comparable Caucasian employees; and (2) denying promotions and other career advancement to qualified African-American and Hispanic-American salaried employees on the bases of race and ethnicity.

50

**COUNT THREE:  INTENTIONAL DISCRIMINATION AGAINST THE NAMED
PLAINTIFFS AND THE CLASS IN VIOLATION OF N.J. STAT. § 10:5-1 et. seq.**

146.    Plaintiffs repeat and re-allege each and every allegation above as if set forth herein in full.

147.    Defendant has intentionally discriminated against Plaintiffs and the Class in violation of the New Jersey Law Against Discrimination, N.J. Stat. §10:5-1 et seq. by a pattern and practice of (1) compensating African-American and Hispanic-American salaried employees less than comparable Caucasian employees; and (2) denying promotions and other career advancement to qualified African-American and Hispanic-American salaried employees on the bases of race and ethnicity.

**COUNT FOUR:  RACIALLY DISPARATE IMPACT
IN VIOLATION OF TITLE VII**

148.    Plaintiffs repeat and re-allege each and every allegation above as if set forth herein in full.

149.    Defendant's policies and practices for determining compensation, including the use of Defendant's performance rating system as a basis for determining compensation and reliance on excessively subjective determinations, have a disparate and discriminatory impact on African-American and Hispanic-American salaried employees in violation of Title VII.

150.    Defendant's policies and practices for determining promotions and other career advancement, including the use of Defendant's performance rating system and Succession Planning Process as bases for determining advancement and reliance on excessively subjective determinations, have a disparate and discriminatory impact on African-American and Hispanic-American salaried employees in violation of Title VII.

## COUNT FIVE:   RACIALLY DISPARATE IMPACT
## IN VIOLATION OF N.J. STAT. § 10:5-1 et seq.

151.    Plaintiffs repeat and re-allege each and every allegation above as if set forth herein in full.

152.    Defendant's policies and practices for determining compensation, including the use of Defendant's performance rating system as a basis for determining compensation and reliance on excessively subjective determinations, have a disparate and discriminatory impact on African-American and Hispanic-American salaried employees in violation of the New Jersey Law Against Discrimination, N.J.Stat. §10:5-1, et seq.

153.    Defendant's policies and practices for determining promotions and other career advancement, including the use of Defendant's performance rating system and Succession Planning Process as bases for determining advancement and reliance on excessively subjective determinations, have a disparate and discriminatory impact on African-American and Hispanic-American salaried employees in violation of the New Jersey Law Against Discrimination, N.J.Stat. §10:5-1, et seq.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully request that this Court grant the following relief:

1.    Certify this case as a class action;

2.    Enter a judgment that Defendant's acts and practices as set forth herein are in violation of the laws of the United States and the State of New Jersey;

3.    Enter preliminary and permanent relief enjoining the discriminatory conduct necessary to end Defendant's discriminatory practices and prevent current and future harm to Plaintiffs and the Class;

4. Award Plaintiffs and the Class lost wages, including back pay, front pay and lost fringe benefits, and including, without limitation, any lost benefits that would otherwise have been included in the 401(k) pension plans of Plaintiffs and the class, which resulted from the discrimination;

5. Award Plaintiffs and the Class compensatory and punitive damages;

6. Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees;

7. Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues of fact and damages in this action.

Dated: May 24, 2002                    RESPECTFULLY SUBMITTED,

_____
Bennet D. Zurofsky (BZ/2005)
Reitman Parsonnet, PC
744 Broad Street, Suite 1807
Newark, NJ 07102
(973) 642-0885


_____
Cyrus Mehri (CM/3465)
Pamela Coukos (PC 4265)
Jeffery Whitney (JW 2470)
Mehri & Skalet, PLLC
1300 19th Street, N.W., Suite 400
Washington, DC  20036
(202) 822-5100

53

*Johnnie L. Cochran, Jr. /BPZ*

Johnnie L. Cochran, Jr. (JC 4361)
Keith Givens (KG 5867)
Cameron Stewart (CS 7221)
The Cochran Firm
Woolworth Building
223 Broadway
New York, NY 10279-0003
(212) 553-9000


*Bruce Ludwig /BPZ*

Bruce Ludwig (BL 4981)
Jonathan Shub (JB 2287)
Scott Johnson (SJ 7519)
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300