# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

--------------------------------------------------------X

Nilda GUTIERREZ, Linda MORGAN,
Wayne BROWN* and Krista MARSHALL*

    *Individually and as
    Class Representatives,*

    Plaintiffs,

        v.

JOHNSON & JOHNSON,

    Defendant.

--------------------------------------------------------X

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 01-5302
(WHW)

## PLAINTIFFS' BRIEF IN SUPPORT OF
## MOTION FOR CLASS CERTIFICATION

Cyrus Mehri  (CM 3465)
Pamela Coukos (PC 4265)
N. Jeremi Duru (NJD 7630)
Nicole Austin-Hillery (NAH 3784)
Mehri & Skalet, PLLC
1300 19th Street, NW, Suite 400
Washington, DC 20036
(202) 822-5100

Bennet D. Zurofsky (BZ 2005)
Timothy McCarthy (TM 3946)
Reitman Parsonnet, PC
744 Broad Street, Suite 1807
Newark, NJ 07102
(973) 642-0885

Johnnie L. Cochran, Jr. (JC 4361)
Cameron Stewart (CS 7221)
The Cochran Firm
Woolworth Building
233 Broadway
New York, New York 10279-0003
(212) 553-9000

Bruce Ludwig (BL 4981)
Scott George (SG 0897)
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300

*Counsel for Plaintiffs and the Putative Class*

* Motion for Leave to Amend Complaint (adding Plaintiffs Brown and
Marshall) pending.

## TABLE OF AUTHORITIES

**Cases**

*Adames v. Mitsubishi Bank, Ltd.*, 133 F.R.D. 82 (E.D.N.Y. 1989) ........................ 59

*Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469 (7th Cir. 2004) ................ 66, 67

*Allison v. Citgo*, 151 F.3d 402 (5th Cir. 1998) ........................................................ 68

*Amchem Prods., Inc v. Windsor*, 521 U.S. 591 (1997) ........................................... 59

*Anderson v. Zubieta*, 180 F.3d 329 (D.C. Cir. 1999) ............................................... 34

*Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994) .............................................. 8, 9, 54

*Barabin v. Aramark*, No. 02-8057, 2003 WL 355417 (3d Cir. Jan. 24, 2003) ....... 68

*Barefield v. Chevron*, 1988 WL 188433 (N.D. Cal. 1988) ..................................... 61

*Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3rd Cir. 1977) ..................................... 66

*Brotherhood Ry. Carmen of U.S. and Canada v. Delpro Co.*, 98 F.R.D. 471 (D.

   Del. 1983) ......................................................................................................... 59, 61

*Caridad v. Metro North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ............ 15, 40

*Castanada v. Partida*, 430 U.S. 482 (1977) ............................................................. 34

*Chiang v. Veneman*, 213 F.R.D. 256 (D.V.I. 2003) .......................................... 63, 64

*Chiang v. Veneman*, No. 03-3488 (3d Cir., Sept. 20, 2004) ............................ passim

*Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867 (1984) ........................... 53

*Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326 (1980) ...................................... 64

*Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004) ................. passim

*Duncan v. State of Tennessee*, 84 F.R.D. 21 (M.D. Tenn. 1979)..............................59

*EEOC v. Am. Nat'l Bank*, 652 F.2d 1176 (4th Cir. 1981).......................................34

*EEOC v. Dial Corp.*, 156 F. Supp. 2d 926 (N.D. Ill. 2001)....................................67

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)...................................................3

*Eubanks v. Billington*, 110 F.3d 87 (D.C. Cir. 1997).........................................65, 66

*Fine v. Ryan*, 305 F.3d 746 (7th Cir. 2002) ..............................................................60

*Gagliardo v. Connaught Laboratories*, 311 F.3d 565 (3d Cir. 2002)....................60

*Gavalik v. Continental Can Co.*, 812 F.2d 834 (3d Cir. 1987)...............................53

*Green v. USX Corp.*, 843 F.2d 1511 (3rd Cir. 1987) ..............................3, 15, 16, 54

*Green v. USX Corp.*, 896 F.2d 801 (3d Cir. 1990)....................................................3

*Gunter v. Ridgewood Energy Corp.*, 164 F.R.D. 391 (D.N.J. 1996)......................54

*Hassine v. Jeffes*, 846 F.2d 169 (3d Cir. 1988).....................................................9, 56

*Hazelwood Sch. Dist. v. United States*, 433 U.S. 299 (1977) .................................33

*Hilao v. Marcos*, 103 F.3d 767 (9th Cir. 1996).......................................................60

*Holmes v. Continental Can*, 706 F.2d 1144 (11th Cir. 1983) ................................65

*Hunter v. City of Philadelphia*, 1999 WL 181388 (E.D. Pa. 1999).......................59

*Ingram v. The Coca-Cola Company*, 200 F.R.D. 685 (N.D. Ga. 2001) .................15

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)..................52, 53, 63

*In Re School Asbestos Litig.*, 789 F.2d 996 (3d Cir. 1986)....................................62

*James v. Stockham Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977)..............35

*Jarvaise v. Rand Corp.*, 212 F.R.D. 1 (D.D.C 2002) ................................................ 63

*Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894 (7th Cir. 1999) ........................ passim

*Jefferson v. Windy City Maintenance, Inc.*, 1998 WL 474115 (N.D. Ill. 1998) ..... 59

*Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468 (5th Cir. 1986) ............................... 60

*Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859 (11th Cir. 1986) ....................... 33, 34

*Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177 (10th Cir. 1999) ....................... 60

*Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999) ................................. 59, 60

*Kuenz v. Goodyear Tire and Rubber Co.*, 104 F.R.D. 474 (E.D. Mo. 1985) ......... 59

*Lanning v. S.E. Pa. Transp. Auth.*, 181 F.3d 478 (3d Cir. 1999) ..................... 51, 52

*Lemon v. Int'l Union of Operating Eng.*, 216 F.3d 577 (7th Cir. 2000) .......... passim

*Lincoln v. Case*, 340 F.3d 283 (5th Cir. 2003) ........................................................ 60

*Martens v. Smith Barney*, 181 F.R.D. 243 (S.D.N.Y. 1998) ................................... 63

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ......................................... 58, 65, 68

*Neal v. Dir., Dist. of Columbia Dept. of Corrections*, Civ. A. No. 93-2420 (RCL),

    1995 WL 517246 (D.D.C. Aug. 9, 1995) ............................................................ 54

*Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370 (N.D. Ill. 1997) ......... 59

*Palmer v. Combined Ins. Co.*, 217 F.R.D 430 (N.D. Ill. 2003) ............................... 61

*Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147 (2d Cir. 2001) ......... passim

*Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590 (2d Cir. 1986) ............................. 63

*Scott v. Aetna Services*, 210 F.R.D. 261 (D. Conn. 2002) ...................................... 64

*Shaw v. Toshiba*, 91 F. Supp 2d 942 (E.D. Tex. 2000)............................................64

*Shores v. Publix Supermarkets, Inc.*, No. 95-1162-CIV-T-25(E), 1996 WL 407850

    (M.D. Fla. Mar. 12, 1996) ...........................................................................15, 40

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001).....................................................8

*Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001).........................................60

*Taylor, et al., v. White, et al.*, 132 F.R.D. 636 (E.D. Pa. 1990) ...............................57

*Trout v. Garrett*, 780 F. Supp. 1396 (D.D.C. 1991)..................................................35

*U.S. v. Landsdowne Swim Club*, 713 F. Supp. 785 (E.D. Pa. 1989).......................34

*Vargas, et al., v. Calabrese, et al.*, 634 F.Supp. 910 (D.N.J. 1996) .......................57

*Wards Cove Packing v. Antonio*, 490 U.S. 642 (1989)................................................3

*Warnel v. Ford Motor Co.*, 189 F.R.D. 383 (N.D.Ill. 1999)....................................64

*Watson v. Fort Worth Bank & Trust*, 487 U.S 977 (1988) ..........................16, 51, 52

*Watson v. Shell Oil Co.*, 979 F.2d 1014 (5th Cir. 1992) ...........................................60

*Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239 (3rd Cir. 1975) ...........................59

*White v. Imperial Adjustment Corp.*, 2002 WL 1809084 (E.D. La. 2002).............61

*Wilson v. Tinicum Tp.*, No. Civ. A. 92-6617, 1993 WL 280205 (E.D. Pa. June 20,

    1993)..................................................................................................................57

*Wilson v. United Int'l Investigative Serv. 401(k) Sav. Plan*, 2002 WL 734339 (E.D.

    Pa. 2002).............................................................................................................64

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................ passim

Fed. R. Civ. Proc. (b) ............................................................................... passim

Fed. R. Civ. Proc. 23(g) ................................................................................... 57

**Other Authorities**

7A Charles A. Wright et al., *Federal Practice and Procedure* § 1778 at 529 (2d ed.

   1986) .......................................................................................................... 62

7A Charles A. Wright et al., Federal Practice and Procedure § 1778 at 534 (2d ed.

