*PART 2*

c.     *Anecdotal Evidence Further Illustrates the*
       *Common Injury the Class Has Suffered*

To bring life to the statistical data, thirty-five current and former African American and Hispanic employees from many facets of Defendant's business operations, holding a variety of jobs, and representing over a dozen different U.S. business units, have submitted declarations in support of class certification. They raise similar promotion and pay claims, and consistent critiques of the highly discretionary policies challenged in this case.

Of the thirty-five declarants, almost all allege discrimination on the basis of race or ethnicity with respect to compensation. Declarant Theresa Ellis, an engineer with sixteen years of experience, was only earning $89,600, while she generally received "superior" performance ratings.[113] Her salary was considerably lower than what the Company paid Caucasians holding her same "Senior Engineer" position – as much as $150,000.[114] She was particularly concerned that managers "had no standards or rules to guide their decision-making with regard to determining bonuses or salaries, and as a result, made their decisions based on

___ ___ ___ ___ ___ ___ ___

[113] Declaration of Theresa Ellis, ¶¶ 20, 26 (App. D, Ex. 12).

[114] *See id.* ¶¶ 21-26.

41

subjective and arbitrary criteria."[115]   Numerous others present examples of salary

disparities that can be explained by no factor other than race.[116]   In addition to

---

[115] *See id.* ¶ 35.

[116] *See, e.g.,* Declaration of Sonya Powell, ¶¶ 28, 32-45 (App. D, Ex. 32) (witnessed racially and ethnically hostile work environment and received less money than less experienced Caucasian counterparts); Declaration of Ingrid Boston, ¶¶ 23-25 (App. D, Ex. 8) (made tens of thousands less than white peers); Declaration of Eunice Harris, ¶ 29 (App. D, Ex. 16) (Caucasian woman in same job began work at J&J one and one-half months after Ms. Harris' start date, had less experience but earned a higher salary) (hereinafter "Harris Decl."); Declaration of Judia Hudson ¶ 17 (App. D, Ex. 17)  ("J&J paid me an initial salary of $60,000.  Based on a conversation with a J&J administrative assistant who had access to salary data, I learned that [my white counterparts with the same education and experience] made almost $20,000 more than me.") (hereinafter "Hudson Decl."); Declaration of Karen Ishmael, ¶ 21 (App. D, Ex. 18) ("Through conversations with my coworkers, I have come to believe that I was paid less than my white counterparts during my tenure at J&J."); Declaration of Lily Kenney, ¶ 19 (App. D, Ex. 20) (learned that J&J provided lower compensation and lower bonuses than white co-workers with "significantly less total business experience, less years of J&J company service, and no college education" and comparable work performance. "I have no explanation, other than race, to explain the disparities in pay.") (hereinafter "Kenny Decl."); Declaration of Latoya Nash, ¶¶ 17-18 (App. D, Ex. 29) ("J&J paid me an initial salary of $45,000. . . . my salary was considerably less than white colleagues with whom I trained but who had less relevant work experience than I did."); Declaration of Robin Ragland, ¶¶ 33-37 (App. D, Ex. 33) (testifying that she was the only African American employee in the department and that she made less than anyone else); Declaration of Victor Robinson, ¶ 29 (App. D, Ex. 35) (saw document showing "white workers, and even those who had less experience than me, earned more. . . . black employees generally earned less than similarly situated white employees").

salary, declarants claim discrimination in merit increases, bonuses[117] and stock options.[118]

The vast majority of African American declarants allege that Company policies and practices contribute to promotional inequity.  Alexander Morrow, a 38-year-old African American former United States Army Captain, testified he was regularly denied promotions for which he was qualified in favor of less qualified Caucasian employees because "positions above a certain level just did not seem to get posted at all."[119]  Morrow's testimony mirrors that of other declarants who critique the failure to post.[120]  Furthermore, across Defendant's family of

---

[117] *See, e.g.,* Harris Decl. ¶ 30-31 ("J&J supervisors did not demonstrate any consistency or regular pattern with regard to the disbursement of bonuses and pay raises" and she observed white employees generally receive higher bonuses than black employees) (App. D, Ex. 16); Declaration of Rosemary Alvarado Martinez ¶¶ 12-14 (App. D, Ex. 25) (disparity in criteria used to evaluate African Americans for bonuses).

[118] *See, e.g.,* Hudson Decl. ¶ 18 (App. D, Ex. 17) (denied stock options even though Caucasian employees with comparable background and experience received them); Declaration of Jacqui Tanner ¶ 27 (App. D, Ex. 38) ("Until last year, I never received stock options for which I was eligible for the past ten (10) years; however, my white counterparts in the labs and my department received them.").

[119] Declaration of Alexander J. Morrow, Jr. ¶ 2, 5, 3, 17. (App. D, Ex. 28).

[120] *See, e.g.,* Kenney Decl. ¶ 23 (App. D, Ex. 20) ("J&J does not always have an open competitive process for positions that become vacant."); Declaration of Normaric Lindsey ¶ 13 (App. D, Ex. 22); Declaration of Christopher Melton ¶ 15 (App. D, Ex. 26) (testifying about four unposted positions "for which I would have

43

companies, declarants state that Defendant's policy of vesting unmonitored

discretion in the hands of its hiring supervisors has the effect of discriminating

against African Americans.  Declarant Clem Alcala, after working for ten years as

a scientist without a promotion despite satisfactory work performance, stated:

> J&J provided no standards to guide the decision-making of those supervisors who were in charge of determining promotions.  As a result, promotions were made haphazardly, based on subjective and arbitrary criteria.[121]

Other declarants tell a similar story.[122]  Taken as a whole, these declarations further

demonstrate the substantial commonality of the class claims.

