partial certification and its analysis of the common issues presented in pattern or practice discrimination cases rely on the same theoretical foundation as the foregoing opinions of the Second, Seventh and Ninth Circuits, among others. Indeed, the Fifth Circuit stands alone in rejecting all hybrid, divided, or partial certification options, *Allison v. Citgo*, 151 F.3d 402 (5th Cir. 1998), and at least two other Circuits have extensively critiqued that court's analysis. *See Robinson*, 267 F.3d at 163-71; *Molski*, 318 F.3d at 949-950 (*Allison*'s rule "holds troubling implications for the viability of future civil rights actions").[168]  Applying *Chiang* and *Green*, as well as the decisions of the majority of Circuits that have an expansive and flexible understanding of Rule 23(b), clearly support certification of the claims in this case.

---

[168]  Notably, the very limited holding denying interlocutory appeal in *Barabin v. Aramark*, No. 02-8057, 2003 WL 355417 (3d Cir. Jan. 24, 2003) is utterly silent on the critical issue of divided, hybrid or partial certification. *See id.* (declining to disturb lower court ruling that hostile work environment class action could not be certified).  In following the least controversial aspect of the *Allison* ruling that highly limited mandatory 23(b)(2) certification of damages, 2003 WL 355417 at *1-2, the Third Circuit did not address the alternatives presented by the Seventh Circuit. *See Barabin*, 2003 WL 355417 *passim.*  The Seventh Circuit agreed with *Allison* in limiting mandatory (b)(2) classes for damages, but endorsed hybrid (b)(2) classes providing opt-out rights or divided certification as a way of addressing the *Allison* court's due process concerns. *See, e.g., Lemon*, 216 F.3d at 581-82; *Jefferson*, 195 F.3d at 898.  In light of the analysis in *Chiang*, the Third Circuit is clearly more likely to follow the Seventh Circuit, rather than the Fifth, on this point.

## CONCLUSION

Plaintiffs respectfully request that the Court grant the Motion for Class

Certification.

Dated: September 27, 2004

Respectfully Submitted,

Cyrus Mehri (CM 9465)
Pamela Coukos (PC 4265)
N. Jeremi Duru (NJD 7630)
Nicole Austin-Hillery (NAH 3784)
Mehri & Skalet, PLLC
1300 19th Street, NW, Suite 400
Washington, DC 20036
(202) 822-5100

Johnnie L. Cochran, Jr. (JC 4361)
Cameron Stewart (CS 7221)
The Cochran Firm
Woolworth Building
233 Broadway
New York, New York 10279-0003
(212) 553-9000

Bennet D. Zurofsky (BZ 2005)
Timothy McCarthy (TM 3946)
Reitman Parsonnet, PC
744 Broad Street, Suite 1807
Newark, NJ 07102
(973) 642-0885

Bruce Ludwig (BL 4981)
Scott George (SG 0897)
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300

*Counsel for Plaintiffs and the Putative Class*

69

**APPENDIX E**

PRECEDENTIAL

IN THE UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT

———————————

NO. 03-3488

———————————

GAIL WATSON CHIANG; *LYNDA
ALEXANDER MUHAMMAD;
JACQUELINE CARR; DENISE
PITTMAN; CARMEN MCALPIN-
CLARKE; KAREN HUNT;
THERESA COLLINGWOOD-
MORRIS; DAVID C. NICHOLAS;
PRECIOUS YEARWOOD;
FREDERICK FREEMAN; BEVERLY
RAWLINS; ANDREA CARROLL;
RONALD J. MITCHELL; JACK
DANIEL; CHRISTINE DANIEL;
ANESTA E. GORE; VANETA
MARTIN; CARMEN GONZALEZ;
M. NARTEL GREEN; SHIRLEY
WILLIAMS; MARIA BLYDEN;
GONZALO RIVERA; BLANCHE R.
RAWLINS; RHEA L. JOHNSON;
MARILYN RIVERA; KEITH R.
WILLIAMS; AL BRUNN; EMERYL
CHRISTOPHER; CHARLES G.
JOHNSON; VELSINA L. GEORGE;
KALEEN CLOUDEN; EUNICE
GOMES; RUTH DUBLIN;
KIMBERLEY L. OLIVER; ELENA
HERBERT; LAWRENCE CHRISTIAN;
MARJORIE JOHN; LAVERNE
WILLIAMS; REVEREND JAMES
CHRISTIAN, on behalf of themselves
and all others similarly situated

v.

ANN M. VENEMAN, In her Official
Capacity as Secretary of
The United States Department of
Agriculture,

*Appellant*

*Amended pursuant to Clerk's Order
dated 11/24/03

———————————

On Appeal From The District Court of
the Virgin Islands
(No. 00-cv-00004)
District Judge:  Honorable Thomas K.
Moore

———————————

Argued December 10, 2003
Before: NYGAARD, BECKER, and
STAPLETON, *Circuit Judges.*

(Filed September 20, 2004)

DOUGLAS B. INMAN, ESQ.
(ARGUED)
Sayre & Chavez
7 Church Street
Christiansted, St. Croix
USVI 00820

*Attorney for Appellees*

PETER D. KEISLER, ESQUIRE
Assistant Attorney General
DAVID M. NISSMAN, ESQUIRE

1

United States Attorney
ERNEST BATEGNA, ESQUIRE
Assistant United States Attorney
ROBERT M. LOEB, ESQUIRE
CHARLES W. SCARBOROUGH,
ESQUIRE, COLETTE G. MATZZIE,
ESQUIRE (ARGUED)
Attorneys, Appellate Staff
Civil Division, PHB Room 9149
U.S. Department of Justice
601 D. Street, NW
Washington, DC 20530-0001

*Attorneys for Appellant*

---

OPINION OF THE COURT

---

BECKER, *Circuit Judge.*

This is an interlocutory appeal by the defendant, United States Secretary of Agriculture, Ann M. Veneman ("Veneman") pursuant to Fed. R. Civ. P. 23(f), in which she challenges a class certification granted by the District Court in a civil rights case brought against her in her official capacity. The lead plaintiff is Gail Watson Chiang ("Chiang"), the representative of the putative class, who, along with thirty-eight other plaintiffs, alleges systematic discrimination against persons who are "Black, Hispanic, women, and/or Virgin Islanders," over a period of nineteen years, in the administration of loan programs intended to help low income rural families obtain homes and make repairs to existing homes.    The claims are made primarily under the Equal

Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA"), which makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a).    To establish a prima facie case under ECOA the class members must show that (1) plaintiff was a member of a protected class; (2) plaintiff applied for credit from defendants; (3) plaintiff was qualified for the credit; and (4) despite qualification, plaintiff was denied credit. *See Matthiesen v. Banc One Mortgage Corp.*, 173 F.3d 1242, 1246 (10th Cir. 1999).