   1986) .......................................................................................................... 63

*Newberg on Class Action* § 24.117, at 24–385-86 (3d ed. 1992) ............................. 59

Fed. R. Civ. P. 23 Notes of the Advisory Committee to the 2003 Amendments,

   Subdivision (g) (West 2004) ........................................................................ 57

## INTRODUCTION

This case challenges Johnson & Johnson's reckless disregard for equal employment opportunity within its ranks. Plaintiffs submit that Johnson & Johnson[1] has systematically discriminated against African-American and Hispanic salaried workers in the United States through common employment policies and practices emanating from the top level of the corporation. Plaintiffs allege these policies result in widespread and readily apparent patterns of inequality. Because the evidence of the policies and their results involves common issues of fact and common questions of law, class certification is manifestly appropriate.

Throughout this litigation, defense counsel has promoted the myth that "Johnson & Johnson," a Fortune 50 company, listed as a single stock ("JNJ") on the stock exchange, and widely recognized and marketed as a unified brand name, is virtually a legal fiction. On the contrary, the Company operates for human resources purposes as a single integrated enterprise. This centralization of employment practices begins with its organization-wide Corporate Credo, continues through its public website touting the role of Corporate Human

---

[1] "Johnson & Johnson," as used in this brief, includes all United States business units and is variously referred to as "Defendant" or "the Company."

Resources in ensuring consistency across the organization,[2] and is further exemplified by its aptly named "Worldwide Policy Manual."[3]  The compensation and promotion policies at issue in this case are approved by the Company's top management, and apply to the entire U.S. workforce.

As set forth in Plaintiffs' original November 2001 complaint (and as the Company's own documents and witnesses now confirm in evidence described *infra*) these common policies as adopted by senior management specifically permit unmonitored managerial discretion to serve as a regular component of pay and promotion decisions.  Under Johnson & Johnson's companywide policy, subjective compensation practices authorize managers to reward favored employees without effective oversight or accountability measures.[4]  Promotions practices throughout the Company's United States operations allow managers virtually unfettered discretion in selecting which employees will advance, and which will languish, thereby denying many class members the opportunity to fairly compete for

---

[2] http://www.jnj.com/careers/worldwide.html (last visited Aug. 9, 2004)  (App. C, Vol. 1, Ex. 3) (hereinafter "Worldwide Headquarters' Role").

[3] Worldwide Policy Manual, 1995-2000 (JOHN0000055586-0000055837) (App. C, Vol. 1, Ex. 4) and Worldwide Policy Manual, 2002 (JOHN0000055838-0000056183) (App. C, Vol. 1, Ex. 5) (hereinafter "Worldwide Policy Manuals").

[4] *See, e.g.,* Complaint ¶¶ 64; 73 (App. C., Vol. 1, Ex. 1); *see infra* at 17-23.

2

advancement opportunities, or even to know opportunities exist.[5]  Excessively subjective systems increase the risk of biased outcomes.  *See Green v. USX Corp.*, 843 F.2d 1511, 1525 (3d Cir. 1988);[6] *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 149 (N.D. Cal. 2004) ("[C]ourts have long recognized that **the deliberate and routine use of excessive subjectivity** is an 'employment practice' that is **susceptible to being infected by discriminatory animus.**") (emphasis supplied). In this case, the unbridled managerial subjectivity enshrined by these policies have worked a real and substantial injury to the class.  Indeed, although at this point Plaintiffs are not required to show they would prevail on the merits, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974); *Chiang v. Veneman*, No. 03-3488 slip op. at 5 (3d Cir., Sept. 20, 2004) (copy attached as App. E), the proofs submitted with this motion strongly support Plaintiffs' claims of class-wide discrimination.

Based on a review of the Company's employee data, Plaintiffs' eminently qualified labor economist, Dr. Janice Madden of the University of Pennsylvania,

---

[5] *See, e.g., id.* ¶ 31; 43.  *See also infra* at 24-29.

[6] Although this opinion was vacated and remanded for further consideration in light of *Wards Cove Packing v. Antonio*, 490 U.S. 642 (1989), *see Green v. USX Corp.*, 896 F.2d 801, 803 (3d Cir. 1990), the Third Circuit reaffirmed the analysis relevant to this case, and specifically reinstated the portion of the prior opinion dealing with class certification.  *Green*, 896 F.2d at 807.

3

documents that African-American and Hispanic employees experience dramatic disparities in compensation as compared with similarly qualified Caucasian employees.[7] For example,

- African-American and Hispanic employees received lower salaries, on average, than comparably qualified Caucasians, **in every single year** from 1997 through 2003.[8]

- Controlling for type of job, education, experience and business unit the differences for African American exempt employees **exceeded seven to ten standard deviations** – a probability of **less than 26 in ten trillion** that the result is due to chance.[9]

- Controlling for type of job, education, experience and business unit, she found salary gaps for Hispanic exempt employees from 7.83% in 1997 to 4.22% in 2003. "The probability that an ethnically neutral process could have generated any of these differentials is **less than . . . 2 in 1,000,000,000,**" or **2 in 1 billion.**[10]

From 1997 through 2003, African Americans received 174 fewer promotions than a race-neutral model predicts. The probability a racially neutral promotion system generated this disparity is **41 in ten billion.**[11]

—————————————.

[7] Report of Janice Fanning Madden and Alexander Vekker (App. A) (hereinafter "Madden Rep.").

[8] Madden Rep. (App. A) and Tables 5a-18c.

[9] *Id.* at Column 5 of Tables 5b, 6b, 7b, 7c, 8b, 8c, 9b, 9c, 10b, 10e, 11b.

[10] *Id.* at 41 (emphasis supplied).

[11] *Id.* at 2 and Table 1.

4

Although Dr. Madden did not find a statistically significant pattern of discrimination in promotions against Hispanics, she documents that Johnson & Johnson hires African American and Hispanic class members at salaries and job levels below comparably qualified white peers, stunting their career opportunities. Indeed, "initial base salaries for African Americans and Hispanics were set 3.75% lower than those for white non-Hispanics hired in the same year and in the same business unit, and of the same age, education, and area of specialization. **The probability that this salary differential could have occurred by chance is substantially less than .0000000000026 or 26 in 10,000,000,000,000.**"[12]

Ironically, for decades Johnson & Johnson has, through its Corporate Credo, made a specific written commitment to every employee worldwide that the Company will provide "fair and adequate" compensation and "equal opportunity for employment, development and advancement for those qualified."[13] Despite this apparent nondiscrimination mandate, Defendant has **known for years** of the very issues raised in this lawsuit. For instance:

- In 1998, Vice President of Human Resources Michael Carey asked Marion HochbergSmith, the head of EEO for the Company, to

---

[12] *Id.* at 44-45 and Table 19a (emphasis supplied). All of these differences far exceed the two to three standard deviation level that establishes intentional discrimination. *See infra* at n. 95.

[13] Johnson & Johnson Corporate Credo (JOHN0000480943) (App. C., Vol. 1, Ex. 2) (hereinafter "Company Credo").

convene the Diversity Best Practices Task Force. Meeting minutes strikingly parallel the allegations made in this case, including a "[g]lass ceiling for Hispanic[s], African-Americans and Women."[14] Around that same time, HochbergSmith warned Carey of "problem areas" where "the company may be vulnerable" to a class action lawsuit.[15]

- The African American Leadership Council ("AALC") held meetings with Carey and Russ Deyo, the most senior officials with human resources authority in the corporation. In a July 2001, Power Point presentation to Deyo the AALC described African-American representation as "flat or down," ultimately making reference to a "brick ceiling" for African Americans.[16]

- The current CEO, Bill Weldon, admitted recently to a group of employees that with respect to diversity at Johnson & Johnson and promotions, "we're not doing well, not there yet."[17]

Company data shows zero or minimal representation of African Americans and Hispanics at the top levels of the corporation, and in the years prior to the lawsuit Johnson & Johnson was actually **going backwards** with respect to representation

---

[14] E-mail from Lupinski re: Best Practices Diversity Task Force Meeting (12/8/98) (JOHN0000348310-0000348320, at JOHN0000348312-0000348315) (App. C, Vol. 2, Ex. 6) (hereinafter "Lupinski E-mail") (emphasis supplied).

[15] Memorandum to Carey from HochbergSmith re: Equal Employment Enhanced Preparedness Recommendation (JOHN0000279917-0000279924) (App. C, Vol. 2, Ex. 7).

[16] *See* E-mail, Carey to HochbergSmith (7/17/01) (JOHN0000360715-0000360725, at JOHN0000360719-0000360720) (App. C, Vol. 2, Ex. 8).

[17] Declaration of Krista Marshall ¶¶ 4-5 (Aug. 10, 2004) (App. D, Ex. 3).

6

of African Americans and Hispanics in critical positions. [18] Senior management's reckless indifference to clear pay and promotion disparities has been matched by a willful refusal to critically examine Company policies that might be at fault. [19] (Notably, Johnson & Johnson is hastily enacting company-wide policy reforms in the wake of this litigation.) [20]

The class action rule is designed to maximize efficiency. Rule 23 allows a court to address thousands of claims at once, if they share enough common factual issues and legal theories to justify class treatment. The Company can and should be accountable for the discriminatory consequences of its common policies. Since these claims rely on common questions of fact and law, the Court should certify the proposed class.

## ARGUMENT

Plaintiffs Gutierrez, Morgan, Marshall and Brown ("the proposed Class Representatives"), [21] move for class certification. They ask the Court to certify the following class of approximately 8,600 class members:

——— — — — —— ——— ——

[18] *See infra* at 45-46.