---

been a qualified candidate" but he had no opportunity to compete for them); Declaration of Deeawn Roundtree ¶ 20 (App. D, Ex. 36) (certain positions are not posted, and as a result, employees learn of the position by being sought out or selected, "or through the grapevine").

[121] *See* Declaration of Clem Alcala, ¶¶ 25, 31 (App. D, Ex. 4).

[122] *See* Declaration of Laura C. Reed, ¶ 18, 37 (App. D, Ex. 34) ("no matter how many people I asked, I could not get the company to give me a straight answer as to what *specifically* would be required of me in order to be considered for such a promotion, and no matter how hard I tried, I never received such a promotion . . . . there is a culture of racial inequity at Johnson & Johnson."); Declaration of Thurman Elliot Dow ¶ 39 (App. D, Ex. 11) ("Personnel in Upper Management positions have full discretion on deciding whom they are going to promote and give opportunities for growth. . . .The deciding factor in most promotion decisions made by Caucasian upper Management personnel seems to be race rather than level of experience or expertise").

44

> d.   *Senior Company Officials and Defendant's Own*
>      *Documents Reveal Longstanding Knowledge of*
>      *These Problems*

In the years leading up to this lawsuit, Defendant's senior management was

clearly on notice of the kind of systemic equal opportunity failures documented by

this statistical and anecdotal evidence – beginning with the conspicuous absence of

African Americans and Hispanics from the upper levels of the corporation:

- There were **zero** African Americans or Hispanics on the Executive
  Committee and **zero** African American Company Group Chairmen
  from 1997 through 2003.  (Only one Hispanic served as a Company
  Group Chairman, and just for 1998-99.)[123]

- There were **zero** Hispanics holding Corporate Department or Division
  Head positions from 1997 through 2003, and only one African
  American at that level until 2001.[124]

- The percentage of African American supervisors dropped from 13%
  to 10.8% from the end of 1997 until just after plaintiffs filed this suit
  in 2001.  Hispanic supervisors suffered a similar fate over this time
  period, dropping from 12.5% to 10.2%.[125]

- Internal Company reports show the representation of African-
  Americans in exempt positions was unchanged from 1976 (7.1%) to

---

[123] Madden Rep. at Attachment B (Distribution of Employees by Various
Characteristics) (App. A).

[124] *Id.*

[125] *Id.*

2000 (7.1%), while the representation of all minorities increased from 9.5% to 20.2% over that time.[126]

- From the end of 1997 until the end of 2001 when this suit was filed, the number of African Americans and Hispanics among the 150 highest paid employees dropped from six to two, and from 1999 to 2003, there were **zero** Hispanics among the top 150 paid employees.[127]

Even if this glass ceiling were not painfully apparent, the Company's periodic

Company-wide EEO reports should have put Carey, Deyo and others on notice.[128]

Since at least 1997, the Company has generated annual EEO reports showing

representation levels for all the domestic operating companies, on a combined

Company-wide basis, "as a tool for [the EEO office] to inform . . . management of

[the] data."[129]  These reports repeatedly documented problems in the representation

———————————————

[126] List of Exempt 1976-2000 (JOHN0000439973) (App. C, Vol. 2, Ex. 9).

[127] Madden Rep. at Attachment B (App. A).

[128] HochbergSmith Dep. at 142-43 (App. B, Vol. 2) ("we always had [an EEO] report that looked, dating as far as [sic] back as I remember, that looked across the companies . . ."); *id.* at 144 (would bring lack of progress "to the attention of our direct management. . . ."); Bolden Dep. at 143 (App. B, Vol. 1) (reports give "the Executive Committee a feel for how they are doing on a consolidated basis").

[129] HochbergSmith Dep. at 434 *et seq* (App. B, Vol. 2).  *See also id.* (Michael Carey received either a verbal summary or an actual copy of these reports); *id.* at 451 (Executive Utilization Reports present EEO data in a format that "aggregate[s] all of the companies in the United States into one snapshot for an easy business read of where we are as a company" and were distributed regularly to all top management, including Carey, Deyo, the GOC's and "the HR leadership").

46

levels for African Americans and Hispanics in management and senior

management positions.[130]  Indeed, Defendant's own senior executives and top

human resources officials conceded they knew about concerns over the

representation of African Americans and Hispanics in management.[131]