According to Chiang, the regional USDA office in Vermont, which had jurisdiction over the U.S. Virgin Islands, kept Virgin Islanders "out of the system" by implementing a "phony," illegal waiting list on which thousands of Virgin Islanders, almost all of whom were Black, Hispanic, or female, had their names placed instead of being given an actual loan application in violation of USDA policy, instructions, and regulations, . These applicants were told that they would receive applications when they became available but, even after years of waiting, most never did. According to Chiang, not only were applications available, but the Virgin Islands was the only locality in the United States where this type of waiting list was implemented.    Thus, Chiang submits, the so-called "waiting list" was not a true waiting list at all, but was rather a device used to deny class members loan applications altogether.

2.

Chiang also alleges that the USDA administrators in Vermont further instructed Virgin Islands officials to give applications only to those class members on the waiting list who became a "problem," and then told local employees "you know what to do with it." This message was uniformly understood by local USDA officials to mean that the applications were not to be processed, but rather that actions were to be taken to make it difficult or impossible for the inquiring parties to meet qualifications and deadlines, the intention being that the applicants would become so frustrated that they would withdraw their loan applications, or that delays would result in disqualification or other justification for denial of the applications. In Chiang's submission, this became known in the local USDA office as the "Impossible Yes": an application would be given out, but the USDA would make it impossible for the putative applicant to have the application fairly processed.

Furthermore, Chiang alleges corruption in the administration of the loan program in the Virgin Islands— in the rare instances in which loans were approved—through favoritism to local contractors who were not building homes in a safe and workmanlike manner. This resulted, it is said, in placing Virgin Islanders into inadequate and unsafe housing, representing a further form of discrimination against Virgin Islanders.

At the behest of Chiang, the District Court granted a Rule 23(b)(3) certification to a class of

All persons who are Black, Hispanic, female and /or Virgin Islanders who applied or attempted to apply for, and/or received, housing credit, services, home ownership, assistance, training, and/or educational opportunities from the USDA through its Rural Development offices (and predecessor designations) located in the U.S. Virgin Islands at anytime between January 1, 1981 and January 10, 2000, and who believe they were discriminated against on the basis of race, gender or national origin.

In Veneman's submission, the District Court abused its discretion when it certified what she describes as a sprawling and unmanageable class action seeking $2.8 billion in damages from the USDA. She complains that the class definition is overbroad, and that it is internally inconsistent insofar as it encompasses every Virgin Islander who applied or attempted to apply for any of the different Rural Housing Service ("RHS")[1] credit

---

[1]   The Rural Housing Service is an agency of the USDA. Formerly known as the Rural Housing and Community Development Service, "RHS" is a successor agency to the Farmers Home Administration, which ceased to exist in 1994. RHS operates a broad range of programs to address rural America's need for single-family and multi-family housing as well as health facilities, fire and police stations, and other community structures. To promote its goals, RHS administers direct loan guarantees and grants through state and local offices located throughout the nation.

3

and benefit programs during a nineteen-year period (from 1981 to 2000), including those with non-credit claims, those with untimely claims, and Caucasian loan applicants who the complaint alleges benefitted from the discrimination.

In Veneman's view, not only is the class so sweeping that the threshold requirements of Rule 23(a) likely are not satisfied, but even if the class definition were deemed to meet Rule 23(a)'s standards, the class fails Rule 23(b)(3)'s more stringent requirements because common issues do not predominate over individual ones and class treatment would not be superior to individual adjudications. Central to Veneman's contention is the argument that to prevail on his or her individual claims under ECOA, each class member would need to demonstrate that the USDA's proffered reason for denial of credit (or loan for defective property) was a pretext for discrimination on the basis of race, gender or national origin. According to Veneman, liability on these claims can only be determined through case-by-case inquiries into the specifics of each transaction, and most particularly, the loan eligibility of each putative class member. If the class member could not have obtained the loan, then he or she cannot succeed in his or her claim of discrimination, regardless of the existence of the alleged waiting list.

Chiang counters this with the contention that determination of loan eligibility would, in fact, be susceptible to class proof because those determinations were purely ministerial in nature. In her supplemental exhibit 1, Chiang submits a chart for our consideration which she claims was the primary document used by USDA employees to determine eligibility, contending that those employees did not have any particular knowledge or skill, but rather, were mere clerks charged with matching income to columns on the chart. According to Chiang, the evaluations of eligibility constituted neither in-depth nor discretionary assessments of the circumstances of each applicant, and hence are subject to common proof.

Veneman is surely correct that the plaintiff in an ECOA case must establish that he or she was qualified for loan eligibility as part of the prima facie case. The record developed thus far leaves us in some doubt as to the validity of Chiang's contentions about the susceptibility of eligibility determinations to common proof. Nevertheless, we believe that this question will be best resolved by the District Court in the first instance. We have no doubt, however, that the question of the existence *vel non* of the "phony" waiting list—and associated techniques used to prevent Virgin Islanders from gaining access to loan applications and loans—is a matter appropriate for class determination. We will therefore affirm that portion of the District Court order certifying the class pursuant to Rule 23(c)(4), which allows a class action to be maintained with respect to particular issues — in this case the waiting list — while simultaneously reserving for the District Court the authority to determine whether eligibility for loans can be certified as a question suitable for class adjudication.