[19] *See infra* at 45-50.

[20] *See infra* at n.35.

[21] On August 16, 2004, Plaintiffs moved for leave to amend the class complaint, adding Plaintiffs Brown and Marshall as named plaintiffs. That motion is pending.

*7*

> All persons of African and/or Hispanic descent employed by defendant Johnson & Johnson in any permanent salaried exempt or nonexempt position in the United States at any time from November 15, 1997, to the present.

This class meets the four requirements of Rule 23 (a) and satisfies the standards established by Rule 23(b), making class certification appropriate.

## I.   THE CLASS SATISFIES THE FOUR PREREQUISITES OF RULE 23(A)

Rule 23 (a) sets forth four prerequisites for maintaining a class action, usually referred to as "numerosity," "commonality," "typicality," and "adequacy." Fed. R. Civ. P. 23(a). These prerequisites "are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994). Plaintiffs satisfy each of these requirements.

### A.   Numerosity

Records produced by Defendant indicate that the proposed class encompasses approximately 8,600 current and former employees,[22] clearly establishing numerosity. *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met").

-- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- -- --

[22] Madden Rep. at 1 (App. A).

8

**B.**     **Commonality**

The second provision of Rule 23(a) requires that the named plaintiffs "share at least one question of fact or law with the grievances of the prospective class." *Baby Neal*, 43 F.3d at 56; *see also Hassine v. Jeffes*, 846 F.2d 169, 177 (3d Cir. 1988) (commonality is met when all class members are subject to the same harm). This requirement is "easily met," *Baby Neal*, 43 F.3d at 56, and Plaintiffs more than satisfy it by the common factual issues and legal theories underlying the claims of the class.

### 1.     *The Class Claims Rely on a Common Set of Facts*

Common facts link all the class discrimination claims – fact witness testimony and Company documents setting forth the common policies at issue, statistical and anecdotal evidence of their discriminatory results, and testimony and documents establishing senior management knowledge of and indifference to systemic discrimination.

> *a.*     *Johnson & Johnson Has Common Policies Applicable to All Class Members That Are Being Challenged in this Case*
>
> > (i)     Centralized Organizational Structure Unified by Corporate Credo

Defendant functions as a single company with common human resources practices applicable to all of its U.S. employees. This commonality begins with its

9

strong, centralized corporate culture.[23]  Johnson & Johnson continually reinforces

its corporate Credo, which states the Company is "responsible to our employees,"

and then specifies that:

> Compensation must be fair and adequate . . . .
> There must be equal opportunity for employment, development
> And advancement for those qualified. [24]

The Credo appears on a large stone plaque at Company headquarters, in

Defendant's annual reports, in speeches by its officers, webpages, and offices

across Defendant's organization.[25]  But it is not mere ornament.  Rather, Company

executives testified the Credo imbues the Company's culture, policies and

———————————

[23] *Accord Dukes*, 222 F.R.D. at 151 (fact that "Wal-Mart has carefully constructed and actively fosters a strong and distinctive, centrally controlled, corporate culture" supports commonality).

[24] *See* Company Credo (JOHN00004800943) (App. C, Vol. 1, Ex. 2); Deposition of Roberta Obler (Jan. 8, 2004) at 38-40 (App. B, Vol. 3) (second paragraph *is* devoted to employees) (hereinafter "Obler Dep."); Deposition of Marion HochbergSmith (Jan. 6, 2004) at 27-28 (App. B, Vol. 2) (hereinafter "HochbergSmith Deposition") (applies to all Defendant's employees). Defendant's obligations under this paragraph have remained the same throughout the class period.  Deposition of Ralph Larsen (Feb. 10, 2004) at 87-91 (App. B, Vol. 2) (hereinafter Larsen Dep."); http://www.jnj.com/our_company/our_credo_history/index.htm (last visited Aug. 6, 2004) (App. C, Vol. 2, Ex. 14) (section unchanged since 1979); http://www.jnj.com/our_company/our_credo_history/revisions/index.htm (last visited Aug. 6, 2004) (App. C, Vol. 2, Ex. 15).

[25] *See* Larsen Dep. at 45, 57 (App. B, Vol. 2); HochbergSmith Dep. at 27 (App. B, Vol. 2); *see also* App. C., Vol. 2, Exhibits 16 – 27 (copies of operating company web pages quoting or citing the Credo).

practices across the entire organization – former CEO Ralph Larsen states it "is the bond or glue that holds our company together."[26]  Frank Bolden, the Vice President of the Office of Diversity, characterizes the Credo as **an obligation** from the Company to all employees, promising equal opportunity in employment, compensation, and professional development.[27]  The Credo establishes Defendant's unfulfilled common obligations to all class members.

Credo values bind Johnson & Johnson's centralized policymaking structure for its U.S. business units ("operating companies" or "affiliates"):

- A single **Board of Directors** ("the Board") is responsible for long-term management and selection and oversight of the senior management who set Company policy and guide the Company's day-to-day conduct.[28]  The Board is to govern "by the values set forth in [the] Credo."[29]  The Company has historically failed to have a diverse Board.[30]

[26] Larsen Dep. at 38 (App. B, Vol. 2); *id.* at 56 ("We embrace the values of Credo as being, in essence, the soul or the heart of the company . . . ."); HochbergSmith Dep. at 28-29, 81, 342-43 (App. B, Vol. 2) (Credo is a "set of core values that hold each operating entity together").

[27] *See* Deposition of Frank Bolden (Dec. 10, 2003) at 25, 110-11 (App. B, Vol. 1) (hereinafter "Bolden Dep.") (available on video).

[28] *See* http://www.investor.jnj.com/governance/principles.cfm, (last visited Aug. 7, 2004), at Section 1, Duties and Responsibilities of the Company and the Board (App. C, Vol. 2, Ex. 31) (hereinafter "Company Corporate Governance Principles").

[29] *See* Larsen Dep. at 76-77, 120-23, 215 (App. B, Vol. 2); Company Corporate Governance Principles at 1; *id.* at items 1 and 9 to Annex B (App. C, Vol. 2, Ex.

11

- The Johnson & Johnson **Executive Committee** allocates the Company's worldwide resources, oversees and coordinates the Company's operations, and makes companywide policy decisions, including approving uniform compensation guidelines and promotion systems.[31] The CEO serves as chair and selects the members; since at least 1996, **no** African Americans or Hispanics have been selected as members of the Executive Committee.[32]

- A **single corporate headquarters** located in New Brunswick, New Jersey houses a fully staffed Human Resources office, including the Worldwide Compensation Resources, Recruiting, Equal Employment

---

31). This includes holding the CEO accounting through his compensation, for upholding the Credo. Proxy Statement (3/14/01) at Section 11-13 (App. C, Vol. 2, Ex. 28); Proxy Statement (3/13/02) at Section 11-13 (App. C, Vol. 2, Ex. 29); Proxy Statement (3/12/03) at 12-15 (App. C, Vol. 2, Ex. 30). But the Board's Compensation Committee reviewed **no reports bearing on equal opportunity or under-utilization** in establishing Larsen's compensation. *See* Larsen Dep. at 74, 149-52, 214-15 (App. B, Vol. 2).

[30] *See* Larsen Dep. at 85-86 (App. B, Vol. 2); Deposition of Michael Carey (Jan. 12, 2004) at 121 (App. B, Vol. 1) (hereinafter "Carey Dep."). For twenty years, the Board had only one African-American member, Ann Jordan, and for many years the CEO did not recommend a single African-American or Hispanic candidate. *See* Larsen Dep. at 92-93; 242-43 (App. B, Vol. 2). Not until **after the filing of this suit** did Defendant add its second African-American Director, just prior to the 2002 shareholder meeting. *See id.* at 242-48. Defendant has never had a Hispanic Director. *See* Bolden Dep. at 25 (App. B, Vol. 1); Timeline of Elections (App. C, Vol. 2, Ex. 32).

[31] *See* Johnson & Johnson, Inc. 2002 Annual Report at 26 and *id.*, Form 10-K at Part 1 (App. C, Vol. 2, Ex. 33); Johnson & Johnson, Inc. 2001 Annual Report at 24 (App. C, Vol. 3, Ex. 34); Larsen Dep. at 15-17 (App. B, Vol. 2).

[32] Deposition of Russell Deyo (Jan. 21, 2004) at 54 (App. B, Vol. 1) (hereinafter "Deyo Dep.").

> Opportunity and Diversity departments, all of which have
> responsibilities throughout the Company.[33]

Other centralized, cross-organizational structures carry out human resources

policymaking.[34]  In fact, eight months after Plaintiffs filed this lawsuit, Defendant

established a Staffing Task Force of HR directors to address minority employee

under-utilization, identifying **common** problems throughout the Company's

organization, and proposed **common** solutions.[35]

---

[33] Obler Dep. at 20-22, 31 (App. B, Vol. 3); HochbergSmith Dep. at 253-57 (App.
B, Vol. 2) (despite a decentralized business structure, human resources functions
are centralized in Defendant's worldwide headquarters); Worldwide Headquarters'
Role (App. C, Vol. 1, Ex. 3).