––––––––––––––––

[130] *See, e.g.,* HochbergSmith Dep. at 442-452 (App. B, Vol. 2) and Executive
Report on Utilization (9/2002) (JOHN0000417443-0000417470, at
JOHN0000417444) (App. C, Vol. 3, Ex. 41) (shortfall of 22 African Americans
and 16 Hispanics in upper management); HochbergSmith Dep. at 439-41 (App. B,
Vol. 2) and Johnson & Johnson Midyear Report, 1998 Versus Year-End 1997 and
Year-End 1996 (JOHN0000359723-000035932, at JOHN0000359723) (App. C,
Vol. 5, Ex. 76) (representation of African-Americans decreases from 5.7% to 5.3%
from 1996-98); Deposition of Linda Bright (Nov. 13, 2003) at 89-96 (App. B, Vol.
1) (hereinafter "Bright Dep.") and List of Exempt 1976-2000 (JOHN0000439973)
(App. C, Vol. 2, Ex. 9) (from 1976 to 2000, there was no improvement in
representation of African American exempts); Bright Dep. at 178-181 and Letter,
Bright to Deyo, with Attachment (JOHN0000094245-0000094247, at
JOHN0000094246) (App. C, Vol. 3, Ex. 40) (diversity metrics report, copied to
both Russell Deyo and Michael Carey, shows unstable representation numbers for
African-American employees––from 3.9% to 5.2% and down again to 4.6% in
years 1998 to 2000, respectively); Bolden Dep. at 148-49 (App. B, Vol. 1) and
Executive Committee Quarterly Review (JOHN0000574175-0000574216,
0000574178) (App. C, Vol. 3, Ex. 43) (during the 2001-2002 timeframe there was
a drop in representation of African-Americans in executive management to 4.3%);
Bolden Dep. at 164-65 (App. B, Vol. 1) and Executive Committee Diversity
Update (June 3, 2002) (JOHN0000573218-0000573244, 0000573223) (App. C,
Vol. 5, Ex. 77) (under-utilization of minorities overall in middle management).

[131] *See, e.g.,* HochbergSmith Dep. at 62-63 (App. B, Vol. 2) (representation of
African-Americans in management positions "an area that we do want to do better
in"); *id.* at 78-81 ("less progress" for Hispanics than for women; "we continue to
concentrate on that as an issue for us"); *id.* at 241-49; Request for Info.
(JOHN0000365158-0000365163, at JOHN0000365162, 0000365163) (App. C,
Vol. 5, Ex. 78) (talking points likely given to Mike Carey for an AALC meeting
state African American management hiring rate "not good enough to make the

Internal activities beginning in the late 1990's firmly linked this lack of representation with flawed human resources practices. Carey convened and charged the Diversity Best Practices Task Force to "[a]ssess our ability to overcome inertia on the subject of affirmative action/diversity."[132] In a series of meetings in late 1998, Task Force members, high level employees drawn from across the Company,[133] met and discussed specific and significant equal opportunity concerns:[134]

- "Glass Ceiling for Hispanic, African Americans and Women"
- "Lack of accountability"
- "Retention of diverse people is a problem"
- "Resistance to change"
- "Lingering Stereotypes"[135]

---

progress we hope to achieve"; need to "increas[e] critical mass for African-American and Hispanic employees at every level"); Deyo Dep. at 141 (App. B, Vol. 1) (flatline trend on African American exempts).

[132] HochbergSmith Dep. at 117-18 (App. B, Vol. 2); Diversity Best Practices Task Force Committee Meeting (11/18/98) (JOHN0000092456-0000092521, at JOHN0000092457) (App. C, Vol. 5, Ex. 79).

[133] *See* HochbergSmith Dep. at 139 (App. B, Vol. 2).

[134] *See id.* at 145-46.

[135] *See* Lupinski E-Mail (JOHN0000348310-0000348320, at JOHN0000348312-0000348313) (App. C, Vol. 2, Ex. 6).

48

The Task Force ultimately presented its detailed analysis to Carey and Deyo, as well as its recommendations, which were never implemented.[136]  During this period, HochbergSmith continued to raise diversity and EEO concerns to Carey, and make specific recommendations for policy reform.  One memorandum states she is "compelled to summarize my concerns and recommendations regarding Johnson & Johnson's need for increased EEO preparedness" in light of recent well-publicized class action discrimination cases, and describing "areas of vulnerability that are not being sufficiently addressed."[137]  She insisted the Company "must make substantial changes and improvements."[138]  Although Carey reviewed the information and discussed it with her, the Company failed to act on her proposals.[139]

---

[136] *See* HochbergSmith Dep. at 154-55, 171-90 (App. B, Vol. 2).

[137] Carey Dep. at 501-04 (App. B, Vol. 1); Memorandum, HochbergSmith to Carey re: Equal Employment Enhanced Preparedness (JOHN0000279917-0000279924, at JOHN0000279917) (App. C, Vol. 2, Ex. 7).

[138] *Id.* at JOHN0000279919.

[139] *See* Carey Dep. at 503-04; 518, 521 (App. B, Vol. 1); *See generally,* HochbergSmith Dep. at 206-50; 347-69 (App. B, Vol. 2); *see, e.g., id.* at 177-85 (describing draft document prepared to express outcomes based on Task Force recommendations, a document that was never sent and some of whose stated changes never occurred); *id.* at 223-225 (her recommendation that EEO training be mandatory not implemented).

49

Defendant has also heard significant concerns expressed by the individuals

directly impacted by the failures – its African and Hispanic American employees.

For example, on July 10, 2001, the AALC met with Russ Deyo and discussed

specific concerns such as "representation of African Americans" being "flat or

down" and the "promotion of African Americans" being "slow," ultimately making

reference to the "brick ceiling" for African Americans.[140] The presentation also

explained that the Company's "succession planning" process was "without results

for African Americans."[141] Common to the claims of every class member is this

record of the Company's reckless disregard for equal opportunity violations.

### 2.     *The Class Will Prove These Claims Under Common Legal Theories*

In this case, the common evidence of the company's policies, statistical and

anecdotal proof of their discriminatory results, and the lengthy record of corporate

knowledge and inaction described above will be proven under common legal

theories.   To prove the discriminatory outcome of Johnson & Johnson's policies,

---

[140] E-Mail, Carey to HochbergSmith (7/17/01) (JOHN0000360716-0000360725) (App. C, Vol. 2, Ex. 8). *Id.* at JOHN0000360719.