We are not troubled by the seeming

4

internal contradiction in the class definition because, inasmuch as the plaintiffs' primary claim is that they were discriminated against for being Virgin Islanders, a cognizable class, we will treat the claim as such and modify the District Court's certification order accordingly. While some claims allege individual gender and race discrimination, the number of such complaints appears to be small, and we think that certifying a class of Virgin Islanders best captures the plaintiffs' arguments. Since 76% of the population of the U.S. Virgin Islands is black and 14% is Hispanic, it is possible that the claims of racial and national origin discrimination may overlap. We therefore leave to the plaintiffs the option to seek to amend the class definition to allege racial and gender, rather than national origin, discrimination; any decision on such amendment will be for the District Court in the first instance. Additionally, for reasons explained *infra*, we will further modify the certification order to eliminate the reference to the class members' "belief" in discrimination, thereby removing such a subjective criterion from the class definition.

As the foregoing suggests, the issues to be dealt with on a class basis do not present predominance, superiority, or manageability problems. *See* Fed. R. Civ. P. 23(b)(3). Neither do we find any merit in Veneman's untimeliness claims, which are not properly before us at this stage of the case. Finally, because the other aspects of the case are not suitable for class determination, i.e., inclusion of the class-based claims of corrupt administration, and, on the present record,

the eligibility facet of liability, we will vacate the District Court's order in all other respects.

## I. Facts and Procedural History

We begin with a recitation of the allegations supporting class certification, derived both from the first amended complaint and from extensive informal class action discovery (largely exchange of documents). We note that it is not necessary for the plaintiffs to establish the merits of their case at the class certification stage, and that, in determining whether a class will be certified, the substantive allegations of the complaint must be taken as true. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).

Between January 1, 1981 and January 10, 2000, thousands of Virgin Islanders requested loan applications from the USDA in order to purchase or make repairs on homes. As noted above, Chiang alleges that all class members who requested home loan applications were forced to put their names on an illegal waiting list instead of actually being given an application.[2] Chiang contends that the

---

[2]   From 1995 to 1999, Chiang worked as a special assistant to the Governor of the Virgin Islands. Although she filed this suit as a private citizen, she explains that she first became aware of the extent of the discrimination problem due to her governmental position which led her to receive "hundreds, if not thousands, of oral complaints from Virgin Islanders regarding what was perceived as a longstanding and widespread systematic

existence of this list, generated in the USDA regional office in Vermont which had jurisdiction over the Virgin Islands, was in direct contravention of USDA instructions and regulations, and that no equivalent list existed anywhere else in the United States. Chiang represents that the justification USDA gave for placing class members on the waiting list was that (1) the USDA did not have any applications and (2) applications were not being given out because the USDA had no money available for loans. However, Chiang contends that applications were, in fact, available, and that a certain low level of funding was also available despite her allegation that the USDA failed to seek or obtain proper levels of funding for rural housing loans for each of the 19 years at issue.[3]

_____

discrimination" and that she was "inundated with complaints of USDA discrimination from all quarters."

_____

[3]    Chiang also contends that because class members were placed on the alleged waiting list, they were never entered into the official USDA database which tracks the number of loan applications in each jurisdiction. She further submits that due to that lack of data entry, the level of need for funding was never properly assessed and so was never allocated to the Virgin Islands. The lack of funding, she maintains, was then used as a reason for putting class members on the waiting list, thereby keeping them out of the database and creating a vicious circle.

There is, however, no basis in the

According to Chiang, each named plaintiff in this lawsuit filed a discrimination complaint with the USDA prior to this action, or authorized one to be filed on his or her behalf.[4] In March 1997,

record to support the contention that the amount of funding is tied to the number of persons who seek loans. The methodology for allocation of housing funds can be found in 7 C.F.R. §§ 1940.552 and 1940.565. The formula is based on (1) the State's percentage of the National number of rural occupied substandard units; (2) the State's percentage of the National rural population; (3) the State's percentage of the National rural population in places of less than 2,500 population; (4) the State's percentage of the National number of rural households between 50 and 80 percent of the area median income; and (5) the State's percentage of the National number of rural households below 50 percent of the area median income. On this record, it appears that none of these factors are derived from the USDA's application database.

To the extent that Chiang alleges an unfair allocation of funds to the Virgin Islands, as opposed to discriminatory behavior on the part of the USDA in administering those funds, she seeks relief in the wrong forum and would be better served directing her complaint elsewhere.

[4]    Those authorizations were apparently directed to Chiang in the course of her employment in the Governor's office. When she fielded complaints about the USDA's alleged discriminatory behavior,

Chiang and 48 other named plaintiffs filed an administrative class program complaint of discrimination with the USDA's Office of Civil Rights in Washington, D.C. The named plaintiffs claim never to have received any type of acknowledgment of their complaints from the USDA. However, in response to mounting discrimination complaints, the USDA sent an investigative team to the Virgin Islands. The USDA team conducted an investigation and documented what Chiang styles the "Highway to Nowhere" in an internal USDA report entitled "Civil Rights Compliance Review for the U.S. Virgin Islands, October 19-29, 1997." The report—which was never officially adopted by the USDA—identified two specific techniques used to deny class members access to the loans.[5] Those techniques were (1) creating the phony, illegal "waiting list," and (2) implementing the "impossible yes" scheme. (See JA 384-411). This lawsuit followed.

The plaintiffs filed their initial complaint on January 11, 2000 and filed their first amended complaint ("FAC") on March 23, 2001. The FAC named 39 plaintiffs and sought class certification. Veneman opposed class certification on the grounds that the threshold

she would ask the complainant to give her permission to lodge an official discrimination complaint with the USDA.

[5]   Veneman refuses to be bound by the contents of the report, calling it an "unofficial and preliminary draft" filled with "hearsay and baseless innuendo." (Reply Brief, P.7, note1).

requirements of Fed. R. Civ. P. 23(a) had not been met. Veneman also argued that the class definition was fatally overbroad because it failed to define the class by reference to any discriminatory practice, included untimely claims and claims arising out of RHS's non-credit benefit programs, and was not limited by race or gender as it included all Virgin Islanders.