[34] Each operating company is in one of four Group Operating Committees
("GOC").  Reporting rolls up through the GOCs to the Executive Committee for
final review, approval and action, including human resources, diversity and
compensation reporting. *See* Deyo Dep. at 57-58 (App. B, Vol. 1).  Other
structures include the Human Resources Leadership Team, Bolden Dep. at 89-92,
103, 119, 200-02, 209-11 (App. B, Vol. 1); the Human Resources Council -- the
HR vice presidents for the business units and groups, *see* Deposition of Peter
Dinella (Nov. 19, 2003) at 105-06 (App. B, Vol. 2) (hereinafter "Dinella Dep.");
and the Affiliate Compensation Group -- compensation personnel from across the
Company. *See* Deposition of Pilar Vitoria (Nov. 14, 2003) at 246-49 (App. B, Vol.
3) (hereinafter "Vitoria Dep."); Obler Dep. at 203-04, 252-53, 273-74 (App. B,
Vol. 3).

[35] *See* Deposition of Gerald Kells (Oct. 16, 2003) at 151-59, 166-75 (App. B, Vol.
2) (hereinafter "Kells Dep.").  The Company rolled out the task force
recommendations in October 2003, which included changes to job posting and
diverse slate requirements. *See id; see also id.* at 230-33.  These changes notably
track the issues raised by Plaintiffs in their complaint, *see, e.g.,* First Amended
Complaint ¶¶ 44, 45-48 (App. C, Vol. 3, Ex. 36) (hereinafter "First Am. Compl."),
and were instituted under the aegis of defense counsel in this litigation. *See* Kells

As follows from the unifying force of one central Credo, one central Board of Directors, and a centralized human resources structure, the Company is united by common human resources policies and recordkeeping practices developed at Corporate Headquarters and approved by the Executive Committee.[36] Defendant maintains a compendium of written policies in its "**Worldwide Policy Manual**" that, by their terms, are usually at least "for use by **all domestic operating companies**"; these polices impact all United States based employees and cover setting of compensation, promotion and job posting, and other employment policies.[37] Virtually any deviation that marks a legal, fiscal, philosophical or cultural change from Defendant's policies requires direct approval from the

---

Dep. at 154-160 (App. B, Vol. 2); Bolden Dep. at 102-04, 117-20 (App. B, Vol. 1). Defendant's previous efforts to "study" the problem and effects of discrimination across its organization yielded virtually no concrete results. *See infra* at 48-50.

[36] *See* Carey Dep. at 214-16 (App. B, Vol. 1) (Succession Planning promotions procedures developed by headquarters and approved by the Executive Committee); *id.* at 51-52 (human resources policies were developed for operating company use by headquarters); Obler Dep. at 51-54 (App. B, Vol. 3) (compensation guidance systems and training developed by central headquarters); HochbergSmith Dep. at 12-13 (coordination of employment policy guidance for operating companies) (App. B, Vol. 2).

[37] *See generally* Worldwide Policy Manuals (App. C, Vol. 1, Ex. 4,5); *see also* HochbergSmith Dep. at 264-265 (App. B, Vol. 2). In a few instances not relevant to this litigation, Defendant has not established the mandatory reach of some of its policies.

14

Executive Committee, and even minor refinements of promotion or compensation practices can demand Executive Committee approval.[38]

The centralized compensation and promotion policies promulgated under this structure authorize excessive and unchecked managerial discretion. Many courts have specifically held that discrimination claims against excessively subjective employment policies satisfy the commonality requirement.[39] The Third Circuit has similarly approved class certification in a case claiming a highly subjective interview process resulted in dramatic racial disparities. *Green*, 843 F.2d at 1533. Judge Higgenbotham's opinion in *Green* used the typicality prong of

---

[38] Worldwide Policy Review Process (JOHN0000382078) (App. C, Vol. 3, Ex. 37) (flow chart showing new policies or policy changes must be initiated by main point of contact). *See also* Carey Dep. at 307 *et seq.* (App. B, Vol. 1) (process for policy changes to Succession Planning that had to be presented to the Executive Board); Obler Dep. at 116 (App. B, Vol. 3) (Executive Committee is involved with administering the distribution of Certificates of Extra Compensation); *id.* at 187-89 (Executive Committee members may approve an operating company's performance rating distribution); *id.* at 191-210 (Executive Committee sets the range of cash and stock bonuses for company executives worldwide); Worldwide Policy Manual, 1995-2000 (JOHN0000055586-0000055837, at JOHN0000055733-0000055734) (App. C, Vol. 1, Ex. 4) (Executive Committee review needed before changes such as cost-of-living adjustments, attendance bonus or a general wage increase are acted upon).

[39] *See, e.g., Caridad v. Metro North Commuter R.R.*, 191 F.3d 283, 292-93 (2d Cir. 1999) (policy of delegating discretionary authority to supervisors to make subjective decisions satisfies commonality); *Dukes*, 222 F.R.D. at 149-50 (same); *Ingram v. The Coca-Cola Company*, 200 F.R.D. 685, 697 (same); *Shores v. Publix Supermarkets, Inc.*, No. 95-1162-CIV-T-25(E), 1996 WL 407850 at *6 (M.D. Fla. Mar. 12, 1996) (same).

15

Rule 23(a) to conclude that challenges to subjective employment practices rest on "**common** issues of fact and law," rather than the minutae of individual employment decisions. [40] *Id.* (explicitly rejecting defendant's claim that "where subjective criteria are employed, it is necessary to evaluate each instance of discrimination independently"). As the Special Master in this case held "[t]here is **no question** that challenges to subjective employment practices" such as Defendant's compensation and promotion policies, "may be appropriate cases for class certification."[41] *Cf. Chiang*, No. 03-3488, slip op. at 10 (discriminatory policy subject to common proof in a single trial). Class discovery, which reveals the extraordinarily centralized nature of these policies, further reinforces how clearly commonality is satisfied.

---

[40] Judge Higginbotham's well-reasoned opinion in *Green* presaged the Supreme Court's ruling in *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977 (1988), that subjective decision making systems can be challenged under an adverse impact theory. *Green*, 843 F.2d at 1525 ("we cannot believe it was the intent of Congress to allow unarticulated biases or unconscious prejudices to result in discriminatory hiring practices merely because they appear in the form of an unsupervised interview").

[41] Opinion and Order Denying Defendant's Motion for Protective Order (Politan, J.) at 16 (App. C, Vol. 2, Ex. 13) (Rejecting Motion for Protective Order seeking to limit discovery to only certain locations and job levels).

16

(ii)    Common Compensation Policies

Consistent with its centralized structure, Defendant maintains a single compensation program, adopted at the highest organizational levels, which governs the Company's entire domestic workforce.[42] The Compensation and Benefits Committee established by the Board of Directors is responsible for, *inter alia*, review and oversight of Defendant's compensation philosophy, establishing eligibility guidelines for management level compensation, and determining and/or approving stock option awards to employees.[43] The Management Compensation Committee, comprised of members of the Executive Committee, is delegated authority to directly review and approve "day-to-day compensation practices of the company and reviews the operating company compensation recommendations."[44] Worldwide Compensation Resources, a part of the Company's centralized human

---

[42] *See, e.g.*, Salary Administration Policy (JOHN0000107642-0000107644) (App. C, Vol. 3, Ex. 46) (hereinafter "Salary Admin. Policy"); Salary Administration Program -- Plan Summary (JOHN0000068794-0000068808) (App. C, Vol. 3, Ex. 47); Salary Administration Training (JOHN0000060777-0000060839) (App. C, Vol. 3, Ex. 48) (hereinafter "Salary Admin. Training"); Obler Dep. at 68-70 (App. B, Vol. 3) (Salary administration program developed "to provide managers an understanding of the factors that they should be considering when administering salaries").

[43] http://www.investor.jnj.com/governance/charters.cfm?charter=com, Compensation and Benefits Commitee Charter (last visited Aug. 7, 2004) (App. C, Vol. 3, Ex. 35).

[44] Larsen Dep. at 73 (App. B, Vol. 2).

17

resources function, carries out these senior management mandates, and oversees the design and administration of Defendant's compensation program across Johnson & Johnson's business units. [45]

In addition to these common structural components, Johnson & Johnson carries out its compensation program through a common compensation policy,[46] annual compensation guidelines,[47] on-going training and meetings,[48] extensive compensation references freely available on the corporate intranet, and uniform compensation software and related compensation planning tools (including the

--- --- --- --- --- ---

[45] Developing Worldwide Leadership Capabilities (JOHN0000000878-0000000894) (App. C, Vol. 4, Ex. 54); J&J Compensation Resources, Strategic Plan – September 2001 (JOHN0000481020-0000481025) (App. C, Vol. 4, Ex. 55); *See* E-mail from Randy Christian to Roberta Obler (Aug. 26, 2002) (JOHN0000480894-0000480900) (App. C, Vol. 4, Ex. 56) (MCC meeting discussed role of WCR "in ensuring 'good' compensation practices, processes, etc. across J&J.")

[46] *See, e.g.,* Worldwide Policy Manual, 1995-2000 (JOHN0000055586-0000055837) (App. C, Vol. 1, Ex. 4).

[47] *See* Larsen Dep. at 134-47 (App. B, Vol. 2); Obler Dep. at 252-259, 271-273 (App. B, Vol. 3); Vitoria Dep. at 64-66 (App. B, Vol. 3).