[141] *Id.* at JOHN0000360720. *See also* Letter from Deloris to JoAnn Heisen (JOHN0000429894-0000429895) (App. C, Vol. 5, Ex. 80) (African American women at the Company face a "concrete ceiling,"); *see* Deyo Dep. at 119-22 (App. B, Vol. 1) and Deyo Handwritten Notes (JOHN0000429106) (App. C, Vol. 5, Ex. 81) (acknowledging Coke-type discrimination class action lawsuits as a threat to the Company).

the class is pursuing both disparate impact claims, and intentional discrimination

("pattern or practice") claims.   Blackletter law establishes that under either

approach, proof of liability focuses entirely on the question of a discriminatory

pattern, and does not address the individual outcomes of particular employment

decisions.  These doctrines establish common questions of law linking all class

claims.

Disparate impact theory permits a remedy against facially neutral

employment practices that nevertheless operate to discriminate.  A disparate

impact claim requires no proof of discriminatory intent.  *See Watson v. Fort Worth*

*Bank & Trust*, 487 U.S 977, 986-87 (1988).  Disparate impact claims involve

competing statistical and other expert testimony on the impact of the challenged

practices and any justifications.  *See, e.g., Watson*, 487 U.S. at 991; *Lanning v. S.E.*

*Pa. Transp. Auth.*, 181 F.3d 478, 485 (3d Cir. 1999).  This theory is available

whether the discrimination takes the form of an improper written test or subjective

compensation or promotion criteria.[142]  Thus, Plaintiffs' disparate impact claim

will rely on a statistical analysis of company-wide employment practices to

_____

[142] The Supreme Court explained the theory underlying a challenge to "an
employer's undisciplined system of subjective decisionmaking," noting that "a
facially neutral practice, adopted without discriminatory intent, may have effects
that are indistinguishable from intentionally discriminatory practices." *Watson*,
487 U.S. at 990-91.

51

determine whether a disparate impact exists and expert testimony to link the impact and the practices at issue.[143]  Individualized issues are not relevant to the claims or defenses.[144]

Plaintiffs also rely on an intent claim and will prove their case of whether a pattern or practice of discrimination exists pursuant to *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). Plaintiffs intend to submit statistical evidence of the discriminatory pattern, bolstered by anecdotal evidence, to establish discrimination as the Company's "standard operating procedure – the regular rather than the unusual practice." *Id.* at 336; 336-39 (class wide discrimination cases may rely primarily on statistical proof, especially where "brought to life" by anecdotal evidence).

Litigating the class claims to judgment will **not** require examining the individual circumstances surrounding thousands of individual incidents of discrimination.  Under the *Teamsters* model, including cases that also involve

---

[143] A common issue in a disparate impact case is whether practices have been validated in accordance with applicable legal standards, usually entirely litigated via expert testimony.  Discovery has already revealed that the company has never validated its evaluation system.  *See supra* at n.86.

[144] *Watson*, 487 U.S. at 987 (disparate impact case "usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities"); *see also, e.g., Lanning v. S.E. Pa. Transp. Auth.*, 181 F.3d 478, 485 (3d Cir. 1999).

disparate impact claims, courts typically conduct trials in two separate phases - a liability phase and a remedial phase. The ultimate issue at the liability phase will be whether a discriminatory **policy or practice** exists, not proof of individual incidents.[145] *See Chiang*, No. 03-3488, slip op. at 10. The kinds of defenses permitted at this liability phase are challenges to the adequacy of the statistical evidence or an alternate explanation for the existence of the pattern or practice, as distinct from explanations for any particular employment decision. *See Teamsters*, 431 U.S. at 360 n.46.[146] *See also Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 168 (2d Cir. 2001).

In the remedial phase, there may be individual relief proceedings (or "mini-trials") but "[t]he proof of the pattern or practice supports an inference that any particular employment decision, during the period in which the discriminatory policy was in force, was made in pursuit of that policy." *Teamsters*, 431 U.S. at 362. No individual must establish an entitlement to relief or the existence of

---

[145] *See Teamsters*, 431 U.S. at 360; *Gavalik v. Continental Can Co.*, 812 F.2d 834, 859 (3d Cir. 1987) ("At the initial 'liability' stage, proof that the discriminatory policy actually existed is all that is required.").

[146] *Accord Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984) (the liability phase involves inquiry into a pattern or practice of discrimination not an inquiry into individual hiring decisions).

53

discrimination — it will be presumed and any individual legal issues are truncated, and restricted to a circumscribed universe of factual questions.[147]

Applying these longstanding legal doctrines makes clear how significant common questions of fact and law are to each class member's claim. Litigating the statistical patterns is the core question for the liability determination, supported by other common anecdotal evidence and evidence related to the common policies. The limited remaining individual relief questions are secondary to an effective and efficient class proceeding. There is no doubt this case meets the commonality requirement.

### C. Typicality

Plaintiffs meet Rule 23(a)'s typicality prong, which merely requires that the claims of the class representatives be "consistent with those presented by the entire class." *Green*, 843 F.2d at 1533; *Baby Neal*, 43 F.3d at 58 ("even relatively pronounced factual differences" can satisfy typicality); *Gunter v. Ridgewood Energy Corp.*, 164 F.R.D. 391, 396 (D.N.J. 1996) (Third Circuit takes a "big picture" approach to typicality).