On February 28, 2003, the District Court filed its decision certifying the class under Rule 23(b)(3).[6] The Court found that the FAC alleged "a pattern and practice of discrimination against each class member." It concluded that the pattern and practice manifested itself in three ways: (1) some members were denied an application package and told to put their names on an unlawful waiting list; (2) RHS provided other members with applications, but then made it impossible for them to obtain credit by deliberately delaying and frustrating the process so that the program would run out of funds, the

[6]   The District Court explicitly chose "not to certify this class under (b)(2)" because even though "Rule 23(b)(2) certification can be particularly well-suited to civil rights actions charging class discrimination . . . certification is not proper where 'the appropriate final relief relates exclusively or predominantly to money damages.'" (Op. 14, note 4) (quoting Advisory Committee Notes to Rule 23 (b) (2)). The District Court concluded that, although some measures of injunctive relief were sought, "the equitable remedies probably do not predominate." (Op. 14, note 4).

7

applicant would become ineligible or the applicant would give up; and (3) even plaintiffs who did obtain loans were denied services such as loan workouts and payment moratoria because of their race, gender, or national origin.

In making these findings, the District Court rejected Veneman's argument that the class definition improperly turned on a class members' state of mind —i.e., whether they "believed" themselves to have suffered discrimination. It rejected Veneman's argument that Rule 23(a)'s requirements were not met. The Court also found that the class was sufficiently cohesive to warrant adjudication by class action given that the common question in each count was whether the USDA's practice and policy discriminated against Blacks, Hispanics, women, and/or Virgin Islanders as a class, and that this common question predominated over differences in the factual circumstances of the individual plaintiffs. The Court additionally held that adjudicating this case as a class action was superior to having numerous individual lawsuits brought against the USDA.

On July 22, 2003, a motions panel of this Court granted Veneman's petition for permission to take an interlocutory appeal under Fed. R. Civ. P. 23(f). The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(e).

## II. Class Certification

### A. Standard of Review

In order to obtain class certification, plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met. *See Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994) (citing *Wetzel v. Liberty Mutual Ins. Co.*, 508 F.2d 239 (3d Cir. 1975)). We review the District Court's decisions on class certification for abuse of discretion. *See In re LifeUSA Holding Inc.*, 242 F.3d 136, 143 (3d Cir. 2001). The District Court abuses its discretion only if its decision "rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 783 (3d Cir. 1995).

### B. Rule 23(a)

In any class certification, the threshold issue is whether the four requisites of Rule 23(a), numerosity, commonality, typicality, and adequacy, are met. Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Veneman does not now contest numerosity, typicality, or adequacy of

8

representation. Rather, she focuses on the commonality prong, arguing that the eligibility determinations for loans are not susceptible to common proof. She also argues that the definition contains an internal contradiction, and that the class as certified is fatally overbroad.

### 1. Commonality

Veneman's first objection to the class certification is that there are not sufficient "questions of law or fact common to the class." *See* Fed. R. Civ. P. 23(a)(2). But the commonality standard of Rule 23(a)(2) is not a high bar: it does not require identical claims or facts among class member, as "the commonality requirement will be satisfied if the named plaintiffs share at least one question of law or fact with the grievances of the prospective class." *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 184 (3d Cir. 2001). We find that Chiang's allegations of discriminatory conduct directed at the entire class do present a common question of law.

As noted above, ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion, national origin, sex or marital status, or age." 15 U.S.C. § 1691(a). The regulations governing ECOA define a "credit transaction" as "*every* aspect of an applicant's dealings with a creditor regarding an application for credit or an existing extension of credit (including, but not limited to, information requirements; investigation procedures; standards of creditworthiness; terms of credit; furnishing of credit information;

revocation, alteration, or termination of credit; and collection procedures)." 12 C.F.R. § 202.2(m) (emphasis added). A potential creditor's refusal to provide an application form is also part of a "credit transaction" within the meaning of the statute, *see Rosa v. Park West Bank & Trust Co.*, 214 F.3d 213 (1st Cir. 2000). Indeed, a refusal to provide a loan *application* "on the basis of race, color, religion, national origin, sex or marital status, or age" would be a prototypical ECOA violation, as it would deny members of a protected class any access to credit.

Plaintiffs here allege discrimination at several different points in the credit application process, from refusal to provide application forms when requested, through delaying tactics in the processing of applications, to discrimination in administration of loan proceeds. Given the broad language of 12 C.F.R. § 202.2(m), we think that all of these forms of discrimination fall under the purview of a "credit transaction," and so constitute ECOA violations. Thus, even though many putative class members never even made it to the official application process because they were denied applications in the first instance, their requests for—and denial of—applications are nevertheless cognizable under ECOA.

As presented by Chiang, and as certified by the District Court, the heart of the complaint alleges discriminatory attempts to keep class members from having access to rural housing loan programs in the Virgin Islands. Chiang submits that the so-called "phony" waiting

9

list and the other practices that allegedly contributed to prevent Virgin Islanders from having access to loans are all susceptible to common proof. Those multifarious practices include the following: the refusal to accept submission of loan applications from class members; the refusal to issue loan applications; the refusal to process loan applications; the refusal to provide reasons for failing to process the loan applications; the unlawful denial of access to established procedures and national funding computer systems; the refusal to notify class members of eligibility for loans and assistance; the refusal to employ mandated priority funding system; the refusal to engage in mandated processing procedures to determine eligibility; the concealment of discriminatory acts by refusal to issue notification stating reasons for failure to process; the failure to issue notices of available funding and requests for information needed to process a loan; the refusal to notify class members of next quarter funding availability; the concealment of class members' attempts to access programs by refusal to enter their information in national database; the failure to advise class members about requirements for keeping loan applications active; the unlawful denial of access to non-program loans; the refusal to advise class members of their right to review and appeal; the unlawful refusal to provide for administrative review of non-appealable decisions; the failure to investigate and process discrimination complaints; the denial of access to non-program procedures for assumption of existing USDA loans and properties; the systematic

denial of access to housing programs; and the unlawful discouragement and refusal to process applications by way of the "impossible yes."

In our view, these claims allege a uniform course of conduct common to all class members subject to common proof in a single trial. In *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 924 (3d Cir. 1992), we held that a "uniform scheme" or "uniform course of conduct" would support a finding of predominance even where injuries resulting from a fraudulent securities scheme were different for each class member; while imposing a higher standard, preponderance presupposes commonality. *See also Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 (1977) (holding that a pattern or practice would be present "only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature"). Chiang has alleged such a practice here. We will therefore affirm the class certification insofar as it deals with the waiting list and associated techniques.