[48] *See* Salary Admin. Training (JOHN0000060777-0000060839) (App. C, Vol. 3, Ex. 48); Executive Compensation Training (JOHN0000544835-0000544869) (App. C, Vol. 3, Ex. 50); Obler Dep. at 52-53 (App. B, Vol. 3) (describing training programs); *id.* at 69-70, 135-38, 299 (training and support for operating companies carries out Credo values through compensation); Vitoria Dep. at 87-89 (App. B, Vol. 3) (common training program), *id.* at 246-49 (Affiliate Compensation Group Meetings).

Company-wide compensation database, Compensation Navigator).[49]  The
Company's compensation guidelines establish clear parameters for suggested merit
increases and other compensation awards, eligibility for and award of bonuses and
stock options, and the use and distribution of numeric performance evaluation
ratings across Defendant's workforce.[50]  However, in each instance, these
parameters merely provide suggested ranges for action, leaving the final
determination to unchecked managerial discretion.[51]

According to these overarching policies, an employee's initial salary is to be
determined by a general assessment of factors established by Defendant, such as
the employee's "expected contribution."[52]  Based on a subjective evaluation of

---

[49] *See* Obler Dep. at 52-53; 65-66 (App. B, Vol. 3); Compensation Navigator User
Manual (JOHN0000405382-0000405468, at JOHN0000405386) (App. C, Vol. 4,
Ex. 51); Compensation Navigator – 2003 Enhancements and Beyond
(JOHN0000543630-0000543643, at JOHN0000543641-0000543642) (App. C,
Vol. 4, Ex. 52).

[50] *See, e.g.,* Compensation Navigator 2002 Year End Compensation Planning
Guidelines and Training (JOHN0000497031-0000497053, at JOHN0000497038-
0000497041) (App. C, Vol. 4, Ex. 53).

[51] *See* Obler Dep. at 53-54  (App. B, Vol. 3) (although WCR provides "appropriate
ranges" manager makes "ultimate decision"); Larsen Dep. at 152 (App. B, Vol. 2)
(system "depended very heavily on the good judgment of our management.").

[52] *See* Salary Admin. Training (JOHN0000060777-0000060839, at
JOHN0000060823) (App. C, Vol. 3, Ex. 48).  Other factors include education,
experience and the salaries of coworkers.

19

these factors, an employee's salary is then placed somewhere in a range of possible salaries for the employee's assigned position -- typically a common "benchmark" range established by Johnson & Johnson for that position across the domestic operating companies.[53]   However, these salary ranges frequently span tens of thousands of dollars – usually from 10 to 90 percent of the market rate for a particular position according to Company policy -- providing a supervisor wide

---

[53] *See id.*; Salary Administration Policy (at JOHN0000107643) (App. C, Vol. 3 , Ex. 46).  Defendant uses a nationwide benchmarking system for up to 70% of its positions.  *See* Vitoria Dep. at 162 (App. B, Vol. 3); Salary Admin. Training (JOHN0000060777-0000060839, at JOHN0000060798) (App. C, Vol. 3, Ex. 48); Global Compensation Overview (JOHN000538066-000053809; 0000542839, at JOHN0000542839 (App. C, Vol. 4, Ex. 58) ("Reasonable target is 70%").  Benchmarking ranges are determined by Worldwide Compensation Resources for positions common throughout Defendant's organization.  *See* Obler Dep. at 95-96 (App. B, Vol. 3); Market Pricing Training (JOHN0000032282-0000032352, at JOHN0000032297) (App. C, Vol. 4, Ex. 65); Salary Administration Policy (JOHN0000107642-0000107644) (App. C, Vol. 3, Ex. 46); Salary Admin. Training (JOHN0000060777-0000060839, at JOHN0000060798) (App. C, Vol. 3, Ex. 48) (describing "job ranking" process for non-benchmarked positions).  To promote the free flow of employees across the organization, Defendant has arranged to offer each operating company free market data for non-benchmark positions through a single data source, Towers Perrin, and published on Defendant's compensation intranet site.  *See* Partnership with Towers Perrin (App. C, Vol. 4, Ex. 66)  (providing ten complementary market analysis for each operating company) (/WCRprivate/Notebook/Compensation%20Community/partnership_with_tower_p errin.htm).  *See also* Obler Dep. at 135 (App. B, Vol. 3) (common training programs support consistency in approaches to market pricing).

20

latitude to play out improper considerations in making an initial salary determination.[54]

Once the Company sets an employee's initial salary, the annual company wide compensation planning process -- which takes place at the same time of the year, with the same guidelines, same database and compensation planning software and tools throughout the organization -- determines any increases or additions to that salary. After review by the Board and its relevant committees, the CEO issues a "Year End" letter, "designed to **get everybody on the same wavelength** in terms of how we were going to be administering compensation."[55]

Under this program, two types of adjustments can be made to base salary: merit increases and other compensation adjustments. Along with the guidelines for distributions and amounts of base salary adjustments, the budgets available for each adjustment are centrally established and approved by Defendant.[56]  Merit

---

[54] *See* Market Pricing Training (JOHN0000032282-0000032352, at JOHN0000032344-0000032348) (App. C, Vol. 4, Ex. 65).

[55] Larsen Dep. at 135-38 (App. B, Vol. 2); *see, e.g.,* 1998 Year End Compensation Letter (JOHN0000032072 – 0000032077) (App. C, Vol. 4, Ex. 67).

[56] The common merit increase budget is established each year by the Management Compensation Committee for all operating companies by world region. *See, e.g.,* 2000 Year End Compensation Letter (JOHN0000032092-0000032099, at JOHN0000032094) (App. C, Vol. 4, Ex. 69). Operating companies set their promotion/other adjustment budget with approval from the appropriate Executive

21

increases are to be based primarily on a supervisor's evaluation of the employee's performance.[57] Other compensation adjustments may accompany a promotion or address "internal equity" issues.[58] In both cases, the adjustments are highly discretionary within the established ranges, and managers have authority to depart from those ranges.[59] Inequities that distort initial salary levels and subsequent increases are compounded by Defendant's other uniform compensation programs – incentive compensation and executive compensation programs.[60] Compensation

---

Committee Member. *See* 2002 OA/PROMO Process (JOHN0000489811 – 0000489817, at JOHN0000489816) (App. C, Vol. 4, Ex. 70).

[57] *See* Obler Dep. at 82-87, 165-70 (App. B, Vol. 3); Vitoria Dep. at 101-02 (App. B, Vol. 3); Salary Admin. Policy (JOHN0000107642-107644) (App. C, Vol. 3, Ex. 46); Salary Admin. Training (JOHN0000060777-0000060839) (App. C, Vol. 3, Ex. 48); 2001 Year End Compensation Letter (JOHN0000003412-0000003417) (App. C, Vol. 5, Ex. 71).

[58] *See* Salary Admin. Training (JOHN0000060777-0000060839) (App. C, Vol. 3, Ex. 48).

[59] Vitoria Dep. at 70-73; 94-96; *cf. id.* at 66-69 (discussing bonus range); 201, 202 (discussing benchmark range).

[60] All employees may be eligible for some bonus but only those whose annual base salary is above a certain threshold established annually by Defendant may be eligible for an award of Johnson & Johnson stock. *See* 1999 Year End Compensation Letter (JOHN0000003060-0000003075, at JOHN0000003062) (App. C, Vol. 5, Ex. 72). Only "executives" as defined by Defendant may be eligible for stock options and Certificates of Extra Compensation. *See* Worldwide Policy Manual, 2002 (JOHN0000055838-0000056183, at JOHN0000055879-0000055882) (App. C, Vol. 1, Ex. 5). These annual rewards can be many times an employee's base salary, but supervisors have inadequate guidelines for making an

22

Navigator tracks the individual compensation recommendations all the way up to the Executive Committee for final approval.[61]

Ultimately, Johnson & Johnson's compensation program encompasses common policies and practices, subject to highly centralized control,[62] which intentionally establish excessive discretion with minimal oversight as the basis for pay decisions.

---

award. *See, e.g.,* Memo re: Standards of Leadership Awards (8-25-99) (JOHN0000343454-0000343460, 0000343454) (App. C, Vol. 5, Ex. 73) (wide bonus ranges); 2000 Year-End Compensation Letter (JOHN0000032092-0000032098, at JOHN0000032094 (App. C, Vol. 4, Ex. 69) (wide bonus and option ranges).

[61] *See* Obler Dep. at 178-79, 190-91 (App. B, Vol. 3); *id.* at 188-89 (the review begins "[b]etween a line manager and his or her boss, between -- and then as it goes up the line. The line manager with their boss, that person with their boss, and so forth, all the way up to the executive committee").

[62] Any domestic operating company compensation plan that deviates significantly from the corporate program requires corporate approval. *See* Obler Dep. at 76 (App. B, Vol. 3); *see also* Vitoria Dep. at 29 (App. B, Vol. 3) (operating companies can share compensation directors and managers). Defendant's own documents emphasize how consistency in compensation decisions, collaboration across the organization, and common best practices are essential to ensure the free movement of employees across the entire organization, a stated strategy of Defendant's uniform compensation program. *See* Changing Culture: Using Compensation as a Strategic Business Tool (JOHN0000585393-0000585416, at JOHN0000585414-0000585415) (App. C, Vol. 4, Ex. 57); Johnson & Johnson Global Compensation Overview (9/2003) (JOHN0000538066-0000542839, at JOHN0000538067) (App. C, Vol. 4, Ex. 58).