---

[147] *See, e.g., Neal v. Dir., Dist. of Columbia Dept. of Corrections*, Civ. A. No. 93-2420 (RCL), 1995 WL 517246, *1,4 (D.D.C. Aug. 9, 1995) ("When an employer has been proven to be a discriminator, and adverse effect on a particular claimant has been demonstrated, the claimant's prima facie case is complete."); *Robinson*, 267 F.3d at 168-69.

54

Plaintiffs' allegations challenging Defendant's company-wide discriminatory policies and practices are typical of the class – they arise out of the same factual issues and are bound by the same legal theories.

- Linda Morgan is an African-American who dedicated 25 years of her life in exemplary service to Defendant. Ms. Morgan received numerous awards for her contributions, yet was paid less than similarly-situated Caucasian colleagues. Additionally, Defendant denied her promotional opportunities because of her race – freezing her as a Manager for almost 12 years.[148]

- Nilda Gutierrez is an Hispanic-American who served Defendant for seven years. Notwithstanding her qualifications and merit, Ms. Gutierrez was underpaid in comparison with Caucasian coworkers throughout her employment.[149]

- Wayne Brown is an African-American former Security Supervisor for the Defendant and a current Detective for the Somerset County, New Jersey, Prosecutor. Despite his successful work performance, Defendant held Detective Brown in the same position for five years based on his race and paid him well below less qualified Caucasian coworkers.[150]

- Krista Marshall is an African-American Manager for J&J Health Care Systems. Although Defendant long recognized Ms. Marshall's extraordinary talents and performance by designating her as "High-Potential" and paying for her Duke University Executive MBA, her

---

[148] Deposition of Linda Morgan (Jan. 17, 2003) at 49, 9-11, 17-22, 30-33, 49, 107-10, 122-24, 170-72, 268-71, 314-16, 325-26, 339-40, 365-75, 386-88, 391-92 (App. B, Vol. 3).

[149] *See* First Am. Compl. ¶ 103, ¶ 108 (App. C, Vol 3, Ex. 36); *see also* Deposition of Nilda Gutierrez (Nov. 11, 2003) at 61-63, 88, 135-36.

[150] *See* Declaration of Wayne Brown ¶¶ 11-22, 14, 21 (App. D, Ex. 1).

compensation remained toward the bottom of similarly-situated Caucasian colleagues and her career stagnated.[151]

Here, the named Plaintiffs' claims all arise from and involve the application of the same discriminatory promotion and compensation systems and processes – such as the highly subjective promotion and pay practices, and failures to post job openings - as the claims of the other class members. Thus, typicality is satisfied.

### D.    Adequacy

Finally, Rule 23(a) requires that Plaintiffs adequately represent the interests of the class. Because their claims are typical and rely on common evidence and a shared legal theory, Ms. Morgan, Ms. Gutierrez, Ms. Marshall and Mr. Brown share the class' interest in challenging Defendant's practices that operate to deny employees of African and Hispanic descent higher-level promotions and equitable compensation.[152] *Hassine*, 846 F.2d at 179 (23(a)(4) requires assessing whether "the putative named plaintiff has the ability and the incentive to represent the

---

[151] Declaration of Krista Marshal ¶¶ 7, 8, 10, 12, 20, 25, 26 (App. D, Ex. 2).
[152] Plaintiffs have also demonstrated their adequacy as representatives by their service to the class. For example, Ms. Morgan and Ms. Gutierrez have appeared at class member "town hall" meetings and made presentations to putative class members about the case. They had regular calls with counsel, and attended court hearings when possible. Ms. Marshall and Mr. Brown are new class representatives and are prepared to take the time necessary to fulfill those duties.

claims of the class vigorously").[153]  Further, the racial diversity of the class will not, as the Company may argue, impact the adequacy of these representatives.[154] Plaintiffs Guttierrez, Morgan, Marshall and Brown have served the class with distinction and will continue to do so.

## II.   THE CLASS SATISFIES RULE 23(B)

In addition to satisfying Rule 23(a) in all respects, the class meets the requirements of Rule 23(b)(2) -- where a defendant "has acted or refused to act on grounds generally applicable to the class" and class-wide injunctive or declaratory relief is appropriate, as well as Rule 23(b)(3) -- where plaintiffs must establish the

---

[153] Ms. Morgan, Ms. Guttierrez, Ms. Marshall, and Mr. Brown have also retained skilled and experienced counsel to represent them.  The fitness of proposed class counsel is set forth in the separate Rule 23(g) Motion for Appointment as Class Counsel, filed on August 16, 2004.  As the Advisory Committee notes to the most recent revisions to Rule 23 explain, all issues related to the adequacy of counsel are to be addressed under this new provision of Rule 23, and are to be considered distinct from the proposed class representatives' adequacy, which will continue to be analyzed under Rule 23(a)(4).  Fed. R. Civ. P. 23 Notes of the Advisory Committee to the 2003 Amendments, Subdivision (g) (West 2004).