If the waiting list and associated techniques claims are resolved in plaintiffs' favor, they will have satisfied the first two prongs of the ECOA prima facie case: membership in a protected class (viz., Virgin Islanders: *see infra* Part II.B.2) and application (or, here, attempted application) for credit. The third and fourth prongs, however—that the applicant was qualified for the credit and that, despite that qualification, defendant denied

10

the credit— may prove harder to adjudicate on a class-wide basis.

Chiang contends that the issues are appropriate for class certification because determinations of loan eligibility are a purely ministerial matter. At oral argument before this Court, counsel for Chiang submitted a chart concerning income limit qualifications for certain RHS loans. Counsel argued that the one-page document demonstrated that qualification for the loans at issue was a mechanical function that could be undertaken by any low-level clerk simply by reading the chart. *See* http://www.rurdev.usda.gov; *see also* 7 C.F.R. § 3550.

Veneman, on the other hand, submits that determining eligibility for loans is quite complex and involves the exercise of discretion. She contends that in order to show that he or she was qualified for a loan, each applicant would need to demonstrate that he or she met each of the regulatory requirements including income limitations and ability to repay the loan. *See* 7 C.F.R. § 3550.53. According to these regulations, two different kinds of income must be considered: repayment income and eligibility income. *See* 7 C.F.R. § 3550.54. Repayment income measures the income which the applicants have available to repay the loan, while eligibility income is based on the income of all members of the household. Veneman submits that although it may seem mechanical to take an applicant's hourly income and multiply it by the number of yearly working hours, such a

calculation is far from easy to perform, especially when applicants may have unstable work histories, the work in question may be seasonal, or continued employment may be questionable—to name just a few of the possible variables. Veneman also submits that class members would need to show that the property for which they sought a loan met the criteria for collateral on the loan. *See* 7 C.F.R. §§ 3550.56-57. In short, she disputes the notion that loan eligibility could be a mechanical question proper for class adjudication.

Federal Rule of Civil Procedure 23(c)(4) provides that "[w]hen appropriate (A) an action may be brought or maintained as a class action with respect to particular issues . . . ." Rule 23(c)(4) both imposes a duty on the court to insure that only those questions which are appropriate for class adjudication be certified, and gives it ample power to "treat common things in common and to distinguish the distinguishable." *Jenkins v. United Gas Corp.*, 400 F.2d 28, 35 (5th Cir. 1968). Because we believe that the two questions—the existence of the phony waiting list and associated techniques on the one hand, and the feasibility of class-wide determinations of loan eligibility on the other—are easily distinguishable, we will affirm certification on the former and leave it to the district court to determine whether class certification might be appropriate on the latter. We note in this regard that courts commonly use Rule 23(c)(4) to certify some elements of liability for class determination, while leaving other elements to individual

11

adjudication—or, perhaps more realistically, settlement. *See; e.g., Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (Posner, J.) ("[I]t may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief."); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 623 (5th Cir. 1999).[7]

---

[7]Because we are not deciding the question of appropriateness of class certification for loan eligibility determinations, we need not rule on Chiang's "Motion to Correct the Record and Reply" in which she wishes to introduce two exhibits. The first document was presented to us only during the course of oral argument and consists of the one page income qualification chart. Since the District Court will be called upon to make the determination as to whether class certification is appropriate for determining the question of loan eligibility, that Court should decide how to proceed with the request. The second document relates to evidence (past loan applications) allegedly destroyed by the USDA (willfully according to Chiang; in the process of routine destruction of records, according to Veneman). To the extent that the alleged intentional destruction of this evidence would have bearing on class certification by making it impossible for the USDA to undertake the individual review of all class members' application files that it advocates, the District Court will again be in a better position to evaluate that request.

Similarly, we need not decide what the applicable test would be to rebut the prima facie case. Veneman would have us hold that a "but for" test applies, and that putative class members would have to show that *but for* the discrimination, a loan would have been granted in each particular case. Chiang, on the other hand, argues that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies because ECOA should be construed in accordance with the law of Title VII discrimination cases.

We have not yet had occasion to decide whether it is appropriate to shift the burden to a defendant to rebut a prima facie claim of discrimination under ECOA. Several of our sister Courts of Appeals have so held, but one Court of Appeals has questioned whether the *McDonell Douglas* model can be imported from the field of employment discrimination to that of credit discrimination. *See Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 406 (6th Cir. 1998) (holding that ECOA's legislative history suggests reviewing claims of discrimination using the same burden allocation system found in Title VII); *Moore v. United States Dept. of Agriculture*, 55 F.3d 991, 995 (4th Cir. 1995) (noting that the *McDonnell Douglas* test would apply to ECOA case but for the fact that plaintiffs had direct evidence of discrimination); *Mercado-Garcia v. Ponce Fed. Bank*, 979 F.2d 890, 893 (1st Cir. 1992) (noting that the language of ECOA and EEOA is "nearly identical"); *Bhandari v. First Nat'l Bank of Commerce*, 808 F.2d 1082, 1100-01 (5th Cir. 1987) (explaining

## 2. Internal Contradiction

The USDA highlights an internal contradiction in the class definition, and argues that this contradiction is so egregious that it renders the class, if not fatally overbroad, then at least logically impossible. In certifying the class, the District Court defined its members as "all persons who are Black, Hispanic, female and/or Virgin Islanders." The USDA argues that a class consisting of Blacks, Hispanics, women, and/or Virgin Islanders is inherently contradictory as it would necessarily both include and exclude white males. We agree. However, rather than decertify the class, as the USDA urges us to do, we prefer to take a less drastic course and simply modify the class definition to remove the ambiguity. *See* 28 U.S.C. § 2106 (entitling us to "affirm, modify, vacate, set aside or reverse any judgment, decree, or order"). Pursuant to the modification, the class definition in relevant part will now read "[a]ll Virgin

---

that language of ECOA is "closely related" to that of EEOA and "was intended to be interpreted similarly"); *Williams v. First Fed. Sav. & Loan Ass'n*, 554 F. Supp. 447, 448-49 (N.D.N.Y. 1981) ("Protections afforded by the ECOA should be applied in the same manner as those created by" the EEOC), *aff'd*, 697 F.2d 302 (2d Cir. 1982). *But see Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 713-15 (7th Cir. 1998) (holdingt hat lack of direct competition between applicants in credit context renders analogy to Title VII cases flawed).