(iii)   <u>Common Promotions Policies</u>

Across its domestic operating companies, Defendant similarly has established common policies and practices for promotion that allow highly discretionary decisionmaking.  The Company's two-tiered promotion structure -- a purportedly "open" job-posting mechanism and a variety of formal and informal procedures that explicitly permit handpicked candidates – permits managers the freedom to select which system (if any) to use.  As minutes of a 1998 Diversity Best Practices Task Force meeting state: **"Little/no system for staffing, it happens by who you know."**[63]

Defendant's only theoretically "open" and competitive promotion system is job posting.  Under the posting policy in effect when this case was filed,[64] Defendant typically posted jobs on the computerized Growth Opportunities (GO) Network up through the manager level and occasionally at the director level.[65] Although "[t]he job posting procedures support the Credo's commitment to the

---

[63] Lupinski E-mail (JOHN0000348310-0000348320, at JOHN0000348312) (App. C, Vol. 2, Ex.6) (emphasis supplied).

[64] This system was recently altered in the fall of 2003. However, this section addresses the system prior to the Company-wide reform.

[65] *See* Deposition of Jeanne Hamway (Dec. 3, 2003) at 31-32 (App. B, Vol. 2) (hereinafter "Hamway Dep.") (this was the general policy and it was followed if positions could not be filled intra-company); *See* Kells Dep. at 189 (App. B, Vol. 2).

24

advancement of qualified employees,"[66] former Vice-President of Human Resources Michael Carey conceded posting "does not represent a predominant way" to fill jobs within an operating company.[67]

Indeed, the job posting policy explicitly contained substantial exceptions. Most notably, under the policy in force until late 2003, there was no requirement to post any opening that could be filled by a promotion or transfer within the operating company.[68] The Company's job posting policy was also merely discretionary regarding positions at the Director level and above, excluding employees from self-nominating for the most desirable jobs.[69] Even where applicable, the Company's adherence to posting was far from consistent.[70]

------

[66] Intercompany Job Posting Policy (JOHN0000055702) (App. C, Vol. 5, Ex. 75); see also Carey Dep. at 665-66 (App. B, Vol. 1) (posting "allows an employee to nominate him or herself for an opportunity. . . it allows the company to access a broader talent pool….").

[67] Carey Dep. at 689-91. (App. B, Vol. 1).

[68] See Hamway Dep. at 89-91 (App. B, Vol. 2); Intercompany Job Posting Policy (JOHN 0000055702) (App. C, Vol. 5, Ex. 75)

[69] See HochbergSmith Dep. at 483-85 (App. B, Vol. 2); Kells Dep. at 150-51, 156-58 (App. B, Vol. 2). Bolden Dep. at 150-51 (App. B, Vol. 1) (conceding that posting job openings at the director level could help alleviate low African American representation in upper management).

[70] See Hamway Dep. at 32-33 (App. B, Vol. 2); Kells Dep. at 132 (App. B, Vol. 2) ("there is no one job posting process, or has not been").

25

Managers could and did ignore the posting requirement, opting instead to select (or in many cases pre-select) a single candidate.[71] Ultimately, whether a job was posted or filled through some other mechanism was left to the subjective discretion of the hiring manager.[72] Defendant was aware for quite some time of concerns among African American employees regarding the limitations of job posting.[73]

Other official mechanisms, aside from job posting, also existed for promoting employees at Johnson & Johnson, but they were largely secret, excluded self-nomination and often highly limited fair and open competition. For example, when an upper level or management position opened at an operating company, a manager could request a slate of candidates who possessed the skills and qualifications to fill an open position—this process was known as internal or

---

[71] *See* Hamway Dep. at 90-92; *id.* at 89-90 (App. B, Vol. 2) (the hiring manager could post a job and also indicate that internal candidates had already been identified for the position—such a practice, however, would likely discourage other qualified candidates from applying, fearing that the identified candidates had an advantage in the hiring process).

[72] *See id.* at 86-87 (App. B, Vol. 2) (hiring manager determined whether the job should be posted) *cf.* Carey Dep. at 660-61 (App. B, Vol. 1) (managers "can choose the best approach" for promoting individuals).

[73] Bolden Dep. at 151-52 (App. B, Vol. 1) (Frank Bolden noted that he was aware that African American employees had expressed concerns about promotions and that they were unable to compete for positions because they were not posted and, hence, they had no knowledge of the opportunities).

26

corporate search.[74]  Defendant employed until late 2003 a highly discretionary

Corporate Search process, vested entirely in the hands of **one** staff person, Judy

Smith.[75]

Similarly, the Company's Succession Planning process -- developed by the

Company "to [e]nsure that there was a continuous succession of replacements for

primarily critical positions in the company," by identifying exceptional employees

for future advancement -- depends on secrecy and "tap on the shoulder"

approaches to advancement.[76]  While a uniform ratings system applies to all

operating companies, the policy institutionalizes highly subjective managerial

———————————————

[74] Hamway Dep. at 103 (App. B, Vol. 2) (managers could request a slate on a requisition form and "a number of candidates would be provided to the hiring manager. . . as a result of that search"); *id.* at 107-08; Carey Dep. at 657 (App. B, Vol. 1) (candidates were identified through a key word match in a database); Deposition of Judith G. Smith (Jan. 31, 2003) at 66-67 (App. B, Vol. 3) (type of position) (hereinafter "Smith Dep.").

[75] Ms. Smith was not provided and did not consult any written or verbal guidelines prior to exercising personal autonomy over this process -- she freely used her discretion  Smith Dep. at 92 (she personally determined certain search parameters); *id.* at 92-93 (never received written or verbal direction about how to select candidates beyond the requisition form).

[76] Dinella Dep. at 221 (App. B, Vol. 2). *See* February 8, 1999 Letter & Attachments (JOHN0000441216-0000441226, 0000441216) (App. C, Vol. 5, Ex. 74) ("The fundamental objective continues to be not only the identification and assessment of people of high potential, but also the implementation of appropriate developmental plans.")

27

assessments and provides a veneer of objectivity to cover a process of hand-picking individuals for promotion.[77]

The process involves individual ratings and closed-door discussions of employees, their ratings and what positions they might attain.  Supervisors rate individual employees based on their performance, their potential, and on so-called "people development skills," relying on subjective criteria.[78]  Then members of the largely white Company senior management meet to discuss the candidate, but without any parameters for conducting ratings discussions or mechanisms to ensure a diverse group of candidates is considered.[79]

Finally, the Company apparently frequently selects candidates by means other than the articulated promotion mechanisms. Notably, several of Defendant's senior managers who reached the top of the corporate hierarchy and were entrusted with

---

[77] *See* Carey Dep. at 213-16 (App. B, Vol. 1) (Carey describes changes to the Succession Planning process, which includes a discussion of the use of and changes to the ratings system).

[78] *See* Carey Dep. at 216-20 (App. B, Vol. 1). *See also* Dinella Dep. at 247 (App. B, Vol. 2).

[79] *See* Carey Dep. at 161-62; 235-36 (App. B, Vol. 1).  Despite repeated internal recommendations for reform, even if a manager chose to use a more open promotion system, Defendant did not require diversity in its candidate slates.  Mike Carey, in fact, dismissed the idea as altogether useless, expressing an unsupported assumption of a dearth of qualified minorities for inclusion on diverse slates and insisting that finding a qualified minority for a slate would be overly time-consuming. *See id.* at 616-18.

28

important human resources responsibilities benefited from "handpicked"

promotions during their careers.[80]  Such "handpicking" is antithetical to fair

competition and creates conditions ripe for discriminatory promotion.

> (iv)   Abdication of EEO
> Responsibility

Despite having a wealth of available data to assess EEO performance,[81]

and despite the shortcomings this data revealed,[82] Johnson & Johnson did virtually

_____  _____  _____  _____

[80] *See* Kells Dep. at 11-13; 33-34 (App. B, Vol. 2); Carey Dep. at 19 (App. B, Vol. 1) (informal promotions for positions in seven different business units); Harnway Dep. at 23 (App. B, Vol. 2) (Jeanne Harnway's manager "made [her] aware" that she had become a candidate for the position of Vice President of human resources at RW Pharmaceuticals); Dinella Dep. at 49-50 (App. B, Vol. 2) (when Dinella became personnel director at McNeil Pharmaceuticals, he was "told" by his supervisor that his name had "come up" during an internal search discussion).