[154] *See, e.g., Vargas, et al., v. Calabrese, et al.,* 634 F.Supp. 910, 919 (D.N.J. 1996) (certifying a plaintiffs class of African Americans and Hispanics -- no conflict of interest under 23(a)(4)); *Wilson v. Tinicum Tp.,* No. Civ. A. 92-6617, 1993 WL 280205, *6 (E.D. Pa. June 20, 1993) (granting class certification to four African Americans representing class of African Americans and Hispanics); *Taylor, et al., v. White, et al.,* 132 F.R.D. 636, 648 (E.D. Pa. 1990) (certifying a broad class including African Americans and Hispanics when the policies discriminated against a broad spectrum).

57

"predominance" of common factual and legal questions over individual issues and the "superiority" of the class action.[155]

Recent appellate rulings on certification of class employment discrimination claims do not erect static barriers between the two provisions. Instead, they apply them flexibly and in combinations and variations, and maintain a discretionary, fact-specific approach to certification. *See, e.g., Molski v. Gleich*, 318 F.3d 937, 947-50 (9th Cir. 2003); *Robinson*, 267 F.3d at 162-66; *Lemon v. Int'l Union of Operating Eng.*, 216 F.3d 577, 581-82 (7th Cir. 2000); *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999); *cf. Chiang*, No. 03-3488, slip op. at 10-12, 18-19. Consistent with this trend, the Court should rely on both 23(b)(2) and 23(b)(3) to certify the claims of the class.

## A.  Liability and Injunctive, Declaratory and Equitable Relief Should Be Certified Under Rule 23(b)(2)

Class certification for liability, injunctive, declaratory, and equitable relief is appropriate in this matter under Rule 23(b)(2). It is well established that civil rights actions, like the case at bar, seeking primarily injunctive relief to redress class-based unlawful discrimination, are paradigmatic examples of Rule 23(b)(2)

---

[155] Fed. R. Civ. Proc. (b)(3) ("questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and "a class action is superior to other available methods for fair and efficient adjudication of the controversy").

58

actions, regardless of whether they also seek some form of monetary relief.[156]

Indeed, blackletter law approves certifying civil rights cases seeking injunctive

relief and equitable relief (back pay and front pay) under Rule 23(b)(2).  *Wetzel v.*

*Liberty Mutual Ins. Co.*, 508 F.2d 239, 251 (3d Cir. 1975); *Brotherhood Ry.*

*Carmen of U.S. and Canada v. Delpro Co.*, 98 F.R.D. 471 (D. Del. 1983).[157]

## B.   **Punitive Damages May Be Certified Under Either Rule 23(b)(2) or 23(b)(3)**

In addition to injunctive, declaratory, and equitable relief, Plaintiffs seek

class-wide punitive damages to punish Defendant for its reckless disregard of EEO

violations and to deter similar conduct by Defendant and other large corporations

in the future.  The Supreme Court's decision in *Kolstad v. American Dental Ass'n,*

527 U.S. 526 (1999), confirms that certification of punitive damages involves

---

[156] *See* 5 Herbert B. Newberg and Alba Conte, *Newberg on Class Action* § 24.117, at 24-385-86 (3d ed. 1992) (citing cases); *Amchem Prods., Inc v. Windsor,* 521 U.S. 591, 614 (1997) (Rule 23(b)(2) is ideal for "civil rights cases against parties charged with unlawful, class-based discrimination[.]").

[157] *See also, e.g., Hunter v. City of Philadelphia,* 1999 WL 181388 (E.D. Pa. 1999) (injunctive and monetary relief); *Jefferson v. Windy City Maintenance, Inc.,* 1998 WL 474115 *10 (N.D. Ill. 1998) (injunctive relief and back pay); *Orlowski v. Dominick's Finer Foods, Inc.,* 172 F.R.D. 370, 374-75 (N.D. Ill. 1997) (injunctive and equitable relief); *Adames v. Mitsubishi Bank, Ltd.,* 133 F.R.D. 82, 91-92 (E.D.N.Y. 1989) (injunctive relief, front and back pay); *Kuenz v. Goodyear Tire and Rubber Co.,* 104 F.R.D. 474, 476-68 (E.D. Mo. 1985) (injunctive relief and back pay); *Duncan v. State of Tennessee,* 84 F.R.D. 21, 37 n.19 (M.D. Tenn. 1979) (injunctive relief and back pay).

issues common to the class. The Court held that the question of whether an employer has displayed the "reckless indifference" requisite to an award of punitive damages depends on the employer's overall knowledge and conduct, *Kolstad*, 527 U.S. at 535-36.[158] Under binding precedent, Plaintiffs' punitive damages claim turns on the evidence of Defendant's senior management knowledge of discrimination and its conduct toward the class as a whole in light of that knowledge. Thus, whether Johnson & Johnson acted with reckless indifference to discrimination is a question common to the class.

Because punitive damages spring from common questions regarding a defendant's conduct, rather than the particular impact of the recklessness on the class members, courts consider class-wide punitive damages based on an evaluation of the defendant's conduct toward the class as a whole without requiring calculations of harm to individuals. *See, e.g., Hilao v. Marcos*, 103 F.3d 767, 782 (9th Cir. 1996) (exemplary damages focus on defendants' conduct).[159] As

---

[158] *Accord, e.g., Lincoln v. Case*, 340 F.3d 283, 291 (5th Cir. 2003); *Gagliardo v. Connaught Laboratories*, 311 F.3d 565, 573 (3d Cir. 2002); *Fine v. Ryan*, 305 F.3d 746, 754-55 (7th Cir. 2002); *Swinton v. Potomac Corp.*, 270 F.3d 794, 810 (9th Cir. 2001); *Knowlton v. Teltrust Phones, Inc.*, 189 F.3d 1177, 1186 (10th Cir. 1999).