Islanders who applied or attempted to apply for . . . and . . . were discriminated against on the basis of national origin."

We modify the class definition to include all "Virgin Islanders," rather than to include only "persons who are Black, Hispanic, [and/or] female," because we understand Chiang to be alleging mainly discrimination against *all* Virgin Islanders, rather than racial discrimination *among* Virgin Islanders. However, at various points in her submissions, Chiang does in fact appear to be alleging individual racial and gender discrimination against Black, Hispanic, and female Virgin Islanders (and *in favor of* white male Virgin Islanders). The number of specific complaints in these areas appears to be small in comparison to the claims of discrimination against all Virgin Islanders. We note that 76% of the population of the U.S. Virgin Islands is Black, and 14% is Hispanic, *see* U.S. Census Bureau, Population and Housing Profile: 2000, *at* http://www.census.gov/Press-Release/www/2002/usvistatelevel.pdf; thus, it is quite possible that claims of racial and national-origin discrimination might overlap here. At all events, we reform the class definition based on our understanding of the main thrust of Chiang's claims, but we leave it open to the plaintiffs to seek to amend the class definition should they actually want to allege racial and gender, rather than national origin, discrimination. We agree with Veneman, however, that plaintiffs' current allegations of *both* kinds of discrimination present an internal contradiction.

13

Although we have not previously held that "Virgin Islanders" is a legitimate designation of national origin for purposes of a federal discrimination claim, we have certainly implied it. *See Moravian Sch. Advisory Bd. of St. Thomas v. Rawlins*, 70 F.3d 270, 278 (3d Cir. 1995) (Becker, J. concurring) (tacitly assuming that "Virgin Islander" is an acceptable designation of national origin in a federal discrimination suit). To the extent that the USDA objects to the inclusion of the term Virgin Islanders in the class definition, we understand the objection to be based on the confusion it creates when contrasted to persons who are "Black, Hispanic, [or] female," rather than on the ground that "Virgin Islander" cannot be a legitimate national origin designation. We have held, for example, that the term Puerto Rican can designate national origin for purposes of a federal discrimination suit, *see, e.g., DiMarco-Zappa v. Cabanillas*, 238 F.3d 25, 36 (1st Cir. 2001); *c.f. Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (accepting the District Court's conclusion that the plaintiff made out a prima facie case of employment discrimination based on his Puerto Rican heritage), and see no reason to distinguish the cases as to the national origin designations.

### 3. Overbreadth

Veneman also contends that class certification should be set aside on the ground that the certified class is "overbroad." In Veneman's universe, it seems that overbreadth is being used as a catch-all to address a number of issues that do seem potentially to bear on class

certification without fitting neatly into any other category. While we note that many of these issues seem to relate at least in part to the commonality prong of Rule 23(a)(2), we will nonetheless analyze them under Veneman's convenient heading of "overbreadth."

a.

First, Veneman argues that the class definition includes untimely claims. She submits that, by attempting to encompass credit discrimination claims dating back to January 1, 1981, Chiang's definition ignores ECOA's two-year statute of limitations. Veneman contends that having brought suit on January 11, 2000, the class may not sue based on acts of discrimination predating January 11, 1998, with the only exception being for those individuals who filed an "eligible complaint" about such an act with the USDA by July 1, 1997.[8] However, we believe that the issue of timeliness goes to the merits of the case, not to the definition of the class. The claims therefore can not be prejudged to deny certification. *See Huff v. ND Cass Co.*, 485 F.2d 710, 714 (5th Cir. 1973) (en banc) (holding that requiring a class representative to prove the merits of his or her claim before being able to represent a class is reversible error); *see also Eisen v. Carlisle & Jaquelin*, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action,

---

[8]*See* Omnibus Consolidated & Emergency Supplemental Appropriations Acts, 1999, Pub. L. No. 105-277, § 741, 112 Stat. 2681-30 (Oct. 21, 1998) (codified at 7 U.S.C. § 2279 note).

14

the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (citation omitted); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 80 (E.D. Pa. 1987) (holding that a statute of limitations defense goes to the merits and hence is not an appropriate objection in the context of class certification).

b.

Second, Veneman argues that in this case the District Court approved a class definition that was explicitly rejected in *Williams v. Glickman*, Civ. No. 95-1149, 1997 U.S. Dist. LEXIS 1683 (D.D.C. Feb. 14, 1997), a case in which the plaintiffs defined their class as:

> All African American or Hispanic American persons who, between 1981 and the present, have suffered from racial or national origin discrimination in the application for or the servicing of loans or credit from the FmHA (now Farm Services Agency) of the USDA, which has caused them to sustain economic loss and/or mental anguish/emotion [sic] distress damages.

*Williams*, at *10.

In *Williams*, the Court rejected this definition as overbroad, finding that "[I]t is not limited to any specific policy or practice which is alleged to be discriminatory; instead, the class purports to include those blacks and Hispanic farmers who have suffered *any* type of discrimination in their dealings with the

FmHA." *Williams*, at *14 (emphasis added). The USDA argues that Chiang's proposed class is an exact parallel to that rejected in *Williams*. We disagree.

Besides the fact that both putative classes share references to Blacks, Hispanics, and loan discrimination, they actually have little in common. In *Williams*, plaintiff farmers filed suit against defendant the USDA claiming that the Farmers Home Administration (FmHA) discriminated against them based on race or national origin. Like the putative class here, the farmers sought recovery under the Equal Credit Opportunity Act. However, in *Williams*, the Court ruled that the farmers' bare allegation of a "common thread of discrimination" did not satisfy the requirement that potential class plaintiffs make a "specific presentation" identifying the common questions of law or fact. Chiang's class, on the other hand, did just that in alleging the existence of a uniform scheme aimed at preventing class members from gaining access to loans. We therefore find *Williams* distinguishable.