[81] Defendant regularly runs quarterly and annual EEO reports for management based on its centralized employee databases.  The JJEMS database contains information regarding all domestic employees' payroll, salary, benefits, internal work history, education and EEO data, from the early 1980s to the present.  *See* Deposition of Craig Shepherd (Oct. 10, 2002) at 10-11, 14-18 (App. B, Vol. 3) (hereinafter "Shepherd Dep."); Deposition of Carolyn Horn (Dec. 11, 2003) at 17-18, 45, 138 (App. B, Vol. 2); Human Resources Reference Guide (JOHN0000000001-0000000031) (App. C, Vol. 3, Ex. 38).  These reports review utilization, distribution, and positive employee movement in each operating company as well as on a Company-wide basis.  *See* Shepherd Dep. at 92-99, 122-28 (App. B, Vol. 3); HochbergSmith Dep. at 435-37; 442-44 (describing reports) (App. B, Vol. 2); Bolden Dep. at 142-143 (App. B, Vol. 1); EEO Reporting (J&J0000002244-0000002319) (App. C, Vol. 3, Ex. 39); Executive Report on Utilization (9/2000) (JOHN0000417443-0000417470) (App. C, Vol. 3, Ex. 41). J&J Internal Availability (JOHN0000285216 0000285227) (App. C, Vol. 3, Ex. 44); Consolidated Status and Activity Summary (JOHN0000439975-0000439976) (App. C, Vol. 3, Ex. 45).

nothing to assess whether the "deliberate and routine subjectivity" of these

compensation and promotion policies or practices discriminated on the basis of

race or ethnicity. This failure to monitor (or in some cases to validate)

compensation procedures,[83] performance evaluations,[84] promotions practices,[85] or

succession planning ratings,[86] demonstrates reckless indifference to systemic

---

[82] *See infra* at 45-47.

[83] At no point is race a part of the review related to annual compensation planning. *See* Vitoria Dep. at 220-23 (App. B, Vol. 3); Obler Dep. at 267-68 (App. B, Vol. 3) (stating only one privileged study has been completed). Race or ethnicity plays no officially sanctioned role in an adjustment based on "internal equity." *See* Salary Admin. Training (JOHN0000060777-0000060839, at JOHN0000060807-0000060808; 0000060824-0000060831) (App. C, Vol. 3; Ex. 48); Vitoria Dep. at 210 (App. B, Vol. 3) ("I have never discussed compensation in the context of race or gender."); Obler Dep. at 155-62 (App. B, Vol. 3) (no disparate impact studies of compensation).

[84] Defendant makes no provision for a regular review of the performance ratings its employees are given based on any category, much less race or ethnicity. *See* Obler Dep. at 190 (App. B, Vol. 3).

[85] *See* Carey Dep. at 474-75 (App. B, Vol. 1) (failing to answer the direct question of whether Defendant has a mechanism in place to monitor the exclusion of African Americans succession planning); Kells Dep. at 116 (App. B, Vol. 2) (he never understood anyone at corporate headquarters to have responsibility for monitoring compensation and promotion practices to ensure they are carried out in a non-discriminatory way).

[86] Apparently, the Executive Committee never reviewed the distributions of succession planning ratings based on race, *see, e.g.*, Larsen Dep. at 24 (App. B, Vol. 2), and the former VP of human resources testified that Defendant has not even validated the ratings and evaluation system that is at the core of its "closed"

problems causing the disparities.  Worse, senior Company officials have testified

that they have no responsibility for actually ensuring Defendant complies with

federal and state anti-discrimination law.  Instead, they claim that all EEO

compliance responsibility is delegated to the operating companies.[87]  But the

Company never formally reviews the results of this delegated authority, and cannot

know if it is in compliance.[88]  In other words, "don't ask, don't tell."[89]

---

promotion systems.  Carey Dep. at 611-13  (App. B, Vol. 1) (available on video);
*cf. id.* at 166-68 (no formal disparate impact analysis of succession planning).

[87] *See, e.g.,* Defendant's Responses and Objections to Plaintiffs' First Set of
Interrogatories at 18 (App. C, Vol. 2, Ex. 10) (operating companies have "primary
responsibility" for "design of and compliance with equal employment opportunity
policies, guidelines, practices and procedures"); HochbergSmith Dep. at 31 (App.
B, Vol. 2) ("Q: Do you think it is important to keep track of whether discrimination
is occurring at the operating companies . . . .? A:  I believe it is the operating
companies' responsibility to manage that for their companies").

[88] When asked whether she was "well-informed" about whether these operating
companies were in compliance, Marion HochbergSmith, the Company's top EEO
manager, admitted she couldn't say she "definitively" knew and she described
them as "aspiring to" compliance, rather than being in compliance.
HochbergSmith Dep. at 34-35 (App. B, Vol. 2) (available on video).  As one
example of the lack of accountability measures, HochbergSmith conceded that
disparate impact reviews should be done every year to monitor legal compliance.
Yet she testified that she merely instructed the operating companies to perform
these analyses, and did not regularly even receive copies.  *Id.* at 457-58.  Similarly,
Defendant frequently claimed to monitor possible inequities arising as a result of
race.  *See, e.g.,* One-Page e-mail from Roberta F. Obler to Michael J. Carey
(5/16/02) (JOHN0000590383) (App. C, Vol. 4, Ex. 62); One-Page e-mail from
Roberta F. Obler to Sheila M. Knudsen (3/11/03) with attachment
(JOHN0000589845-0000589850, at JOHN000058950) (App. C, Vol. 4, Ex. 63);
Obler Dep. at 296 (App. B, Vol. 3).  However, Defendant really relied almost

31

The Company's unifying Credo, its Board of Directors with central control and oversight of the entire organization, and its Company-wide human resources policies and data, confirm the existence of **a singular** Johnson & Johnson entity that can enforce policy across the corporation. Indeed, between 1999 and 2001, in an industry-wide "war for talent," the Management Compensation Committee demanded that each operating company conduct a searching review of the pay equity of all positions in comparison with Defendant's competitors and, regardless of budgetary restraints, to increase pay for those positions that had fallen short.[90] Clearly, Johnson & Johnson could use the same companywide remedy if compensation or other inequities based on race or ethnicity exist in violation of Credo mandates, but Defendant has simply left this crucial matter to the unchecked

---

exclusively on a leap of faith, not actual studies, monitoring or tracking across its organization. *See id.* at 69 (monitoring was relegated to the operating company level); *id.* at 297-300 (available on video).

[89] Similarly, in the first paragraph of its answer, Defendant explains that Johnson & Johnson, and the operating companies, are "committed to equal opportunity in the workplace" and that "**for these reasons** Johnson & Johnson denies the allegations in this lawsuit of a pattern or practice of race discrimination." Answer ¶ 1 (App. C, Vol. 2, Ex. 11) (emphasis supplied); *see also* Answer to 1st Amend. Compl. ¶ 1 (App. C, Vol. 2, Ex. 12). A commitment is all very well and good, but it does not suffice to support a legal denial of the claims in this action.

[90] *See* Competitive Analysis Strategy e-mail (6/1/99) (JOHN0000586826-0000568827) (App. C, Vol. 4, Ex. 60); Competitive Analysis Strategy e-mail (6/3/99) (JOHN0000587034-0000587036 (App. C, Vol. 4, Ex. 61); Larsen Dep. at 148-49 (App. B, Vol. 2).

32

discretion of the operating companies.[91] All class members will rely on common evidence of these common discretionary policies, as well as the common evidence of their results documented below.

b.   *Statistical and Other Expert Evidence Will Show How These Policies Discriminate*

Dr. Janice Madden of the University of Pennsylvania[92] has analyzed the extracts from the Company's employee databases provided to the Plaintiffs in discovery.[93] In employment discrimination cases, courts accept statistical evidence as proof that an employer has engaged in a pattern and practice of intentional discrimination.[94] If a difference in pay or promotion rates is unlikely to be due to

---

[91] Larsen Dep. at 149-51 (App. B, Vol. 2) (available on video); Obler Dep. at 267-69 (App. B, Vol. 3) (operating companies are merely encouraged to monitor).

[92] Dr. Madden, who holds an endowed chair at the University of Pennsylvania, has published widely on the topic of the effects of race and gender on labor market outcomes. She has served as a faculty member in seminars for federal judges sponsored by the Federal Judicial Center, the Federal Reserve Bank and The Wharton School of the University of Pennsylvania. Her Curriculum Vitae, which details her qualifications, is attached to her report as Attachment C (App. A).

[93] The extracts are taken from data as it is maintained in the ordinary course of business by the Company.

[94] *See Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 874 (11th Cir. 1986) ("A prima facie case of

33

random chance, as shown by statistical analysis, "the legal inference of discrimination . . . is thus 'scientifically' confirmed." *U.S. v. Landsdowne Swim Club*, 713 F. Supp. 785, 809 n. 51 (E.D. Pa. 1989), *aff'd* 894 F.2d 83 (3d Cir. 1990) (quoting *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1191 (4th Cir. 1981). Social scientists generally accept two standard deviations (equivalent to a five in 100 chance that a result is random) as "statistically significant" and courts look to disparities in that range as evidence of discrimination.[95]  In this case, Dr. Madden's analysis repeatedly finds statistically significant racial and ethnic disparities after comparing otherwise similar employees.  Her review of relevant data strongly supports Plaintiffs' claims of discriminatory outcomes for the class, and serves as common evidence linking all class claims.

In her compensation analysis, Dr. Madden uses a linear regression analysis. This generally accepted method of analyzing pay disparities between similarly situated employees allows her to include "controls" in the equation . . nondiscriminatory factors available in the data that might explain why one

———  —  —  —  —  ——  —  ——  —  ——  ——  —  —  ——  —  ——  —  —  ——  —

class-wide disparate treatment may be established by statistics alone if they are sufficiently compelling.").