[159] *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1019 (5th Cir. 1992) (finding that in considering class claims, "that the punitive damages inquiry . . . focuses primarily on the egregiousness of the defendant's conduct"); *accord Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 474 (5th Cir. 1986); *Dukes*, 222 F.R.D. at 170-71; *see*

60

one trial court explained in certifying punitive damages claims in an employment discrimination case:

> Because the purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant, any claim for such damages hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole.

*Barefield v. Chevron*, 1988 WL 188433, *3 (N.D. Cal. 1988).   Since the *Kolstad* "reckless indifference" assessment also directly flows from the 23(b)(2) inquiry into whether Defendant "acted or refuses to act" with respect to the class as a whole, many courts have chosen to certify punitive damages claims under Rule 23(b)(2). *See, e.g., Dukes*, 222 F.R.D. at 170-71; *Barefield*, 1988 WL 188433, *2. It would also be appropriate, however, to certify these damages under 23(b)(3), as the common questions surrounding Defendant's knowledge and conduct predominate over individual questions. *Brotherhood Ry.*, 98 F.R.D. at 478 (punitive damages claims satisfy predominance and superiority).

---

*also Palmer v. Combined Ins. Co.*, 217 F.R.D 430, 440 (N.D. Ill. 2003) (punitive damages claim need not require individualized inquiry); *White v. Imperial Adjustment Corp.*, 2002 WL 1809084, *11 (E.D. La. 2002) (punitive damages focuses "on the same proof for all potential claimants (i.e., defendants' alleged course of conduct)").

61

### C.   Compensatory Damages Should Be Certified Under Rule 23(b)(3)

Plaintiffs' claims for compensatory damages are properly certified under Rule 23(b)(3) because Plaintiffs satisfy both the "predominance" and the "superiority" requirements.

To satisfy the predominance requirement, Plaintiffs must show that one or more common issues predominate over individual issues.  Predomination involves an assessment of the relative significance of common and individual issues, *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986) (class certification under Rule 23(b)(3) is appropriate when "class resolution of one issue or a small group of them will so advance the litigation that they may fairly be said to predominate"), and can be satisfied even where class members' damages must be assessed individually. *See, e.g., Chiang*, No. 03-3488, slip op. at 10; *id.* at 19 ("it is **settled law** that the necessity for proving damages individually does not defeat class predominance or class certification") (emphasis supplied); *Accord Gunter*, 164 F.R.D. at 399-400. [160]  Here, the question of whether Defendant's employment practices systemically discriminate is **the central issue in this case** and provides

---

[160] *Accord* 7A Charles A. Wright et al., *Federal Practice and Procedure* § 1778 at 529 (2d ed. 1986) ("[W]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action will be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately.") (internal citations omitted).

the basis of liability for **all claims**. Further, a finding of liability creates a presumption of entitlement to relief for every class member. *Teamsters*, 431 U.S. at 362. For this reason, many courts have held that whether a pattern or practice of discrimination exists is a predominant question under Rule 23 analysis. *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598-99 (2d Cir. 1986) (defendant's allegedly discriminatory evaluation system was "a common thread running between" the class representative's claim and the class members' claims of discrimination).[161] *See also Chiang*, No. 03-3488, slip op. at 10 (allegations of common course of conduct supports finding of predominance).

In addition to meeting Rule 23(b)(3)'s predominance requirement, Plaintiffs also meet Rule 23(b)(3)'s superiority requirement. One trial of common issues is certainly *superior* to conducting literally hundreds or thousands of separate trials. Certification would obviate the need for each class member to conduct duplicative

---

[161] *See also* 7A Charles A. Wright et al., Federal Practice and Procedure § 1778 at 534 (2d ed. 1986) (courts view "illegal discrimination" as an issue of "overriding significance" and therefore as a predominant issue) (internal citations omitted); *Chiang v. Veneman*, 213 F.R.D. 256, 263 (D.V.I. 2003) (predominance met despite "variations in individual circumstances" because "defendant's policy, pattern, and practice. . . is common to all plaintiffs"); *Jarvaise v. Rand Corp.*, 212 F.R.D. 1, 3-4 (D.D.C 2002) ("any individual issues" are predominated by the question of whether plaintiffs can show that defendant "had system-wide practice of paying female employees less than male employees"); *Martens v. Smith Barney*, 181 F.R.D. 243, 260 (S.D.N.Y. 1998) (finding predominance when plaintiff's allegations regard defendant's "central and systemic failures to comply with Title VII").

discovery concerning Defendant's policies and practices, to undertake the same

statistical analyses, and to waste judicial resources by separately litigating the same

evidence of Defendant's discriminatory employment practices.[162]   Further, if

forced to proceed one by one, many genuinely injured plaintiffs may be deterred

by the costs and risks entailed in suing one's employer. [163]   Where, as here,

common questions of fact and law are central to the claims, certification serves the

best interests of the Court and the parties.[164]

### D.     This Court Has the Discretion to Certify Plaintiffs' Claims Under Multiple Provisions of Rule 23(b)

As the Seventh Circuit explains: "A court should endeavor to select the most

appropriate subsection [of Rule 23(b)], not just the first linguistically applicable

one in the list." *Jefferson*, 195 F.3d at 898.  Thus, this Court has discretion to

certify Plaintiffs' injunctive, declaratory, and equitable relief claims as well as

---

[162] *See Chiang*, 213 F.R.D. at 263; *Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 388 (N.D. Ill. 1999).