It is no objection to Chiang's class that the allegations of a uniform scheme are not contained in the class definition itself: we read *Williams* to hold that the proposed class was "overly broad" because of the plaintiffs' varied factual allegations of discrimination, lacking Rule 23(a)(2) commonality, rather than because of any lack of specificity in the class definition itself. In fact, Judge Flannery objected to the inclusion of allegations of discrimination in the class definition, holding that "[b]ecause the Court must

15

the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.") (citation omitted); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 80 (E.D. Pa. 1987) (holding that a statute of limitations defense goes to the merits and hence is not an appropriate objection in the context of class certification.)

b.

Second, Veneman argues that in this case the District Court approved a class definition that was explicitly rejected in *Williams v. Glickman*, Civ. No. 95-1149, 1997 U.S. Dist. LEXIS 1683 (D.D.C. Feb. 14, 1997), a case in which the plaintiffs defined their class as:

All African American or Hispanic American persons who, between 1981 and the present, have suffered from racial or national origin discrimination in the application for or the servicing of loans or credit from the FmHA (now Farm Services Agency) of the USDA, which has caused them to sustain economic loss and/or mental anguish/emotion [sic] distress damages.

*Williams*, at *10.

In *Williams*, the Court rejected this definition as overbroad, finding that "[I]t is not limited to any specific policy or practice which is alleged to be discriminatory; instead, the class purports to include those blacks and Hispanic farmers who have suffered *any* type of discrimination in their dealings with the

FmHA." *Williams*, at *14 (emphasis added). The USDA argues that Chiang's proposed class is an exact parallel to that rejected in *Williams*. We disagree.

Besides the fact that both putative classes share references to Blacks, Hispanics, and loan discrimination, they actually have little in common. In *Williams*, plaintiff farmers filed suit against defendant the USDA claiming that the Farmers Home Administration (FmHA) discriminated against them based on race or national origin. Like the putative class here, the farmers sought recovery under the Equal Credit Opportunity Act. However, in *Williams*, the Court ruled that the farmers' bare allegation of a "common thread of discrimination" did not satisfy the requirement that potential class plaintiffs make a "specific presentation" identifying the common questions of law or fact. Chiang's class, on the other hand, did just that in alleging the existence of a uniform scheme aimed at preventing class members from gaining access to loans. We therefore find *Williams* distinguishable.

It is no objection to Chiang's class that the allegations of a uniform scheme are not contained in the class definition itself: we read *Williams* to hold that the proposed class was "overly broad" because of the plaintiffs' varied factual allegations of discrimination, lacking Rule 23(a)(2) commonality, rather than because of any lack of specificity in the class definition itself. In fact, Judge Flannery objected to the inclusion of allegations of discrimination in the class definition, holding that "[b]ecause the Court must

answer numerous fact-intensive questions before determining if an individual may join the class, the proposed class is not clearly defined." *Williams*, 1997 U.S. Dist. LEXIS 1683, at *13. Thus *Williams* cannot stand for the proposition that all allegations of a uniform scheme of discrimination must be included in the class definition—rather, it stands for the opposite proposition, that class definitions must be free of merits allegations that require extensive factual findings.[9]

c.

Veneman also argues that the class is overbroad because it consists of two groups with conflicting interests. *See Penn. Dental Ass'n v. Medical Serv. Ass'n of Penn.*, 745 F.2d 248, 263 (3d Cir. 1984) (upholding District Court's refusal to certify class where proposed class consisted of two groups with inherently conflicting interests). More specifically, Veneman urges us to decertify the class on the basis that there is a significant risk of intra-class conflicts between those class members who received loans and those who did not, as well as between those who have claims concerning their properties and those who do not.

We do not see any of the purported conflicts of interests that Veneman claims are present here. Rather, we believe that the class definition properly identifies a group of people who attempted to gain

access to the USDA's Rural Housing program in the Virgin Islands and were systematically denied that access. The fact that some class members were able to make more progress than others does not translate into intra-class conflict, nor does it mean that the class as defined is fatally overbroad.

d.

Finally, Veneman argues that defining a class by reference to those who "believe" they were discriminated against undermines the validity of the class by introducing a subjective criterion into what should be an objective evaluation. We agree.[10] *See, e.g., NOW v. Scheidler*, 172 F.R.D. 351, 357, 1997 U.S. Dist. LEXIS 4036, at *9 (N.D. Ill. Mar. 28, 1997) (explaining that an identifiable class exists if its members can be ascertained by reference to objective criteria and that when membership in a class is defined solely by state of mind, the class is

---

[9]For further discussion of merits allegations in class definitions, see *infra*, Part II.B.3.d.

[10]Chiang argues that class certification based on a "belief in discrimination" was already stipulated to by the USDA in a previous class action for discrimination. In *Pigford v. Glickman*, where a class of African American applicants for loans filed racial discrimination complaints against the USDA, the final consent decree included the phrase "All African American farmers ... [who] believed that they were discriminated against on the basis of race." *Pigford v. Glickman*, 185 F.R.D. 82, 92 (D.D.C. 1999). While this is true, we fail to see how the USDA's prior stipulation to language in a consent decree before a different court affects the class definition in this case.

generally deemed unascertainable); *Zapka v. Coca-Cola Co.*, No. 99 CV 8238, 2000 U.S. Dist. LEXIS 16552, at *7 (N.D. Ill. Oct. 26, 2000) (noting that an identifiable class does not exist if membership in the class is contingent on the state of mind of the prospective members); *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ. 4911, 2003 U.S. Dist. LEXIS 11897, at *6-*7 (S.D.N.Y. July 15, 2003) (explaining that membership in a class should rest on objective criteria that are administratively feasible for the court to rely on to determine whether a particular individual is a member of the class).