[95] *See Castanada v. Partida*, 430 U.S. 482, 496 n.17 (1977) (two or three standard deviations); *Anderson v. Zubieta*, 180 F.3d 329, 339-40 (D.C. Cir. 1999) (1.96 standard deviations); *Kilgo*, 789 F.2d at 872-73 (standard deviations as low as 1.92 accepted); *Landsdowne*, 713 F. Supp at 809 (two or three standard deviations).

employee's compensation is different from another.  Her controls include measures of qualifications, such as education, experience[96] and tenure at the Company. Controlling for "job function" ensures the analysis accounts for pay differences that reflect job differences, like those between computer scientists and marketing professionals.[97]  All equations include a control for the business unit (operating company) where the employee works.  Finally, there are controls for job level, called hierarchy codes. [98]

Using these equations, Dr. Madden found "that the awarding of compensation is not racially and ethnically neutral.  For each year from 1997 through 2003, African Americans and Hispanics had lower average base salaries

---

[96] Dr. Madden uses age as a proxy for total years of experience, a common approach in her field.

[97] The job function control also relates to experience. Madden Rep. at 22 (App. A). The job function coding includes "major subfunction." In this brief, "job function" includes both "function" and "major subfunction."

[98] Because she ultimately determined that race affects affect promotion and that race and ethnicity affect initial job assignment, Dr. Madden concluded it would be inappropriate to control for job level to measure racial or ethnic compensation differences. *Id.* at 40 (App. A).  *See, e.g., Trout v. Garrett*, 780 F. Supp. 1396, 1412-13 (D.D.C. 1991) ("If, for example, an individual's grade level is itself based on discrimination, then use of grade level as a variable would falsely suggest that disparities in pay were attributable to an objective factor rather than to the real source, discrimination.").  *Accord James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 332 (5th Cir. 1977).  Values reported in column 5 of her tables remove this inappropriate control.

than comparably qualified white non-Hispanic employees, **even when in the same job.** The racial and ethnic salary differences occur among both exempt employees and nonexempt employees at J&J."[99]

Regardless of what controls she used, Dr. Madden found that African Americans received lower pay than comparable Caucasians in each year from 1997 to 2003 – differences that were virtually always statistically significant.[100] Controlling for type of job, education, experience and business unit she found average base salary and total compensation gaps of 5.2% to 8.39% for exempt employees.[101] Those disparities were at standard deviation levels of seven to ten or

---

[99] Madden Rep. at 3 (emphasis supplied) (App. A).

[100] *Id.* at Tables 5b (1997), 6b (1998), 7b (1999), 8b (2000), 9b (2001), 10b (2002), and 11b(2003) (base salary analysis for exempt employees). For some years, there was data available to analyze total compensation, which would include bonuses and other additions to wages. *Id.* at Tables 7e (1999), 8e (2000), 9e (2001) and 10e (2002) (exempt employees). *See also id.* at Tables 12b (1997), 13b (1998), 14b (1999), 15b (2000), 16b (2001), 17b (2002), and 18b (2003) (base salary analysis for nonexempt employees). The total compensation analysis for nonexempt employees showed lowered racial differences; Dr. Madden concluded that this "arose from differences in overtime work." Madden Rep. at 29 n.11 (App. A).

[101] *Id.* at Tables 5b (1997), 6b (1998), 7b (1999), 8b (2000), 9b (2001), 10b (2002), and 11b(2003) (base salary analysis for exempt employees); Tables 7e (1999), 8e (2000), 9e (2001) and 10e (2002) (total compensation analysis for exempt employees) (App. A).

36

more – equivalent to a probability of **less than 26 in ten trillion** that the result is due to chance.[102]

Dr. Madden found similarly striking results when she analyzed compensation paid to Hispanics at the Company. In each year from 1997 to 2003, Hispanic employees received lower pay, regardless of the controls used in the analysis.[103] These differences were virtually always statistically significant. Controlling for education, experience, tenure, type of job, and business unit, "the base salary differentials for Hispanic exempt workers relative to non-Hispanic white exempt workers . . . are . . . 7.83%, 7.6%, 5.87%, 5.33%, 4.88%, 3.84%, and 4.22% for 1997 through 2003, respectively. The probability that an ethnically

_____

[102] Column 5 of Tables 5b (1997), 6b (1998), 7b (1999), 8b (2000), 9b (2001), 10b (2002), and 11b(2003) and Tables 7e (1999), 8e (2000), 9e (2001) and 10e (2002). (App. A). The comparable analysis for nonexempt employees demonstrated an average race-based salary gap of 3.77% in 1997 and 2.6% in 2003, and standard deviations of 3 to 5 in virtually all years. Column 5 of Tables 12b (1997), 13b (1998), 14b (1999), 15b (2000), 16b (2001), 17b (2002) and 18b (2003). (App. A)

[103] *Id.* at Tables 5c (1997), 6c (1998), 7c (1999), 8c (2000), 9c (2001), 10c (2002), 11c (2003) (base salary analysis for exempts); Tables 7f (1999), 8f (2000), 9f (2001), and 10f (2002) (total compensation analysis for exempts); Tables 12c (1997), 13c (1998), 14c (1999), 15c (2000), 16c (2001), 17c (2002) and 18c (2003) (nonexempts).

37

neutral process could have generated any of these differentials is less than . . . 2 in 1,000,000,000."[104]

In the end, Dr. Madden concludes:

The overall pattern of lower [compensation] for African Americans and Hispanics than for non-Hispanic whites. . . in the same job and with the same age, tenure at J&J and education, are at levels **well beyond** those usually required by the courts to dismiss random variation as a source. **The results are consistent with racial and ethnic discrimination in setting salaries and compensation even within jobs.**[105]

For the promotion analysis, Dr. Madden uses two generally accepted statistical tests, multiple pools and probit regression, which "yield the same conclusion: the selections of salaried [African-American] employees for promotion at J&J from 1997 through 2003 were not racially neutral."[106]

Using multiple pools analysis, Dr. Madden establishes that from 1997 to 2003, when controlling for hierarchy code, business unit, job function and year,

_____

[104] Madden Rep. at 41 and Column 5 of Tables 5c (1997), 6c (1998), 7c (1999), 8c (2000), 9c (2001), 10c (2002), and 11c (2003) (App. A). Using the same controls, she identified highly statistically significant pay gaps ranging from 5.17% to 9.95% for non-exempt employees. Column 5 of Tables 12c (1997), 13c (1998), 14c (1999), 15c (2000), 16c (2001), 17c (2002) and 18c (2003) (App. A).

[105] Madden Rep. at 39-40 (App. A) (emphasis supplied).

[106] *Id.* at 7.

38

African-Americans received 174 fewer promotions than expected.[107]  She

concludes that "[t]he probability that a racially neutral promotion process could

have generated this racial disparity is **41 in ten billion**."[108]  The probit regression

analysis, which included controls for qualifications such as education and

experience, yielded similar results to the multiple pools analysis.[109]  Indeed, if

anything, adding controls for education and experience "increases the magnitude of

the promotional disadvantage of African Americans."[110]

Finally, Dr. Madden's promotion analysis also strongly supports the view

that promotion discrimination at the Company is a systemic problem, unconfined

to particular areas of the business.  Her multiple pools analysis assessed 2,416

separate job/business unit/year pools that had promotions and also included

---

[107] *Id.* at 2, 10 and Table 1.

[108] *Id.* at 2 (emphasis supplied).

[109] Madden Rep. at 19-20 (App. A); Tables 3 (all employees), 3a (exempt
employees) and 3b (nonexempt employees) control for hierarchy code, job
function, business unit and year.  Tables 4 (all employees), 4a (exempt employees)
and 4b (nonexempt employees) control for hierarchy code, job function, business
unit, year, education, experience and tenure at the Company (App. A).

[110] *Id.* at 21. Dr. Madden also performed analyses comparing the period prior to
the filing of the lawsuit – 1997 through 2001 – with the post-filing period – 2002
to 2003. Not surprisingly, she found that although "J&J significantly under-
promoted African Americans in the 1997 through 2001 period, before they knew of
the class allegations," the disparities shrank once the Company was on notice of a
class-wide discrimination claim. *Id.* at 11 and Table 1 Columns 1 and 2.

African-American and white employees.  In 1,733 of the 2,416 pools – 72% –there

were fewer African American promotions than expected.  *Id.* at 23.

The last issue Dr. Madden examines is Class members' placement at their

initial entry into the Company, compared with their similarly qualified Caucasian

colleagues.  She determined that, in fact, the Company assigns African Americans

and Hispanics to jobs in lower hierarchy codes and at lower salary levels than

Caucasians with the same qualifications at hire.[111]

The Plaintiffs proffer Dr. Madden's report as an exemplar of common

factual and legal issues linking the entire class.  Although the Company will

attempt to rebut Dr. Madden, any "battle of the experts" is irrelevant to the

question of whether a class should be certified.[112]  Plaintiffs are entitled to have a

jury decide whether the statistical evidence establishes a pattern and practice of

discrimination.

---

[111] *Id.* at 44-46 and Table 19a-c.

[112] *Caridad*, 191 F.3d at 292 ("'statistical dueling' is not relevant to the certification determination.") (citation omitted); *see also, e.g., Dukes*, 222 F.R.D. at 155; *Shores*, 1996 WL 407850 at *7.

40