[163] *See Scott v. Aetna Services*, 210 F.R.D. 261, 267-68 (D. Conn. 2002); *Warnell*, 189 F.R.D. at 388; *cf. Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338-39 (1980) (class action superior where economically infeasible for claimants to successfully file individual suits); *Wilson v. United Int'l Investigative Serv. 401(k) Sav. Plan*, 2002 WL 734339, *7 (E.D. Pa. 2002); *Shaw v. Toshiba*, 91 F. Supp 2d 942, 952 (E.D. Tex. 2000).

[164] Indeed, if the Court certifies the class and the Phase I liability jury finds in favor of the defendant, then the case will be completed, and the Company will have extinguished the class claims of every member of the class in a single proceeding.

punitive damages claims under Rule 23(b)(2) while certifying compensatory damages claims under Rule 23(b)(3), provided class members receive an opt-out right with respect to any monetary relief. Alternatively, the Court may consider certifying all monetary relief claims in this case, not just compensatory damages claims, under Rule 23(b)(3), for the reasons set forth in the preceding section.

Recent appellate cases endorse a variety of flexible, practical approaches to certification, yielding at least four options for certification of this case:

**"Hybrid" certification.** The District of Columbia, Second, Seventh, Ninth and Eleventh Circuits have all endorsed certifying monetary relief such as back pay or damages under Rule 23(b)(2), while offering class members the notice and opportunity to opt out under the discretionary powers set forth in Rule 23(d).[165] This approach allows courts to apply 23(b)(2) as intended to civil rights claims, while addressing the potential due process issues raised by mandatory damages classes.

---

[165] *See Molski*, 318 F.3d at 947-50 (instructing lower court to consider hybrid certification); *Robinson*, 267 F.3d at 164-66 (instructing lower court to consider hybrid certification); *Lemon*, 216 F.3d at 582 (endorsing hybrid and divided certification under Rule 23(b)); *Jefferson*, 195 F.3d at 898 (endorsing hybrid and divided certification under Rule 23(b)); *Eubanks v. Billington*, 110 F.3d 87, 96 n.14 (D.C. Cir. 1997) (setting forth ways a court may provide opt-out rights to a 23(b)(2) class, including hybrid certification); *Holmes v. Continental Can*, 706 F.2d 1144, 1154 (11th Cir. 1983) (can use opt-out procedure to certify monetary relief under (b)(2)).

**"Divided" certification**. A court may certify portions of a suit, such as injunctive and equitable relief, under Rule 23(b)(2), while certifying other aspects under Rule 23(b)(3). *See Lemon*, 216 F.3d at 581; *Jefferson*, 195 F.3d at 898.[166] Divided certification satisfies due process by "consistent treatment of class-wide relief and an opportunity for each affected person to exercise control over the damages aspects." *Jefferson*, 195 F.3d at 898.

**Partial certification**. Whether each aspect of the class case -- liability, injunctive relief, equitable relief, punitive damages and compensatory damages -- can be certified involves distinct questions that must be considered separately. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) (if problems in proving damages "outweigh the advantages of class certification," the district court should still "give appropriate consideration to certification of a class limited to the determination of liability"); *Chiang*, No. 03-3488, slip op. at 11-12 (Rule 23(c)(4) permits certification of liability only, "while leaving other elements to individual adjudication"); *id.* at 18-19 (*citing Bogosian*). *See also Allen v. Int'l Truck & Engine Corp.*, 358 F.3d 469 (7th Cir. 2004) (reversing and remanding a lower court decision refusing to certify injunctive relief claims where damages claims

---

[166] *Accord Eubanks*, 110 F.3d at 96 n.14 (discussing certification of injunctive relief under 23(b)(2) and compensatory damages under 23(b)(3)); *Robinson*, 267 F.3d at 167-72.

also sought); *Robinson*, 267 F.3d at 167-68 (endorsing certification of liability only, since "litigating the pattern-or-practice liability phase for the class as a whole would both reduce the range of issues in dispute and promote judicial economy").[167]

**Certifying all claims under Rule 23(b)(3).** The analysis in *Chiang*, which points out how common issues in a pattern or practice discrimination case predominate over issues related to individual damages, and that class treatment is superior in such cases, clearly supports certifying all claims in this case under Rule 23(b)(3). *Chiang*, No. 03-3488, slip op. at 10, 18-19. *See also, e.g., Lemon*, 216 F.3d at 581 (lower court on remand should consider certifying all claims under 23(b)(3)); *cf. Robinson*, 267 F.3d at 168 (liability stage of pattern or practice claim involves common issues and their resolution narrows issues presented at remedial stage).

Although the Third Circuit has not directly ruled on hybrid or divided certification in employment cases, the Third Circuit is in line with the majority view taking a flexible and expansive approach to 23(b). *Chiang*'s endorsement of

---

[167] Although Defendants may argue that Plaintiffs' proposals for divided or partial certification run afoul of the Seventh Amendment's re-examination clause, numerous courts have considered the argument and dispatched it. *See, e.g., Allen*, 358 F.3d at 471-72; *Robinson*, 267 F.3d at 169 n.13; *EEOC v. Dial Corp.*, 156 F. Supp. 2d 926, 957-58 (N.D. Ill. 2001).