While *Veneman* is technically correct, we think the issue to be a red herring, for "belief" seems to us to be mere surplusage. It is clear enough that Chiang and the other named plaintiffs believe that they were discriminated against. *See, e.g.*, Fed. R. Civ. P. 11(b) (requiring that pleadings represent a reasonable belief that claims are warranted by law and have evidentiary support). Such belief in discrimination, however, is not a prerequisite for inclusion in the putative class. Our earlier modification to the class definition, *see supra* Part II.B.2, makes clear that we are certifying a class to try an issue common to all Virgin Islander loan applicants: whether USDA engaged in a pattern of discrimination via phony waiting lists and delaying tactics. This issue is properly adjudicated on behalf of a class consisting of all Virgin Islander applicants during the relevant period; if it is adjudicated against Veneman, then further proceedings will be appropriate to determine which, if any, class members are actually entitled to

relief. The putative class members' *belief* that they were discriminated against is irrelevant at the class certification stage.

For similar reasons, we decline to modify the class definition to include Virgin Islanders who "claim that they were discriminated against," or those who "were discriminated against." "Claim" seems to be a mere substitute for "believe" and "a class defined with reference to the state of mind of its members will not be allowed to proceed under Rule 23." 7A Wright, Miller & Kane, *Federal Practice & Procedure* § 1760, at 124-26. Moreover, the *Manual for Complex Litigation (Second)* has recommended that courts should "avoid class definitions that depend on . . . the seeking of relief (for example, persons claiming injury or seeking damages from some stated practice)," *Manual for Complex Litigation (Second)* § 30.14 (1985), though we note that later editions of the *MCL* have eliminated that stricture, *see Manual for Complex Litigation (Fourth)* § 21.222 (2004). Limiting the class to those who were in fact discriminated against would seem to prejudge the merits of the case, contrary to the teaching of *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974); *see also* 5 James Wm. Moore et al., *Moore's Federal Practice* ¶ 23.21[3][c] (3d ed. 1999) ("A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a particular person is a member of the class.").

We will therefore modify the class definition to eliminate the notion of

17

"belief." In combination with our first modification, *see supra* Part II.B.2. the class will now be defined as:

> All Virgin Islanders who applied or attempted to apply for, and/or received, housing credit, services, home ownership, assistance, training, and/or educational opportunities from the USDA through its Rural Development offices (and predecessor designations) located in the U.S. Virgin Islands at any time between January 1, 1981 and January 10, 2000.

Thus, with the modifications we have made to the class definition, and keeping in mind the caveats about loan eligibility we have set forth, we are confident that the waiting list question satisfies all four requisites of Rule 23(a).

### C. Rule 23(b)

In addition to meeting the prerequisites of Rule 23(a), the plaintiffs must demonstrate that the class would satisfy any one of the three subsections under Rule 23(b). Rule 23 addresses the commonality required to demonstrate cohesiveness for class certification in two subsections, (a)(2) and (b)(3). Rule 23(a)(2) requires that plaintiffs prove that "there are questions of law or fact common to the class." As explained in Part II.B.1, *supra*, the relatively low Rule 23(a)(2) commonality requirement is easily satisfied here. However, because the Rule 23(b)(3) predominance requirements

incorporate the commonality requirement of 23(a), it is possible that "even if Rule 23(a)'s commonality requirement is satisfied . . . the predominance criterion is far more demanding.." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997).

The District Court certified this class pursuant to Fed. R. Civ. P. 23(b)(3). In relevant part, the Rule reads:

> An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> . . .
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Veneman argues that, in this case, common issues do not predominate over individual ones.

In order to predominate, the common issues must constitute a "significant part" of the individual cases. *Jenkins v. Raymark Industries, Inc.*, 782 F.2d 468, 472 (5th Cir. 1986); *see also Watson v. Shell Oil*, 979 F.2d 1014, 1022 (5th Cir. 1992). Veneman contends that because the damages sought, on the order of 2.8 billion dollars, are so high, and will require such exacting, specific, individual proof, that those individual questions are, in reality,

the predominant issues in the case.

Chiang concedes that the eventual calculations of damages will require individual proof. However, she points out that it is settled law that the necessity for proving damages individually does not defeat class predominance or class certification. "The presence of individual questions as to [each class member] does not mean that the common questions of law and fact do not predominate over questions affecting individual members as required by Rule 23(b)(3)." *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985).

To be sure, there are cases where the question of damages is so central that it can, in some sense, overtake the question of liability. But as noted in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977):

> [I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate. If for any reason the district court were to conclude that there would be problems involved in proving damages which would outweigh the advantages of class certification, it should give appropriate consideration to certification of a class limited to the determination of liability.

(citations omitted).

That does not seem to be the case here, and we are satisfied, based upon the analysis set forth earlier in this opinion, that both the predominance and the superiority requirements of Rule 23(b) are easily met with respect to the issues certified under Rule 23(c)(4)(A).[11]

### III. Conclusion

For the foregoing reasons, we will affirm the class certification pursuant to Rule 23(c)(4)(A) only insofar as it relates

———————————

[11]We note that the relief sought is primarily for monetary damages and not for injunctive relief. Perhaps anticipating the potentially problematic aspect of this posture in a case where—were liability established—damages calculations would probably be extremely individualized, Chiang acknowledges that "it may come to pass that the trial court deems injunctive relief the better remedy and finds that damages are minimal." (Chiang Brief, p.38). Whether that would be the more logical path we do not say, but we do note that unlike in cases where the primary relief sought is injunctive in nature, *see Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994), Chiang seeks only ancillary injunctive relief: the primary relief she seeks is 2.8 billion dollars in damages. Given that each class member will likely find him- or herself in very different circumstances in terms of establishing damages, we think it unlikely that the calculation of damages will be suitable for class determination. However, should Chiang make it to that stage, we once again defer to the District Court in the first instance to evaluate whether damages can be adjudicated on a class wide basis.

to the question of the alleged waiting list and related techniques, and will modify the class definition to provide for a class of:

> All Virgin Islanders who applied or attempted to apply for, and/or received, housing credit, services, home ownership, assistance, training, and/or educational opportunities from the USDA through its Rural Development offices (and predecessor designations) located in the U.S. Virgin Islands at any time between January 1, 1981 and January 10, 2000.

The certification will be vacated in all other respects. The District Court should reevaluate the appropriateness of class certification on certain discrete issues such as the eligibility facet of liability and the calculation of damages, and may entertain any applications for revision of the class definition in accordance with this opinion.

20