**FILED ELECTRONICALLY**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

NILDA GUTIERREZ, et al.,

Plaintiffs,

v.

JOHNSON & JOHNSON,

Defendant.

Civil Action No. 01-5302 (WHW)

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Theodore V. Wells, Jr. (TW 2830)
Jeh Charles Johnson
Maria H. Keane
Melanie H. Stein
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

Donald R. Livingston
**AKIN GUMP STRAUSS HAUER & FELD, L.L.P.**
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000

Francis X. Dee (FD 7739)
Stephen F. Payerle
David B. Beal
**McELROY DEUTSCH MULVANEY & CARPENTER LLP**
Three Gateway Center
100 Mulberry Street
Newark, New Jersey 07102-4079
(973) 622-7711

Nancy Rafuse
**ASHE RAFUSE & HILL LLP**
1355 Peachtree Street
Suite 500
Atlanta, GA 30309
(404) 253-6000

Barbara A. McCormick
**JOHNSON & JOHNSON**
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933
(732) 524-3758

Counsel for Defendant Johnson & Johnson

# TABLE OF CONTENTS

Table of Authorities……………………………………………………………iii

Preliminary Statement ................................................................................ 1

STATEMENT OF FACTS ......................................................................... 10

    A.    J&J and its Subsidiaries ........................................................ 10

    B.    J&J's Decentralized Management Framework ................................... 16

    C.    The Subsidiaries' HR Policies and Practices ...................................... 18

    D.    The Data............................................................................. 26

    E.    Plaintiffs' Individual and Anecdotal  Claims of Discrimination ........ 29

ARGUMENT ............................................................................................. 32

I. THE WEIGHT OF AUTHORITY IN THIS CIRCUIT AND ELSEWHERE REJECTS THE EXCESSIVE SUBJECTIVITY THEORY AS A BASIS FOR CLASS CERTIFICATION ........................... 32

II. PLAINTIFFS HAVE FAILED TO DEMONSTRATE A NEXUS BETWEEN THEIR STATISTICAL ANALYSES AND ANY HR PRACTICE............................................................................. 38

III. PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(a) ......................................................................... 40

    A.    Plaintiffs Have Not Demonstrated Commonality ................................. 41

        1.    Plaintiffs are in reality challenging hundreds of employment policies and practices and thousands of individual decisions. ................................................................. 41

        2.    The diversity of the proposed class also defeats commonality ............................................................................. 43

        3.    The data does not support commonality ................................... 43

    B.    Plaintiffs Have Failed to Establish Typicality...................................... 53

i

C.      Conflicts Within the Proposed Class Defeat Adequacy of
        Representation .................................................................................. 54

IV. PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF
    RULE 23(b) ............................................................................................ 57

    A.      No Class Can Be Certified Under Rule 23(b)(2) ................................. 58

    B.      No Class Can Be Certified Under Rule 23(b)(3) ................................. 62

            1.      Common Questions Do Not Predominate Because Each
                    Claim Must be Individually Adjudicated .................................... 63

            2.      Plaintiffs Cannot Rely on *Teamsters'* Two Phase Trial
                    Paradigm to Establish Predominance ......................................... 63

            3.      A Class Action is Not The Superior Means of
                    Adjudication ................................................................................ 65

    C.      Plaintiffs' Attempts to Carve Out Various Amalgams of Rule
            23(b)(2) and 23(b)(3) Classes Create More Problems Than
            They Solve and Are Contrary to Law .................................................... 66

            1.      The Court Cannot Separately Certify
                    Equitable/Injunctive Claims Under Rule 23(b)(2) and
                    Damages Claims Under Rule 23(b)(3) ........................................ 66

            2.      "Hybrid Certification" with Opt Out Rights Is Not
                    Permitted Under Rule 23(b)(2) .................................................... 68

Conclusion ........................................................................................................ 70

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

*Abram* v. *UPS*, 200 F.R.D. 424 (E.D. Wis. 2001) ............................................ *passim*

*Allen* v. *Chicago Transit Auth.*,
    2000 WL 1207408 (N.D. Ill. July 31, 2000) ..................................................... 33

*Allen* v. *Int'l Truck and Engine Corp.*, 358 F.3d 469 (7th Cir. 2004) ...................... 69

*Allison* v. *Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998) .................... *passim*

*Appleton* v. *Deloitte & Touche LLP*,
    168 F.R.D. 221 (M.D. Tenn. 1996) .................................................... 33, 43, 55

*Bacon* v. *Honda of Am. Mfg. Inc.*, 370 F.3d 565 (6th Cir. 2004) ..................... *passim*

*Barabin* v. *Aramark Corp.*, 210 F.R.D. 152 (E.D. Pa. 2002) .......................... *passim*

*Barabin* v. *Aramark Corp.*, 2003 WL 355417 (3d Cir. Jan. 24, 2003) ............ *passim*

*Barnes* v. *American Tobacco Co.*, 161 F.3d 127 (3d Cir. 1998) ............................. 58

*Bennett* v. *Roberts*, 2000 WL 781868 (N.D. Ill. June 15, 2000) .............................. 33

*Betts* v. *Sundstrand Corp.*, 1999 WL 436579 (N.D. Ill. June 21, 1999) .................. 33

*Bogosian* v. *Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977) ........................................ 68

*Bostron* v. *Apfel*, 182 F.R.D. 188 (D. Md. 1998) ..................................................... 33

*Boykin* v. *Viacom Inc.*, 1997 WL 706323 (S.D.N.Y. Nov. 12, 1997) ............... 33, 34

*Brooks* v. *Circuit City Stores, Inc.*,
    1996 WL 406684 (D. Md. June 17, 1996) ................................................. 33, 34

*Cardenas* v. *Massey*, 269 F.3d 251 (3d Cir. 2001) ............................................ 56, 57

*Caridad* v. *Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) .................37

*Carson* v. *Giant Food, Inc.*, 187 F. Supp. 2d 462 (D. Md. 2002) ................... *passim*

*Chiang* v. *Veneman*, 385 F.3d 256 (3d Cir. 2004) ...............................59, 68

*City of Los Angeles* v. *Lyons*, 461 U.S. 95 (1983).....................................56

*Clayborne* v. *Omaha Public Power Dist.*,
    211 F.R.D. 573 (D. Neb. 2002).............................................. *passim*

*Coleman* v. *General Motors Acceptance Corp.*,
    296 F.3d 443 (6th Cir. 2002)............................................58

*Cooper* v. *Fed. Reserve Bank*, 467 U.S. 867 (1984) ................................65

*Cooper* v. *Southern Co.*, 205 F.R.D. 596 (N.D. Ga. 2001).......................50

*Cooper* v. *Southern Co.*, 390 F.3d 695 (11th Cir. 2004).................................. *passim*

*De La Fuente* v. *Chicago Tribune Co.*,
    1985 U.S. Dist. LEXIS 17512 (N.D. Ill. July 24, 1985) ...............................33

*Denney* v. *City of Albany*, 247 F.3d 1172 (11th Cir. 2001) ......................37

*Dillon* v. *Coles*, 746 F.2d 998 (3d Cir. 1984) .....................................63, 65

*Donaldson* v. *Microsoft Corp.*, 205 F.R.D. 558 (W.D. Wash. 2001) ...............33, 55

*Dukes* v. *Wal-Mart Stores, Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004) ................ *passim*

*Faibisch* v. *Univ. of Minnesota*, 304 F.3d 797 (8th Cir. 2002) ...............56

*Garcia* v. *Veneman*, 211 F.R.D. 15 (D. D.C. 2002) ...............................8, 39

*Garcia* v. *Veneman*, 224 F.R.D. 8 (D.D.C. 2004) ...............................33, 34

*General Telephone Company of the Southwest* v. *Falcon*,
    457 U.S. 147 (1982)................................................................ *passim*

iv

*Georgine* v. *Amchem Prods., Inc.*, 83 F.3d 610 (3d Cir. 1996) ................................ 65

*Green* v. *USX Corp.*, 843 F.2d 1511 (3d Cir. 1988) ............................................. 2, 35

*Green* v. *USX Corp.*, 896 F.2d 801 (3d Cir. 1990) ............................................ *passim*

*Griffin* v. *Dugger*, 823 F.2d 1476 (11th Cir. 1987) ............................................ 33, 34

*Grosz* v. *Boeing Co.*,
  2003 U.S. Dist. LEXIS 25341 (C.D. Cal. Nov. 7, 2003) ............................... 33

*Hawkins* v. *Groot Industries, Inc.*,
  2003 WL 22057238 (N.D. Ill. Sept. 2, 2003) ................................................. 56

*Int'l Brotherhood of Teamsters* v. *United States*, 431 U.S. 324 (1977) ............. 63, 64

*Jackson* v. *Motel 6 Multi-purpose, Inc.*, 130 F.3d 999 (11th Cir. 1997) ................ 56

*Jefferson* v. *Ingersoll Intern. Inc.*, 195 F.3d 894 (7th Cir. 1999) ............................ 68

*Katz* v. *Carte Blanche Corp.*, 496 F.2d 747 (3d Cir. 1974) ..................................... 65

*Kresefky* v. *Panasonic Communications and Sys. Co.*,
  169 F.R.D. 54 (D. N.J. 1996) ......................................................................... 33

*Kyriazi* v. *Western Elec. Co.*, 647 F.2d 388 (3d Cir.1981) ..................................... 69

*Lang* v. *Kansas City Power & Light Co.*,
  199 F.R.D. 640 (W.D. Mo. 2001) ....................................................... 33, 34, 56

*Liberty-Lincoln Mercury, Inc.* v. *Ford*, 149 F.R.D. 65 (D. N.J. 1993) ................... 53

*In re LifeUSA Holding, Inc.*, 242 F.3d 136 (3d Cir. 2001) ....................................... 53

*Link* v. *Mercedes Benz of North Am.*, 550 F.2d 860 (3d Cir. 1977) ....................... 68

*Lott* v. *Westinghouse Savannah River Co.*,
  200 F.R.D. 539 (D.S.C. 2000) ................................................................... 33, 34

*Lusardi* v. *Xerox*, 118 F.R.D. 351 (D. N.J. 1987) ...................................................... 63

*McCree* v. *Sam's Club*, 159 F.R.D. 572 (M.D. Ala. 1995) ...................................... 33

*Miller* v. *Hygrade Food Prods. Corp.*, 198 F.R.D. 638 (E.D. Pa. 2001) ......... *passim*

*Moore* v. *Boeing Co.*, 2004 WL 3202777 (E.D. Mo. Mar. 31, 2004) ...........6, 33, 47

*Morgan* v. *Metro. Dist. Comm'n*, 222 F.R.D. 220 (D. Conn. 2004) ....................... 34

*Osgood* v. *Harrah's Entertainment, Inc.*,
 202 F.R.D. 115 (D. N.J. 2001) ....................................................................... 69

*Pryor* v. *Nat'l Collegiate Athletic Assoc'n*,
 2004 WL 1207642 (E.D. Pa. Mar. 4, 2004) .............................................68, 69

*Ramirez* v. *DeCoster*, 194 F.R.D. 348 (D. Me. 2000) ................................. 34, 64, 65

*Reap* v. *Continental Cas. Co.*, 199 F.R.D. 536 (D. N.J. 2001) ........................ *passim*

*Reid* v. *Lockheed Martin Aeronautics Co.*,
 205 F.R.D. 655 (N.D. Ga. 2001) .............................................................. *passim*

*Rhodes* v. *Cracker Barrel Old Country Store, Inc.*,
 213 F.R.D. 619 (N.D. Ga. 2003) ..................................................................33, 34

*Riley* v. *Compucom Sys., Inc.*,
 2000 WL 343189 (N.D. Tex. Mar. 31, 2000) ..........................................33, 34

*Robertson* v. *Sikorsky Aircraft Corp.*,
 2000 WL 33381019 (D. Conn. July 5, 2001) ......................................... *passim*

*Robinson* v. *Metro-North  Commuter R.R. Co.*,
 267 F.3d 147 (2d Cir. 2001) ........................................................................... 60

*In re School Asbestos Litigation*, 789 F.2d 996 (3d Cir. 1986) .............................. 60

*Smikle* v. *Coca-Cola Enters.*, No. 03-0431 (D. N.J. May 17, 2004) ............... *passim*

*Smith* v. *City of Jackson*, --- U.S. --, 2005 WL 711605 (Mar. 30, 2005) ................ 40

*Sperling* v. *Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346 (D. N.J. 1996) .............. 37

*Stastny* v. *Southern Bell Tel.*, 628 F.2d 267 (4th Cir. 1980) .................................... 43

*Stubbs* v. *McDonald's Corp.*, 224 F.R.D. 668 (D. Kan. 2004) ............................... 33

*Szczubelek* v. *Cendant Mortgage Corp.*,
     215 F.R.D. 107 (D. N.J. 2003) ........................................................................ 53

*Talley* v. *Arinc, Inc.*, 222 F.R.D. 260 (D. Md. 2004) ................................................ 55

*Thompson* v. *Merck*, 2004 WL 62710 ............................................................... *passim*

*Ticor Title Ins. Co.* v. *Brown*, 511 U.S. 117 (1994) ........................................... 59, 60

*Troupe* v. *Randall's Food & Drug, Inc.*,
     1999 WL 552727 (N.D. Tex. July 28, 1999) .................................................. 33

*Tustin* v. *Heckler*, 591 F. Supp. 1049 (D. N.J. 1984) ............................................... 69

*Vinson* v. *Seven Seventeen HB Philadelphia Corp.*,
     2001 WL 1774073 (E.D. Pa. Oct. 31, 2001) ..................................... 33, 53, 55

*Vuyanich* v. *Republic. Nat'l Bank of Dallas*,
     723 F.2d 1195 (5th Cir. 1984) ........................................................................ 33

*Wagner* v. *Taylor*, 836 F.2d 578 (D.C. Cir. 1987) ............................................ 44, 55

*Ward* v. *Johns Hopkins Univ.*, 861 F. Supp. 367 (D. Md. 1994) ............................ 56

*Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642 (1989) ........................................ 40

*Webb* v. *Merck*, 206 F.R.D. 399 (E.D. Pa. 2002) .............................................. *passim*

*Wetzel* v. *Liberty Mut. Ins. Co.*, 508 F.2d 239 (3d Cir. 1975) .......................... *passim*

*Wright* v. *Circuit City Stores, Inc.*, 201 F.R.D. 526 (N.D. Ala. 2001) .................... 33

*Zachery* v. *Texaco Exploration and Prod., Inc.*,
185 F.R.D. 230 (W.D. Tex. 1999) ...................................................................33

*Zapata* v. *IBP, Inc.*, 167 F.R.D. 147 (D. Kan. 1996) ..........................................33, 34

*Zenith Labs., Inc.* v. *Carter-Wallace*, 530 F.2d 508 (3d Cir. 1976)........................53

## STATUTES

Fed. R. Civ. P. 65(d)...............................................................................................61

Fed. R. Civ. P. 23................................................................................... *passim*

**Preliminary Statement**

By this motion, plaintiffs seek to bring together under the caption of one class action thousands of current and former employees of over 30 U.S. companies, in a variety of different businesses with diverse human resource practices and policies. This class would be unprecedented in scope and diversity, fraught with internal conflicts, and inconsistent with the prerequisites of Rule 23 in almost every respect.

Johnson & Johnson is not a highly centralized corporate structure consisting, for example, of thousands of retail stores or fast food restaurants that are virtual clones of each other. J&J is a decentralized collection of 200 companies in 57 countries; it is the broadest based network of consumer and health care companies in the world. Today, J&J consists not just of the consumer products companies familiar to the public; it also includes medical device companies that market joint implants and surgical instruments, diagnostic companies that provide laboratory testing equipment and software, and pharmaceutical companies that develop and sell prescription drugs. Over 50 companies were acquired by J&J just since the 1990s, and many brought with them their own distinct HR practices, job structures and workforces.

Within the broad sweep of plaintiffs' proposed class are company presidents, clerical employees, field sales representatives, biochemists, engineers, research scientists, physicians, lawyers, computer specialists and many others. Plaintiffs' proposed class includes African Americans who complain they failed to get jobs that went to Hispanics, African Americans who are challenging employment decisions made by other African Americans, and Hispanics who complain of job evaluations received from other Hispanics.

1

As for a common employment practice that supposedly links the employees of these diverse companies together as victims of discrimination, plaintiffs actually point to none.  Lacking a single, across-the-board discriminatory employment practice imposed by J&J on all these companies – such as a uniform written test or job requirement – plaintiffs instead assert a theory of "excessive subjectivity," under which the absence of a common objective HR practice is alleged to be the illegal form of discrimination supporting class certification.  The theory assumes that, left to their own devices, everyone will discriminate, and that it is the affirmative legal duty of J&J, the parent company, to abolish all opportunity for judgment and discretion from its subsidiaries' HR practices.  This is not the way to run a business, and it is not what the law requires.  Accordingly, as reflected by the long line of cases cited at pp. 32–34, most courts that have faced the issue have been unreceptive to certifying a class based on an "excessive subjectivity" theory.  *See, e.g., Cooper* v. *Southern Co.,* 390 F.3d 695, 716-19 (11th Cir. 2004); *Reap* v. *Continental Cas. Co.*, 199 F.R.D. 536, 545 (D. N.J. 2001); *Abram* v. *UPS*, 200 F.R.D. 424, 430 (E.D. Wis. 2001).  In this case, class treatment is even less appropriate because plaintiffs seek to extend its reach to include a parent company and over 30 subsidiaries in diverse businesses with diverse workforces and HR practices.

The two cases on which plaintiffs rely most are *Green* v. *USX Corp.,* 843 F.2d 1511 (3d Cir. 1988), *vacated by* 490 U.S. 1103 (1989), *on remand, Green* v. *USX Corp.*, 896 F.2d 801 (3d Cir. 1990), and *Dukes* v. *Wal-Mart Stores, Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004).  In those cases, classes were certified in exceptional circumstances not present here.  In *Green*, the focus of the litigation was a discrete

plant-level job interview which Judge Higginbotham and the district court had concluded was "<u>wholly</u> subjective." Such a finding is consistent with footnote 15 of the Supreme Court's opinion in *General Telephone Company of the Southwest* v. *Falcon*, 457 U.S. 147, 159 (1982), which "conceivably" supports class certification based on "significant proof" of an "<u>entirely</u> <u>subjective</u>" decisionmaking process. Here, the many HR practices employed by J&J and its subsidiaries are a combination of objective and subjective criteria, which cannot be the basis for class certification. *Bacon* v. *Honda of Am. Mfg. Inc.*, 370 F.3d 565, 571 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1334 (2005). In fact, Dr. James Outtz (a noted industrial psychologist, whose expert report on the subject accompanies this brief) reports that the performance management systems at J&J subsidiaries, the outcomes of which are a key factor for compensation and promotion, "well exceeded accepted professional standards for objectivity" (Outtz Report at 40). Dr. Outtz also reports that the factors the subsidiaries used to determine compensation and promotions "are consistent with professional standards for best practices" (Outtz Report at 49, 52, 54, 57).

In *Wal-Mart* (appeal pending in the Ninth Circuit), the district court granted class certification against an employer which consisted of thousands of identical retail stores with identical job functions and duties, controlled by a home office that micromanages everything down to the temperature and music in stores. J&J is the antithesis of Wal-Mart; it is a parent company of more than 30 separately incorporated U.S. subsidiaries operating in different businesses with different workforces, almost all with their own headquarters, facilities, senior management, and HR function. These HR functions are stand-alone operations that, according to Dr.

Outtz, employ HR policies and practices that are significantly different from each other.

Thus, any attempt to litigate, within one case under one caption, whether all these HR practices are excessively subjective and discriminatory would be a nightmare of complex litigation that could go on for years. For example, to litigate named plaintiff Nilda Gutierrez's claim of discrimination in compensation under a theory of excessive subjectivity, the Court must, among other things:

 (1) identify the specific criteria applied to evaluate her performance as a recruiting coordinator in the specific department within the company she worked, J&J Shared Services,

 (2) determine whether those criteria were excessively subjective,

 (3) determine whether those criteria were motivated by discrimination or resulted in discrimination, and

 (4) determine whether the criteria caused her to suffer an adverse employment action.

However, such a determination would <u>at</u> <u>most</u> resolve issues only with respect to certain HR practices at J&J Shared Services, where Gutierrez was employed. This determination would have no relevance at all to the case of a Ph.D. research scientist at Ortho Biotech, a patent manager at Ethicon, or a regulatory compliance director at Biosense Webster, each of whom is evaluated and paid based on an entirely different set of criteria. Policies for the compensation and evaluation of sales representatives and district managers – who comprise about <u>one-third</u> of the putative class – are a world in themselves. The evaluation criteria for sales employees (based in large

measure on sales results) not only differ company to company, but also among sales forces within companies.

The individualized nature of plaintiffs' proposed class claims does not stop there, however. Subjective decisionmaking, by its nature, affects different people in different ways. Assuming some level of subjectivity in an employment decision, discrimination cannot automatically be assumed to result. *Abram* v. *UPS*, 200 F.R.D. 424, 430 (E.D. Wis. 2001). To the contrary, the courts have held that HR practices that include elements of subjective decisionmaking are perfectly valid and lawful. In order to adequately and fully defend an excessive subjectivity claim, J&J is entitled to show that its personnel actions, to the extent subjective, were nondiscriminatory. Since subjective judgments, by their very nature, have an individual effect, this can only be litigated <u>one</u> <u>decision</u> <u>at</u> <u>a</u> <u>time</u>, at the <u>liability</u> phase of the case. While plaintiffs would like to gloss over this, such decisions number in the hundreds of thousands over the life of the class period.

This is why courts reject class certification of excessive subjectivity claims such as those here. Courts recognize that such excessive subjectivity claims are merely an improper attempt to group "together many unrelated employment decisions made by many individual supervisors against many individual plaintiffs[,]" the analysis of which "would raise numerous individualized questions that are not amenable to generalized proof." *Reap* v. *Continental Cas. Co.*, 199 F.R.D. at 545.

There are many other critical flaws in plaintiffs' case. Here are just a few:

*First*, plaintiffs' statistical experts, Drs. Janice Madden and Alexander Vekker, focus on the <u>wrong</u> question.  At the class certification stage, the Court must consider whether the employees of the various J&J companies face common HR practices, and, if so, whether such practices result in a <u>pattern</u> of statistical differences consistently adverse to minorities across the companies.  *See, e.g.*, *Abram* v. *UPS,* 200 F.R.D. at 426, 431; *Carson* v. *Giant Food, Inc.*, 187 F. Supp. 2d 462, 471 n.8 (D. Md. 2002), *aff'd sub nom. Skipper* v. *Giant Food Inc.*, 68 Fed. Appx. 393 (4th Cir. 2003); *Moore* v. *Boeing Co.*, 2004 WL 3202777, *12 (E.D. Mo. Mar. 31, 2004).  Rather than investigate this question, Drs. Madden and Vekker assume, incorrectly, that employees of the more than 30 J&J U.S. companies are subject to common compensation and promotion practices.  Relying on this assumption, Madden and Vekker improperly aggregate the data of all these diverse companies and purport to investigate whether J&J's promotion and compensation practices are "racially and ethnically neutral."  That is a merits inquiry, not the inquiry necessary at the class certification stage.

A very similar report prepared by Dr. Madden, in a very similar excessive subjectivity case, using virtually the same methodology, was severely criticized by the Eleventh Circuit in November 2004 when it affirmed a denial of class certification. *See Cooper* v. *Southern Company*, 390 F.3d 695 (11th Cir. 2004).  As detailed below (at pp. 44–50), history is repeating itself with the report Dr. Madden submits in this case.

As explained in the accompanying report of Dr. David Wise (a highly respected Harvard economist who, even Dr. Madden acknowledges, is a "first-rate

statistician"), when the promotion and compensation data of the many J&J companies are analyzed company by company, the data show <u>no pattern</u> of compensation and promotion differences consistently adverse to African Americans and Hispanics across J&J's subsidiaries.  In some companies, differences may favor whites; in others, differences may favor blacks and/or Hispanics.  For example, the data for Ethicon, where plaintiff Linda Morgan worked, actually indicate blacks received promotions at a rate slightly <u>higher</u> than expected based on their representation in the workforce.

Even Drs. Madden and Vekker found <u>no</u> statistically significant disparity adverse to Hispanics in promotion (Madden/Vekker Report at 3).  In her deposition, Dr. Madden also admitted that her own analysis revealed <u>no</u> statistically significant disparity in promotion rates between blacks and whites for 2002-2003 (Madden Dep. at 491–93),[1] the most recent period she studied.  Thus, faced with the reality of their own experts' statistical analysis, plaintiffs are required to withdraw much of their original claims in their complaint.

*Second*, plaintiffs fail to even identify a specific "excessively subjective" HR practice common to all J&J companies as <u>the</u> <u>source</u> of the statistical disparities they claim exist.  All plaintiffs do is complain generally of "common HR policies and practices in compensation and promotion."  Unlike plaintiffs in *Green*, who alleged

---

[1] Deposition excerpts and documents referred to herein (other than those relating to plaintiffs' 33 declarants) are appended as exhibits to the declaration of Maria H. Keane, submitted herewith in Appendix E.

that a specific plant-level job interview was "wholly subjective," plaintiffs here never even identify <u>which</u> specific policies and practices are excessively subjective, or explain how those policies and practices <u>cause</u> the statistical disparity they claim to find. The law requires that this link be identified before a class can be certified. *See, e.g., Garcia* v. *Veneman*, 211 F.R.D. 15, 21 (D. D.C. 2002); *Clayborne* v. *Omaha Public Power Dist.*, 211 F.R.D. 573, 596-97 (D. Neb. 2002) (citing *Falcon* and *Reid* v. *Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655 (N.D. Ga. 2001)).

*Third,* the named plaintiffs' cases demonstrate the internal conflicts that exist between their claims and the putative class claims, and within the broad class they want to represent. For example, plaintiff Linda Morgan, an African American, alleges discrimination when she was not promoted to Director of Purchasing at Ethicon. As it turns out, however, the actions challenged by Morgan as discriminatory were taken by a supervisor who also happens to be African American (Morgan Dep. at 14, 346, 350).[2] Plaintiff Nilda Gutierrez, a Hispanic, alleges discrimination in compensation. However, Gutierrez, like Morgan, had a supervisor of the same race who was responsible for many of the actions complained of as discriminatory (*See* Hamway Dep. at 180, 188, 197, 213–14, 219).

*Fourth*, not only do plaintiffs fail to meet the commonality, typicality and adequacy requirements of Rule 23(a), they fail to meet the test of either Rule 23(b)(2) or 23(b)(3) – one of which must be satisfied in addition to the elements of Rule 23(a). Certification pursuant to Rule 23(b)(2) is reserved for cases where injunctive or

---

[2]   *See also* Clark Decl. at ¶¶ 12–14.

declarative relief, and not monetary relief, predominates. Under the test set forth in *Allison* v. *Citgo Petroleum Corp.,* 151 F.3d 402, 415 (5th Cir. 1998), to certify a class under Rule 23(b)(2), a claim for monetary relief must be no more than "<u>incidental</u>" to a claim for injunctive relief. Though plaintiffs suggest otherwise, the *Allison* test was followed in the Third Circuit in *Barabin* v. *Aramark Corp.*, 2003 WL 355417, *1-2 (3d Cir. Jan. 24, 2003) (unpublished), *aff'g*, 210 F.R.D. 152 (E.D. Pa. 2002) and in district courts within this Circuit. Here, it is plain from plaintiffs' own pleadings that their claim for money is not just "incidental" to their claims for injunctive relief.

Certification under Rule 23(b)(3) is also inappropriate in this case. Under Rule 23(b)(3), the court must find that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." The Third Circuit and the district courts within it reject class certification under Rule 23(b)(3) where, as here, the alleged pattern or practice of discrimination are allegations of excessively subjective or decentralized decisionmaking. *See Barabin*; *Smikle* v. *Coca-Cola Enters.*, No. 03-0431, slip op., at 32 (D. N.J. May 17, 2004); *Thompson* v. *Merck*, 2004 WL 62710, *4-5 (E.D. Pa. Jan. 6, 2004); *Reap*, 199 F.R.D. at 548-49; *Miller* v. *Hygrade Food Prods. Corp.*, 198 F.R.D. 638, 643-44 (E.D. Pa. 2001).

In sum, Johnson & Johnson and its broad and decentralized network of subsidiaries, with their own distinct businesses, workforces, HR practices and policies, are uniquely <u>ill-suited</u> for class certification. The weight of case authority in excessive subjectivity cases denies certification of classes far less diverse, with far fewer conflicts, than this putative class.

**STATEMENT OF FACTS**

A.   **J&J and its Subsidiaries**

Plaintiffs portray J&J and its subsidiaries as a single company, "widely recognized and marketed as a unified brand name." This is simply not true. J&J is traditionally associated with BAND-AID® bandages and Johnson's® Baby Powder. Today, however, J&J is a decentralized multinational conglomerate of companies that is the broadest based network of diverse consumer and health care companies in the world.

At present, there are more than 200 J&J subsidiaries in 57 countries around the world (Keane Decl. (App. E), Ex. 1 at cover, pp. 72–74). More than 30 are U.S. companies, with operations and headquarters in 18 states. Many of these J&J subsidiaries are themselves large enough to constitute *Fortune* 1000 companies. Together, J&J and its subsidiaries employ over 40,000 individuals in the United States (Carey Decl. at ¶ 4).

Today, companies owned by J&J manufacture and sell such diverse products as surgical sutures, stents for cardiovascular disease, contraceptive patches, leukemia medication, TYLENOL®, NEUTROGENA® soap, SPLENDA® sweetener, contact lenses, equipment for bariatric surgery, blood glucose monitors used by diabetics, artificial replacements of joints and spinal discs, and drugs for treatment of Alzheimer's (*see* Keane Decl. (App. E), Ex. 1 at pp. 67–70). These products are not marketed under the "Johnson & Johnson" brand name or logo. In fact, only a small percentage of J&J's overall sales/profits come from products sold under the "Johnson

10

& Johnson" brand name (*see generally* Keane Decl. (App. E), Ex. 1 at pp. 29, 64) (a visual depicting selected products is appended hereto).

J&J subsidiaries operate in different industries, have different competitors, and sell to different customers. For example, Cordis sells medical devices to hospitals and group purchasing organizations for use by cardiologists and surgeons and competes principally with Boston Scientific and Medtronic. In contrast, Ortho-McNeil Pharmaceutical markets pharmaceutical products primarily to neurologists and primary care physicians, and competes with other pharmaceutical companies.

A review of just a few of J&J's many subsidiaries (as of 2001, when this case was brought) illustrates the extent to which they differ:



Headquartered in Miami Lakes, FL, with additional facilities in Warren, NJ. Develops, produces and markets devices for circulatory disease management, including stents, balloons, vena cava filters and catheters used in treating cardiovascular disease and related conditions (*see* Gudicello Decl. at ¶¶ 7, 9).



Headquartered in Los Angeles, CA, creates and markets premium skin and hair products. Product lines include over-the-counter items such as bar and liquid cleansers, shampoo, hand cream, body lotion, facial moisturizers, bath preparations and cosmetics, as well as prescription hair and skin care products (*see* Jennings Decl. at ¶¶ 4–6).



Headquartered in Bridgewater, NJ, has additional facilities in Yardley, PA. Develops and markets biopharmaceuticals used to treat anemia associated with serious chronic conditions, organ transplant rejection, leukemia, and certain forms of cancer (*see* Collins Decl. at ¶¶ 4, 7).

11



Headquartered in Fort Washington, PA, manufactures and markets a no calorie sweetener, SPLENDA®, soft calcium chews, VIACTIV®, milk and dietary supplements for the lactose-intolerant, LACTAID®, and spreads and soft gels to reduce cholesterol, BENECOL® (*see* Riles Decl. at ¶¶ 6–7).



Composed of four companies with headquarters or facilities in Indiana, Massachusetts, California and Utah. Develops, markets and distributes artificial joint replacements, products and surgical instruments for skeletal, soft tissue and sports injuries, and neurological and central nervous system disorders (*see* Hanlin Decl. at ¶¶ 4–7).



Headquartered in Jacksonville, FL, Vistakon revolutionized the vision correction industry in 1988 with the invention of the world's first soft disposable contact lens. Designs, manufactures and markets contact lenses under the ACUVUE® and SUREVUE® brand names (*see* Berle Decl. at ¶¶ 2–3).



Headquartered in Somerville, NJ, has four separate divisions and manufacturing facilities in three states (NJ, GA and TX), Puerto Rico and Mexico. Ethicon Products develops and markets products for surgery, wound management, and advanced wound care treatment, such as MultiPass™ needles and PROLENE™ sutures. Other divisions market instruments for gynecologic surgery and cardiovascular procedures (*see* Cachinero Decl. at ¶¶ 6–12).



Headquartered in Fort Washington, PA, markets over-the-counter and prescription pharmaceuticals, including complete lines of TYLENOL® and MOTRIN®, IMODIUM® A-D Anti-diarrheal, ST. JOSEPH® Aspirin, and NIZORAL® A-D Shampoo. Prescription products include drugs for attention deficit hyperactivity disorder and muscle spasms (*see* Walker-Manella Decl. at ¶¶ 3–4).



Headquartered in Irvine, CA.  Develops, manufactures and markets sterilization systems and solutions, including STERRAD® machines and CIDEX® solutions for disinfecting instruments and endoscopes (*see* Rains Decl. at ¶¶ 3–4).



Headquartered in Titusville, NJ.  Produces and markets prescription medications used in the treatment of psychiatric disorders, including RISPERDAL®, an antipsychotic medication, and REMINYL® for Alzheimer's disease (*see* Reardon Decl. at ¶¶ 1, 3).



Headquartered in Raritan, NJ, with sales offices in California, Colorado, Illinois, Texas, Georgia, Pennsylvania and New Jersey.  Develops, markets, and sells DITROPAN XL®, for overactive bladders; ULTRACET® for pain; TOPAMAX® for epilepsy; AXERT® for migraine headaches; and the contraceptives ORTHO EVRA® and ORTHO TRI-CYCLEN® LO (*see* Famularo Decl. at ¶¶ 6–7; Cohen Decl. at ¶ 10).

(Numerous other differences among the J&J companies are set forth in Exhibit 1 to the Stein Declaration accompanying this brief.)

The list of companies owned by J&J has expanded in recent years, and changes constantly; many have been J&J subsidiaries for only a short period of time, while others have been sold during the putative class period.[3]  Many of these recent

---

[3]    Recent mergers and acquisitions include Cordis and Indigo Medical (in 1996); Biopsys Medical, Biosense, Gynecare, Innotech and Nitinol Development Corp. (1997); DePuy (1998); Centecor and Horizon Health Services (1999); Innovasive Devices, Atrionix and Medtrex (2000); ALZA, BabyCenter, Heartport, Inverness Medical Technologies and TERAMed (2001); Tibotec-Virco and Micro Typing Systems (2002); Scios, Link Spine Group, 3-Dimensional Pharmaceuticals and Orapharma (2003); and Egea Biosciences, Inc. and Wyeth St. Louis Facility (2004).  Meanwhile, recent divestitures include Horizon Health Services (2003); Can-Am Care Corp. and LNX Corp. (2002); J&J Medical (1999-2003); DePuy Orthotech (2000) and Critikon (1998) (s*ee* John Kador, *Great Engagements: The*

acquisitions have brought with them their own distinct HR practices and procedures (*see*, *e.g.*, Cunningham Decl. at ¶ 19; Michalcewicz Decl. at ¶ 11, 25, 28).

The diversity of J&J's companies, and the variety of their industries and products, also means a wide range of job types and skill demands among and within the companies. As reflected in the accompanying report of J&J's statistical expert, Dr. David Wise, there are thousands of distinct jobs reflected in the data set analyzed by the parties, a large portion of which are unique to one company (Wise Report at 9, 37-41). As also discussed by Dr. Wise, the functional composition of the workforces of the companies varies widely. For example, 90.4% of employees at Ortho Dermatological and 75.1% of employees at Janssen are in sales and marketing. On the other hand, no employees at J&J Pharmaceutical Research & Development are in sales and marketing, while 67.9% are in R&D; over 47% of Alza's employees are in R&D or engineering, and only 1% are in sales and marketing (Wise Report at 33).[4] The chart below illustrates these differences:

---

*Once & Future Johnson & Johnson* 239 (2004) (Keane Decl. (App. E), Ex. 3); Keane Decl. (App. E), Ex. 1 at 55–56; Keane Decl. (App. E), Ex. 4). Just recently, shareholders of Guidant Corporation approved its acquisition by J&J, the effect of which will be to increase the overall workforce of J&J companies by 11%; Keane Decl. (App. E), Ex. 5).

[4]   Plaintiffs make much of a single document they received in discovery (Pls.' Br. at 45–46). This document shows that in 1976, 7.1% of all salaried, exempt J&J employees were African American, that by the 1990s the percentage had climbed to 8.4%, and that in 2000, the percentage was again 7.1%. Plaintiffs claim this document shows a lack of progress for African American in the years 1976-2000. However, the document, on its face, fails to take account of the overall demographic change in the workforces of J&J's subsidiaries. During that same 25-year period, many companies were acquired or divested by J&J, significantly shifting the subsidiaries' businesses and the nature of their workforces from textile-based consumer products to science-based products (Larsen Dep. at 180–81; *see*

14



## Distribution of Employees by Function, 2001

(Wise Report, Figure 1 at 9).

Even within a single J&J subsidiary – Ethicon Endo-Surgery, for example – the diversity of jobs is extraordinary. EES' workers include (i) engineers with expertise in metallurgy and plastics, (ii) research scientists in laser and ultrasound technology, (iii) surgeons and medical professionals, (iv) regulatory and clinical affairs specialists to ensure compliance with FDA and other regulations, (v) a

---

*also* Carey Dep. at 570–71; Carey Decl. at ¶¶ 40–42). More importantly, as can be seen from the document itself, when one compares the representation levels of African Americans to <u>whites</u> for this period, the representation of exempt African Americans to white employees <u>grew</u> from 7.8% to 9.1% by 2001, a 17% increase from 1976.

15

highly trained salesforce with specialists in urology and breast care, (vi) information management specialists to maintain websites for patient resources, and (vii) finance, human resources and administrative support personnel (Ward Decl. at ¶¶ 1–18).

This wide variety of jobs and functions also means wide company-by-company differences in education (by both level of degree and field of study).  The percent of employees with a Ph.D. ranges from 0% (at J&J Sales & Logistics Co.) to 36.5% at J&J Pharmaceutical Research & Development.  The percent of employees with an MBA or law degree ranges from 4.6% (Alza) to 48.2% (Personal Products Company) (Wise Report at 36).

### B.    J&J's Decentralized Management Framework

The key to managing this broad array of companies is a decentralized style of management within an overall framework of values, processes, and resources (Deyo Dep. at 112–13).  J&J believes this style of management as fundamental to its success, and business experts regard it as a successful and respected model for running a large and diverse conglomerate of companies.  Accompanying this brief is the declaration of Mr. Daniel Lemaitre, a recently retired Managing Director of Merrill Lynch, and widely-regarded as among the top three research analysts in the medical technology and hospital supply industries.  Lemaitre, who covered Johnson & Johnson for 20 years, notes that J&J's "decentralized approach is the result of a conscious decision to provide a sense of focus, ownership, responsibility and accountability at the local level as a means of creating sustainable sales growth over the long term" (Lemaitre Decl. at ¶ 16).  In Lemaitre's opinion, J&J's

decentralized management approach has been a very effective way of managing and growing Johnson & Johnson's very large and diverse group of companies. Indeed, it is my opinion that decentralized management has been an important contributing factor in Johnson & Johnson remaining a powerhouse in pharmaceuticals, biotechnology, diagnostic and medical devices, making it the world's most broadly based health care company.

Lemaitre Decl. at ¶ 22.[5]

Under J&J's philosophy of decentralized management, each subsidiary, not J&J headquarters, is responsible for running its own business operations on a day-to-day basis and for managing its own personnel. Each subsidiary has its own headquarters and operational facilities (Carey Decl. at ¶ 4; Keane Decl. (App. E), Ex. 1 at 67–74), and its own "senior management" headed by a chairman, president, general manager or managing director, and generally consisting of vice presidents for operations, regulatory, sales, finance, human resources and other functions (Carey Decl. at ¶ 5). This senior management has responsibility for all aspects of that business entity, including compliance with laws and regulations (*see* Carey Decl. at ¶ 5).

There is a 10-member Executive Committee that is the principal management group of J&J. The Executive Committee does not directly oversee the

---

[5]    *See also* Francis J. Aguilar & Arvind Bhambri, *Johnson & Johnson(A): Philosophy & Culture*, 3 (June 30, 1986), Keane Decl. (App. E), Ex. 7; James C. Collins & Jerry I. Porras, *Built to Last: Successful Habits of Visionary Companies*, 147 (1994), Keane Decl. (App. E), Ex. 8; John Kador, *Great Engagements: The Once & Future Johnson & Johnson*, 78–101 (2004), Keane Decl. (App. E), Ex. 3; Mark Lipton, *Guiding Growth: How Vision Keeps Companies on Course*, 119 (2003), Keane Decl. (App. E), Ex. 9; Alex Taylor III, *Can J&J Keep the Magic Going?*, FORTUNE, May 27, 2002, at 119, Keane Decl. (App. E), Ex. 10; Keane Decl. (App. E), Ex. 6 at 7, Ex. 2 at 25.

activities of the subsidiaries.  Rather, the Committee includes three "Worldwide Chairmen" who oversee the activities of the subsidiaries by business segment:  (i) consumer, (ii) pharmaceutical, and (iii) medical devices and diagnostics.  Below the Worldwide Chairmen are approximately 21 "Company Group Chairmen," to whom the business leaders of the subsidiaries report.

The role of J&J headquarters is to set, in collaboration with the subsidiaries, overall financial and strategic objectives for the subsidiaries, and to review progress toward those goals and objectives (Carey Decl. at ¶ 7).  J&J also expects each subsidiary to follow the values set forth in J&J's Credo. In other respects, J&J leaves the running of a subsidiary to that subsidiary's own senior management team.

### C.    The Subsidiaries' HR Policies and Practices

Plaintiffs contend that J&J and its many subsidiaries "operate[] for human resources purposes as a single integrated enterprise," and that J&J has "a centralized human resources structure. . . united by common human resources policies and recordkeeping practices . . ." (Pls.' Br. at 1, 14).  Again, this is inaccurate.

Accompanying this brief are declarations from 37 vice presidents, directors and managers of J&J's U.S. companies as of 2001.  As reflected in these declarations, almost every subsidiary has its own stand-alone HR department, typically headed by an HR vice president, and including compensation and recruiting specialists, and an EEO officer[6] (*see, e.g.,* Gudicello Decl. at ¶¶ 13–15; Ward Decl. at

---

[6]    *See also* Bright Dep. at 24; Carey Dep. at 60–61; Carey Decl. at ¶¶ 19, 27.

¶¶ 19–20).  The HR staffs of some companies number in the dozens (*see* Calicchio Decl. at ¶ 8; Gudicello Decl. at ¶ 13; Monge Decl. at ¶ 11; Ward Decl. at ¶ 20).  The heads of the HR departments report directly to the business leader of the subsidiary, and not to J&J's Vice President, Human Resources (*see, e.g.,* Hind Decl. at ¶ 11; Collins Decl. at ¶ 10).

Within each subsidiary, hiring, promotion, compensation and evaluation decisions are made by the management of that subsidiary, with the assistance of the subsidiary's HR personnel (*see, e.g.,* Cachinero Decl. at ¶ 2; Michalcewicz Decl. at ¶ 8; Rains Decl. at ¶ 5).  These decisions are subject to a second-level review – *e.g.*, a manager's performance evaluation completed by a director will be reviewed by a vice-president, often in consultation with the subsidiary's HR personnel (*see, e.g.,* Chen Decl. at ¶ 22; Riles (J&J•Merck) Decl. at ¶ 10; Cunningham Decl. at ¶ 22).  Thus, in general, it is only with respect to the two top positions at a subsidiary – typically president and vice president (a very small fraction of the workforce) – that J&J personnel are involved in the decisionmaking process with respect to hiring, promotion, evaluation, compensation and succession planning at a subsidiary (Carey Decl. at ¶ 12).

The role of the HR departments at the individual subsidiaries is to support and assist line management in personnel actions and decisions.  For example, in 2001, in consultation with line management:

- HR personnel at each subsidiary decided how to fill a job vacancy – where to recruit, which college campuses to visit, in which newspapers to advertise, whether to post the vacancy internally and/or externally, what interview procedures and parameters to adopt,

and how to make a job offer (*see, e.g.,* Berle Decl. at ¶¶ 25–26; Chen Decl. at ¶¶ 33–34).

- HR personnel at each subsidiary developed and implemented the performance appraisal systems at that subsidiary (Kells Dep. at 41–42) – *e.g.*, decided the performance appraisal form(s) to use at the company, the competencies upon which employees should be evaluated, whether the competencies should differ among positions, the weightings to be assigned to various criteria, and the sources of input (*see, e.g.*, Calicchio Decl. at ¶¶ 9, 12; Collins Decl. at ¶¶ 13–14; Levinson Decl. at ¶¶ 13–32).

- HR personnel at each subsidiary developed salary offers for initial hires (*see, e.g.,* Snyder Decl. at ¶ 44; Woodring Decl. at ¶ 44), and, at companies with field sales employees, set salary ranges for field sales positions (*see, e.g.*, Famularo Decl. at ¶¶ 19–21; Reardon Decl. at ¶¶ 48–49; Shapiro Decl. at ¶¶ 14–15).

- HR personnel at each subsidiary administered annual merit increases, bonuses, stock awards and stock options awarded to individual employees based on performance (*see, e.g.,* Dillard Decl. at ¶¶ 5–7; Gudicello Decl. at ¶¶ 20–24; Walker Decl. (McNeil) at ¶¶ 18–19).

There is no centralized HR function at J&J to which the individual HR departments of the many companies are directly responsible. Rather, at J&J headquarters, there are several groups that are available to support the HR functions of J&J's 200 subsidiaries worldwide. These groups act as a resource for subsidiaries in designing their own HR policies, guidelines, practices and procedures; they do not instruct or supervise the HR departments at the subsidiaries (Carey Dep. at 103–04).[7]

---

[7] In addition, there is a "Human Resources Council," which includes the HR vice presidents or directors from the J&J subsidiaries, and, since 2000, a "Human Resources Leadership Team" which consists of HR vice presidents for each of the major business segments into which the J&J subsidiaries are organized. These groups address strategic, policy, and technology resource matters (Kells Dep. at 187; Deyo Dep. at 171).

For example, there is an HR function at J&J which issues guidelines for annual succession planning.  However, this is only with respect to positions at the senior-most level of the subsidiaries (president and vice president and the replacements for those positions) (Carey Decl. at ¶ 16; Carey Dep. at 471–73).  The subsidiaries may or may not follow the J&J model at the level below vice president, and to what extent the subsidiaries do so varies considerably (*see, e.g.,* Cunningham Decl. at ¶ 28; Ward Decl. at ¶ 34–35; Levinson Decl. at ¶ 46; Raher Decl. at ¶ 51).

At J&J headquarters, J&J Recruiting Services ("JJRS") is available as a recruiting agency for subsidiaries, but only to the extent the subsidiaries choose to use it, which, again, varies significantly (*compare* Lochner Decl. at ¶ 26 *with* Hind Decl. at ¶ 35).  In 2001, JJRS offered the "GO Network," an intranet based job posting system for use by subsidiaries.  However, it was up to HR personnel at a subsidiary to decide whether to use it, or to use their own job posting system or other method of job search.  It is the subsidiaries that decide the duties and minimum qualifications for positions, whom to hire, and the compensation to be offered (Carey Decl. at ¶ 14).

In 2001, there was a "Worldwide Policy Manual" issued at J&J headquarters (*see, e.g.,* Keane Decl. (App. E), Ex. 2).  However, this document was not a binding directive to the 200 subsidiaries (*see* Carey Dep. at 138–39; Kells Dep. at 138–39), nor did it amount to, as plaintiffs claim, "common human resources policies . . . [that] impact all United States based employees."  Pls.' Br. at 14.  In 2001 the Manual served as guidance and a template for the subsidiaries' own policy manuals, and they could choose not to use it (HochbergSmith Dep. at 12–13).  Each subsidiary often issues its own written HR manuals, policies, procedures or guidelines

21

covering both subjects that are addressed in the J&J Manual as well as subjects that are not (*see, e.g.*, Reardon Decl., Ex. 2; Cunningham Decl., Ex. 5; Levinson Decl., Ex. 4).

At J&J headquarters, there is a "Worldwide Compensation Resources" group ("WCR") (Carey Decl. at ¶ 18).  Contrary to plaintiffs' claims, this group does not set or approve individual employee compensation.  WCR consists of just 15 employees, and it provides advice to the subsidiaries about compensation for certain senior positions.  WCR also provides annual year-end guidelines for merit increases, bonuses, stock awards and options with suggested ranges and eligibility criteria.  These guidelines are essentially budgets or pools, and the management of each subsidiary decides how to meet its overall budget (Carey Decl. at ¶ 20; Obler Dep. at 34–35; Keane Decl. (App. E), Ex. 12).  Additionally, WCR provides "Compensation Navigator," a software tool to help managers and HR at the subsidiaries determine and administer compensation for their personnel (Carey Decl. at ¶ 23).  WCR also provides informational websites and training materials; and develops market-pricing data for certain benchmark positions in approximately 30 countries (Carey Decl. at ¶ 22; Carey Dep. at 98; Obler Dep. at 52–54, 135).  However, the subsidiary, not WCR, determines whether positions at the subsidiary should be matched to WCR's benchmark market data.  Subsidiaries are free to not use WCR's data, and subsidiaries often develop their own set of benchmark data from other sources (*see, e.g.,* O'Conner Decl. at ¶ 15; Collins Decl. at ¶¶ 16–17; Woodring Decl. at ¶ 45; Messina Decl. at ¶ 17).

Compensation programs for field sales personnel, which account for almost <u>one-third</u> of the putative class, are developed and customized entirely by the subsidiaries (*see, e.g.,* Grimley Decl. at ¶¶ 5, 7; Caldarera Decl. at ¶¶ 10–11; David Decl. at ¶ 18–22; Shapiro Decl. at ¶¶ 18–23; Ward Decl. at ¶¶ 65–67). WCR issues no guidelines for base pay or incentive compensation and develops no benchmark data for field sales personnel (David Decl. at ¶ 23; Johnson Decl. at ¶ 7; Gudicello Decl. at ¶ 18). Rather, sales management and HR personnel at the subsidiary develop sales compensation programs based on the focused business strategy of that subsidiary, at times individualized down to the specific product level (*see, e.g.,* Cohen Decl. at ¶ 18, ¶¶ 24–33; Green Decl. at ¶ 4; Cunningham Decl. at ¶ 11; Chen Decl. at ¶¶ 46–48). For example, Ethicon had six separate and unique sales compensation plans for its varied sales forces: two for Ethicon Products and one each for Gynecare, Advanced Wound Care, Wound Management and Mitek (Snyder Decl. at ¶¶ 10, 20–41). Neutrogena, a skin care and cosmetics company, has three sales compensation plans for different segments of its consumer sales force and an entirely separate program for its pharmaceutical sales force (Jennings Decl. at ¶¶ 36–40).

It is the responsibility of each subsidiary to monitor its own compliance with federal, state and local laws and regulations, including equal employment and civil rights laws (HochbergSmith Dep. at 31, 271–74). Each subsidiary has its own EEO officer (*see* Bright Dep. at 24), and is responsible for developing and satisfying its own Affirmative Action Plans and goals (Carey Decl. at ¶¶ 28–30). There is an EEO Office at J&J in New Brunswick, which has two main functions: to facilitate resolution of disputes through "Common Ground," an employee dispute resolution

23

program, and to provide training, support and guidance to the subsidiaries' EEO officers in the preparation of EEO-1s and Affirmative Action Plans that the subsidiaries must complete annually (HochbergSmith Dep. at 31, 381–82; Carey Decl. at ¶ 28).  At J&J headquarters, there is also an Office of Diversity headed by a vice president reporting to the Chairman; however, the subsidiaries have long managed their own diversity efforts (Carey Decl. at ¶¶ 31, 32).

The result of this decentralized HR environment, with more than 30 separate HR functions, is a huge variety in HR policies and practices.  For example:

- In 2001, Cordis made its sales representatives eligible for merit pay.  Prior to that, Cordis had a three-tier system to set base pay, and sales representatives were not eligible for merit increases (Gudicello Decl. at ¶ 19).  At the same time, at many other companies, including Ethicon Endo, McNeil Consumer, Ortho-McNeil, and Ortho-Clinical, sales representatives were already eligible for merit pay (*see*, *e.g.*, Ward Decl. at ¶ 68; Shapiro Decl. at ¶ 17; Famularo Decl. at ¶ 24; Hind Decl. at ¶ 42).

- In 2001, Centocor had its own promotion guidelines pursuant to which promotions generally involved salary increases of specified amounts (Cunningham Decl. at ¶ 25).

- In 2001, Noramco followed its own merit increase guideline pursuant to which employees were awarded specified percentage amounts for specific performance ratings (Raher Decl. at ¶ 31).

- In 2001, LifeScan used salary grids to set initial compensation for new hires, and had a separate salary grid for college hires (Monge Decl. ¶¶ 20–25).

- In 2001, Ortho-McNeil supplemented the base pay of sales employees assigned to high-cost territories with quarterly payments that depended on the territory to which they were assigned (Famularo Decl. at  ¶ 21).

- In 2001, Ethicon Endo had an electronic performance management system that calculated an overall performance rating for sales

24

associates following entry of ratings for individual components that allowed for fractional overall results (Ward Decl. at ¶ 70); this was one of a large number of different performance appraisal systems used by the J&J companies (*see*, *e.g.,* Hind Decl. at ¶¶ 13–23; Levinson Decl. at ¶¶ 18–22; Reardon Decl. at ¶¶ 9–18).

Although employment policies and practices differ significantly among companies, the factors used by the subsidiaries in determining compensation and promotion "are consistent with professional standards for best practices." This is the opinion reached by Dr. James Outtz, a highly respected industrial organizational psychologist. In his career, Dr. Outtz has been retained as a consultant or expert by the Civil Rights Division of DOJ, the FBI, OFCCP, the NAACP Legal Defense Fund, the Lawyers' Committee for Civil Rights, and the cities of Detroit, Baltimore, Chicago, San Francisco, New Orleans, and Washington, DC (Outtz Report, Appendix A). After review of the declarations of the 37 vice presidents/managers cited herein, the subsidiaries' HR policies and guidelines, and a representative sample of 2001 performance evaluations from J&J's U.S. companies,[8] Dr. Outtz concludes:

- Examination of the compensation policies, practices and procedures of the companies indicated significant differences among the companies.

- Examination of the promotion practices of the companies indicated that promotions were obtained in a variety of ways. Analysis of plaintiffs' promotion claims requires detailed information about the specifics of each promotion.

- Plaintiffs' experts did not utilize appropriate methodology in evaluating the companies' human resources policies, practices and

---

[8]   This representative sample was selected by Dr. Eugene Ericksen, an expert in sampling, statistics, and survey research on the faculty of Temple University. Dr. Ericksen describes the method he used to construct the sample in detail in his report accompanying this brief.

procedures. Plaintiffs' experts' analysis does not address initial job assignments; additional information is needed to adequately address that issue.

- The review of 2001 performance appraisals revealed that the performance management systems at the companies (a) exceeded the standards of accepted professional practice with regard to objectivity and (b) were significantly different among companies.

(Outtz Report at 66–67).

## D. The Data

If, as plaintiffs allege, there were a common practice of discriminating against African Americans and Hispanics in pay and promotions "throughout J&J," the data ought to show <u>a pattern</u> of compensation and promotion statistical differences adverse to blacks and Hispanics across companies. The data, however, show exactly the opposite.

As reflected in the accompanying report of Dr. David Wise, the data show no pattern of statistical differences in base pay, non-salary compensation, "direct payments"[9] or promotions consistently adverse to African Americans or Hispanics across J&J companies (Wise Report at 6, 63, 105, 116–17, 151–52). When properly analyzed company by company, the data show that in any one year at some companies African Americans fare better than similarly-situated whites, and at some companies whites fare better. Similarly, at some companies Hispanics fare better; at other companies they do not.

---

[9]   Though he is critical of this type of analysis (Wise Report at 113–14), Dr. Wise analyzed "direct payments" to facilitate comparison with Dr. Madden's analysis of "total direct compensation" (Wise Report at 63). Dr. Wise included overtime pay and excluded sales commissions from his analysis (Wise Report at 113–14).

The following figure, extracted from Figure (D.c.) 1a. on page 116 of Dr. Wise's report, illustrates the point. The figure shows the estimated percentage difference between "direct payments" to African Americans and similarly situated whites for the year 2001, taking into account employee performance for the preceding year.



Clearly, this figure shows no pattern of differences adverse to African Americans across J&J companies. For example, in 2001 black employees of Ortho-McNeil ("OMP") are estimated to have earned 2.37% more than whites performing the same job, while black employees of J&J Health Care Systems ("HCS") are estimated to have earned 1.48% less. This chart reflects just one year. "Direct payments" data for other years show a similar lack of pattern company by company, as well as a lack of

pattern at the same companies year to year (Wise Report at 116).  For example, in 2001, black employees of Neutrogena ("NTG") (the company with the largest negative variance above) are estimated to have earned 4.59% less than whites, but in 2000 were estimated to have received 4.22% <u>more</u> than whites (Wise Report, Figure (D.c.) 1a.).  The analysis for Hispanics shows similar company-by-company variation in 2001:



**Percentage Average Difference Between Direct Payments to Hispanic and White Employees, By Company (2001)**

In addition, a comparison of the two figures above shows lack of consistency between "direct payments" to blacks and Hispanics compared to whites: the companies in which blacks fare better than whites are often not the same as the companies in which Hispanics fare better than whites.  The "direct payments" analyses for Hispanics for the other years studied show a similar lack of pattern.

28

Moreover, results of Dr. Wise's base pay, non-salary compensation and promotion analyses all show a similar lack of a pattern company by company, year to year, and between blacks and Hispanics (Wise Report at 66–69, 99–100, 151–52).

### E.   Plaintiffs' Individual and Anecdotal Claims of Discrimination

Even at this stage, discovery reveals that the named plaintiffs' claims lack merit, are not typical of the alleged class claims, and present substantial conflicts within the putative class.

**Linda Morgan** is an African American who claims discrimination when she was not promoted to Director of Purchasing at Ethicon. As it turns out, however, the actions challenged by Morgan as discriminatory were taken primarily by an African American. Morgan sought the Director of Purchasing position that became open when her manager, Joe Clark, an African American, retired. Clark himself participated in the identification, evaluation, and interviews of candidates to succeed him (*see* Clark Decl. at ¶ 10; Fox Decl. at ¶ 18), and determined that Morgan did not have the experience to be promoted to his position (*see* Clark Decl. at ¶¶ 12–14; *see also* Morgan Dep. at 14, 346). Morgan also claims that she should have been promoted to other positions, including a plant manager position that went to a Hispanic and a Director of Operations position that went to an African American woman (*see, e.g.*, Morgan Dep. at 42–43, 154–55, Fox Decl. at ¶ 15).

**Nilda Gutierrez,** a Hispanic employed at J&J Shared Services, alleges discrimination in compensation. However, Gutierrez's initial salary was *higher* than that of white employees she identifies as her comparators (Gutierrez Dep. at 165–70).

29

Like Morgan, Gutierrez also had a supervisor of the same race, who took many of the alleged discriminatory actions complained of (Hamway Dep. at 180, 188, 197, 213–14, 219).

**Krista Marshall** is an African American who alleges discrimination in compensation and promotion at Ethicon, Worldwide Headquarters, and J&J Healthcare Systems. However, Marshall's compensation claim is based largely upon a significant misunderstanding of what comparator employees were earning ( Marshall Dep. at 29–30, 51, 169, 172–74, 303).

**Wayne Brown,** an African-American who worked at J&J headquarters as a security guard supervisor, alleges discrimination in promotion and compensation. Although Mr. Brown claims he was not promoted to the position of Security Manager because of his race, he admits that he had less security and law enforcement experience than the candidate selected ( Brown Decl. at ¶¶ 12, 14, 17; Brown Dep. at 89–90).

To bolster their individual claims, plaintiffs have also offered declarations of 35 African American and Hispanic employees (mostly former), as "anecdotal evidence" of discrimination; we have had the opportunity to depose 33 declarants (two were withdrawn). When subjected to scrutiny and cross-examination, their allegations of discrimination do not stand up. Many of the declarants' claims of discrimination in compensation are unsubstantiated or based on mistaken beliefs about other employees' salary, job tenure, work experience, education, performance ratings

and starting salaries.[10]   Other times, a declarant's salary was lower because of significant documented performance problems or other legitimate reasons, such as excessive absence.[11]

        Half of the declarants who received performance reviews admitted that some or all of their evaluations were fair and/or non-discriminatory.[12]   Many also testified that some or all of their performance ratings were based upon appropriate criteria and/or defined goals and objectives.[13]   In fact, the declarants themselves often participated in establishing the goals and objectives against which they were evaluated.[14]   Nearly a quarter of the declarants do not assert promotion claims.[15] Almost half of the declarants who assert such claims acknowledge the positions that they sought were posted either locally or on the GO Network.[16]   In addition, numerous declarants who assert promotion claims were awarded promotions to positions that were not posted.[17]   Several declarants acknowledged that they did not meet the job

---

[10]  *See* Beal Decl., Ex. 3, "Notes" for Declarants 1, 8, 11, 12, 14, 18, 20, 21, 24, 26.

[11] *See* Beal Decl., Ex. 3, "Notes" for Declarants 3, 10, 16, 26.

[12] *See* Beal Decl., Ex. 3.

[13] *See id.*

[14] *See id.*

[15] *See* Beal Decl., Ex. 2.

[16]  *See id.*

[17]  *See id.*

requirements for the positions they sought or that the individuals who were awarded these positions had more relevant experience than they did.[18]

Nearly two-thirds of the declarants had an African American or Hispanic supervisor.[19]  More than half of the declarants with African American or Hispanic supervisors claim discrimination or challenge decisions made by those supervisors.[20] A few of the declarants supervised other African American or Hispanic employees.[21]

## ARGUMENT

## I.

## THE WEIGHT OF AUTHORITY IN THIS CIRCUIT AND ELSEWHERE REJECTS THE EXCESSIVE SUBJECTIVITY THEORY AS A BASIS FOR CLASS CERTIFICATION

The weight of authority in this and other circuits rejects "excessive subjectivity" as an employment "policy" or "practice" that can provide the basis for class certification.  These courts recognize that the excessive subjectivity theory is merely an attempt to erect one large class action by "grouping together many unrelated employment decisions made by many individual supervisors against many individual plaintiffs[,]" the analysis of which "would raise numerous individualized questions that are not amenable to generalized proof."  *Reap* v. *Continental Cas. Co.*,

---

[18]  *See, e.g.*, Beal Decl., Ex. 2, "Notes" for Declarants 25, 31, 33.

[19]  *See* Beal Decl., Ex. 1.

[20]  *See id.*

[21]  *See id.*

199 F.R.D. 536, 544-45 (D. N.J. 2001) (citations omitted).[22]  In addition, courts have

recognized that claims of excessive subjectivity are inconsistent with the requirements

of Rule 23(b)(2) or (b)(3).[23]

---

[22]  *See Cooper* v. *Southern Co.,* 390 F.3d 695 (11th Cir. 2004); *Bacon* v. *Honda of Am. Mfg. Inc.*, 370 F.3d 565, 571-72 (6th Cir. 2004); *Griffin* v. *Dugger*, 823 F.2d 1476, 1490-91 (11th Cir. 1987); *Vuyanich* v. *Republic. Nat'l Bank of Dallas*, 723 F.2d 1195, 1199 (5th Cir. 1984); *Moore* v. *Boeing Co.,* 2004 WL 3202777, *10-13 (E.D. Mo. Mar. 31, 2004); *Garcia* v. *Veneman*, 224 F.R.D. 8, 12-15 (D.D.C. 2004); *Stubbs* v. *McDonald's Corp.*, 224 F.R.D. 668, 675 (D. Kan. 2004); *Rhodes* v. *Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 619, 675-76 (N.D. Ga. 2003); *Grosz* v. *Boeing Co.,* 2003 U.S. Dist. LEXIS 25341, *16 (C.D. Cal. Nov. 7, 2003); *Carson* v. *Giant Food, Inc.,* 187 F. Supp. 2d 462, 470 (D. Md. 2002), *aff'd sub nom. Skipper* v. *Giant Food Inc.*, 68 Fed. Appx. 393 (4th Cir. 2003); *Webb* v. *Merck*, 206 F.R.D. 399, 406, 407 (E.D. Pa. 2002) (Weiner, J.); *Clayborne* v. *Omaha Public Power Dist.*, 211 F.R.D. 573, 594-95 (D. Neb. 2002); *Vinson* v. *Seven Seventeen HB Philadelphia Corp.*, 2001 WL 1774073, *19-20 & n.27, 22-23 (E.D. Pa. Oct. 31, 2001); *Robertson* v. *Sikorsky Aircraft Corp.,* 2000 WL 33381019, *3-4 (D. Conn. July 5, 2001); *Reid* v. *Lockheed Martin Aeronautics Co.*, 205 F.R.D. 655, 670 (N.D. Ga. 2001); *Abram* v. *UPS*, 200 F.R.D. 424, 430-33 (E.D. Wis. 2001); *Donaldson* v. *Microsoft Corp.,* 205 F.R.D. 558, 566-68 (W.D. Wash. 2001); *Wright* v. *Circuit City Stores, Inc.,* 201 F.R.D. 526, 540-41 (N.D. Ala. 2001); *Lang* v. *Kansas City Power & Light Co.*, 199 F.R.D. 640, 654-55 (W.D. Mo. 2001); *Lott* v. *Westinghouse Savannah River Co.,* 200 F.R.D. 539, 551-54 (D.S.C. 2000); *Allen* v. *Chicago Transit Auth.*, 2000 WL 1207408, *9-10 (N.D. Ill. July 31, 2000); *Bennett* v. *Roberts*, 2000 WL 781868, *3-4 (N.D. Ill. June 15, 2000); *Riley* v. *Compucom Sys., Inc.*, 2000 WL 343189 *2-3 (N.D. Tex. Mar. 31, 2000); *Zachery v. Texaco Exploration and Prod., Inc.,* 185 F.R.D. 230, 238-39 (W.D. Tex. 1999); *Troupe* v. *Randall's Food & Drug, Inc.*, 1999 WL 552727, *2, 4-5 (N.D. Tex. July 28, 1999); *Betts* v. *Sundstrand Corp.*, 1999 WL 436579, *5-7 (N.D. Ill. June 21, 1999); *Bostron* v. *Apfel*, 182 F.R.D. 188, 195-96 (D. Md. 1998); *Boykin* v. *Viacom Inc.*, 1997 WL 706323, *4 (S.D.N.Y. Nov. 12, 1997); *Kresefky* v. *Panasonic Communications and Sys. Co.*, 169 F.R.D. 54, 63 (D. N.J. 1996) (Wolin, J.); *Zapata* v. *IBP, Inc.*, 167 F.R.D. 147, 159 (D. Kan. 1996); *Appleton* v. *Deloitte & Touche LLP*, 168 F.R.D. 221, 228 (M.D. Tenn. 1996); *Brooks* v. *Circuit City Stores, Inc.,* 1996 WL 406684, *3-5 (D. Md. June 17, 1996); *McCree* v. *Sam's Club*, 159 F.R.D. 572, 577 (M.D. Ala. 1995); *De La Fuente* v. *Chicago Tribune Co.,* 1985 U.S. Dist. LEXIS 17512, *9-11, 18-20 (N.D. Ill. July 24, 1985).

[23]  *See Barabin* v. *Aramark Corp.*, 210 F.R.D. 152, 160-62 (E.D. Pa. 2002), *aff'd*, 2003 WL 355417 (3d Cir. Jan. 24, 2003); *Smikle* v. *Coca-Cola Enters.*, No. 03-0431, slip op. at 32 (D. N.J. May 17, 2004) (Kugler, J.); *Thompson* v. *Merck*,

The Eleventh Circuit's recent decision in *Cooper* v. *Southern Co.,* 390 F.3d 695 (11th Cir. 2004), is a case similar to this one, including even the identity of plaintiffs' expert, Dr. Janice Madden.  There the Eleventh Circuit affirmed the denial of class certification on a theory of excessive subjectivity.  In *Cooper*, African American employees asserted that their managers were given unfettered discretion to set employee compensation and make promotions.  The Eleventh Circuit found that the plaintiffs had established neither commonality nor typicality.  The court held that the requirements of Rule 23(a) were not satisfied because the allegations, like here, involved decisions by "individual managers in disparate locations, based on the individual plaintiffs' characteristics, including their educational backgrounds, experiences, work achievements, and performance in interviews, among other factors."  *Id.* at 714-15.   In addition, the court held that plaintiffs' excessive subjectivity claim failed to satisfy the requirements under Rule 23(b).  *See id.* at 720-22.

---

2004 WL 62710, *3-4 (E.D. Pa. Jan. 6, 2004); *Miller* v. *Hygrade Food Prods. Corp.*, 198 F.R.D. 638, 642-45 (E.D. Pa. 2001); *Reap* v. *Continental Cas. Co.*, 199 F.R.D. at 546-48; *see also Allison* v. *Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir. 1998); *Cooper* v. *Southern Co.*, 390 F.3d at 720-23; *Morgan* v. *Metro. Dist. Comm'n,* 222 F.R.D. 220, 235-36 (D. Conn. 2004); *Garcia* v. *Veneman*, 224 F.R.D. at 16; *Rhodes* v. *Cracker Barrel*, 213 F.R.D. at 683; *Grosz* v. *Boeing,* 2003 U.S. Dist. LEXIS 25341, *18-21; *Carson* v. *Giant Food,* 187 F. Supp. 2d at 471-72; *Webb* v. *Merck*, 206 F.R.D. at 409; *Clayborne*, 211 F.R.D. at 600-01; *Robertson* v. *Sikorsky Aircraft,* 2000 WL 33381019, *9-12; *Reid*, 205 F.R.D. at 679-86; *Lang*, 199 F.R.D. at 648-49; *Ramirez* v. *DeCoster*, 194 F.R.D. 348, 352-54 (D. Me. 2000); *Riley* v. *Compucom*, 2000 WL 343189, *4-5; *Lott,* 200 F.R.D. at 562; *Boykin* v. *Viacom Inc.*, 1997 WL 706323, *4; *Zapata*, 167 F.R.D. at 162-63; *Brooks* v. *Circuit City Stores,* 1996 WL 406684, *6.

The two cases upon which plaintiffs stake their case for class certification present extreme circumstances not present here. Plaintiffs rely primarily on Judge Higginbotham's decisions in *Green* v. *USX Corp.,* 843 F.2d 1511 (3d Cir. 1988), *vacated by* 490 U.S. 1103 (1989), *on remand, Green* v. *USX Corp.*, 896 F.2d 801, 805 (3d Cir. 1990). In the *Green* series of cases, however, the courts upheld the district court's finding of disparate impact centered around one, discrete HR practice: a plant-level job interview, which the court found was "wholly subjective" because it consisted of the "gut reactions to the applicant of employees in the personnel office and one or more foremen at the plant." 896 F.2d at 805. Thus, in *Green*, the plaintiffs had actually identified a discrete HR practice (a plant-level job interview) as the source of alleged discrimination (unlike plaintiffs here, *see* Point II *infra*). Further, in *Green* Judge Higginbotham condemned USX's plant-level job interview as "wholly subjective." This is consistent with footnote 15 of the Supreme Court's decision in *General Telephone Company of the Southwest* v. *Falcon*, 457 U.S. 147 (1982), which stated that an across-the-board class could "conceivably" be supported where there is "*[s]ignificant* proof that an employer operated under a general policy of discrimination [t]hat manifested itself in [the challenged] practices in the same general fashion, such as through an entirely subjective decision-making process" (emphasis added).

The record in this case makes very clear that HR practices at J&J and its subsidiaries are far from "entirely" subjective. According to Dr. Outtz, those HR processes, in fact, "are consistent with professional standards for best practices" (Outtz Report at 48, 52, 54, 57). A system that contains elements of both objective

and subjective criteria cannot serve as the basis for class certification.  *Bacon* v. *Honda of Am. Mfg. Inc.*, 370 F.3d 565, 571 (6th Cir. 2004), *cert. denied*, 125 S. Ct. 1334 (2005).

Plaintiffs also rely on *Dukes* v. *Wal-Mart Stores, Inc.*, 222 F.R.D. 137 (N.D. Cal. 2004) (appeal pending in the Ninth Circuit), for their assertion that allegations of excessive subjectivity can support commonality across multiple facilities.  However, Wal-Mart is a very different type of company than J&J, and the class certified in that case was limited to certain types of employees.  In that case, Judge Jenkins expressly relied on Wal-Mart's highly centralized corporate structure, that Wal-Mart's retail stores were all practically spitting images of each other, and that the organizational structure had virtually identical job categories, job descriptions and management hierarchies.  *See id.* at 146.  As Judge Jenkins found, every new employee of Wal-Mart nationwide goes through the same orientation process; "Wal-Mart TV" is broadcast into all stores; all employees are subject to a detailed schedule of corporate culture lessons and daily store meetings at which managers lead employees in the "Wal-Mart cheer."  *Id.* at 152.  J&J and its subsidiaries are the antithesis of Wal-Mart, given J&J's decentralized management and diverse businesses detailed above.  *See* pp. 10-18.

In *Wal-Mart*, the certified class was also limited to hourly and salaried in-store employees in a handful of positions (*e.g.*, store manager, co-manager, management trainee, support manager, department manager, customer service manager).  The certified class did not include upper management and positions subject to educational and state licensing requirements (*e.g.*, store pharmacists). In this case,

36

plaintiffs' proposed class is not nearly so limited. Rather, plaintiffs here seek to include within one class a much more diverse group of employees.[24]

Courts recognize that subjective decisionmaking is a vital business practice and nothing in anti-discrimination laws should be construed to prevent it. As the Eleventh Circuit stated in *Denney* v. *City of Albany*, 247 F.3d 1172, 1185-86 (11th Cir. 2001):

> [S]ubjective evaluations of a job candidate are often critical to the decisionmaking process, and if anything, are becoming more so in our increasingly service-oriented economy. . . . It is inconceivable that Congress intended anti-discrimination statutes to deprive an employer of the ability to rely on important criteria in its employment decisions merely because those criteria are only capable of subjective evaluation.

*Id.* (internal quotation and citation omitted); *see also Robertson* v. *Sikorsky Aircraft Corp.*, 2000 WL 33381019, *4 (D. Conn. July 5, 2001); *Abram* v. *UPS*, 200 F.R.D. at 430; *Sperling* v. *Hoffmann-La Roche, Inc.*, 924 F. Supp. 1346, 1363 (D. N.J. 1996) (Ackerman, J.).

---

[24] Plaintiffs' reliance on the divided Second Circuit panel decision in *Caridad* v. *Metro-North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir. 1999) is also misplaced. As discussed above at pp. 32–34, the weight of the authority in this and other circuits does not recognize "excessive subjectivity" as a common employment practice. Indeed, at least one district court within the Second Circuit itself has indicated that it was "troubled by the *Caridad*" holding. *Robertson* v. *Sikorsky Aircraft Corp.*, 2000 WL 33381019, *1 (D. Conn. 2001) (Goetel, J.) (denying certification on Rule 23(b) grounds and finding that excessive subjectivity claim did not satisfy commonality requirement).

## II.

### PLAINTIFFS HAVE FAILED TO DEMONSTRATE A NEXUS BETWEEN THEIR STATISTICAL ANALYSES AND ANY HR PRACTICE

Next, we note a major flaw in plaintiffs' case:

Plaintiffs make the general claim that their statistical presentation supports their theory that the J&J companies have common excessively subjective HR policies and practices that constitute discrimination (Pls.' Br. at 33–40).  However, unlike the plaintiffs in *Green,* for example (who identified and isolated a plant-level job interview as the source of excessively subjective decisionmaking), plaintiffs here fail to identify a specific employment policy or practice that is the source of the excessively subjective decisionmaking that they claim results in discrimination.  After 3½ years of litigation, over 600,000 pages produced in discovery and 56 depositions, plaintiffs have not and cannot do so.

Throughout their brief plaintiffs refer constantly to "common HR policies and practices in compensation and promotion" that they say are excessively subjective.  But plaintiffs never actually identify a specific J&J policy or practice that is excessively subjective, or show how those policies and practices cause the statistical disparity they claim to find.  In fact, one of the HR practices to which plaintiffs refer most – succession planning – is a practice that their own expert states is not the source of the statistical disparities she claims to see.  This is what Dr. Madden had to say about succession planning at her deposition:

> Q:   And what was it that you had told [plaintiffs' attorneys] at the presentation on this subject [of succession planning]?

38

> A:    I had told them that succession planning, as I said yesterday,
>        did not affect promotions, and that… the effects on promotions
>        were equivalent for minorities and whites . . .

(Madden Dep. at 411).

Similarly, while plaintiffs refer often to the lack of a consistent policy and practice when it comes to job posting, their experts do not actually contend that there is any correlation between the lack of job posting and the denial of promotion opportunities for African Americans and Hispanics. In addition, a number of plaintiffs' declarants said that some or all of the positions they sought but did not receive were actually posted, either on J&J's company-wide GO Network, or locally in their operating company.[25] After reading plaintiffs' 70-page brief and the voluminous exhibits and pages that accompany it, one must still ask: which allegedly common HR policy or practice do plaintiffs believe is the source of discrimination? Plaintiffs do not say. Plaintiffs acknowledge that they have the burden of identifying the employment practice that is the source of the alleged disparate impact, but do no better than promise that this crucial evidentiary link will be delivered in the future:

> Plaintiffs' disparate impact claim will rely on a statistical analysis of
> company-wide employment practices to determine whether a
> disparate impact exists and expert testimony to link the impact and the
> practices at issue.

Pls.' Br. at 51–52 (emphasis added).

This is not sufficient to permit this case to go forward as a class action. See Garcia v. Veneman, 211 F.R.D. 15, 21 (D. D.C. 2002) ("[The expert's] analysis, however, fails to tie the statistical disparity he observes to any one or more subjective

---

[25]  See Beal Decl., Ex. 2.

criterion and thus fails to establish that subjective decisionmaking is common to the proposed class.") (citing *Webb* v. *Merck*, 206 F.R.D. 399, 408 n.2 (E.D. Pa. 2002)); *Clayborne* v. *Omaha Public Power Dist.*, 211 F.R.D. 573, 596-97 (D. Neb. 2002); *see also Cooper* v. *Southern Co.*, 390 F.3d 695, 712-13, 716 (11th Cir. 2004).  As the Supreme Court just recently held:

> it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is 'responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.

*Smith* v. *City of Jackson*, --- U.S. ---, 2005 WL 711605 (Mar. 30, 2005) (quoting *Wards Cove Packing Co.* v. *Atonio*, 490 U.S. 642, 656 (1989) (internal quotation omitted)).

### III.

### PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(a)

We now turn to a review of the individual elements of Rule 23.

Plaintiffs bear the burden of establishing that the four elements of Rule 23(a) have been met, <u>and</u> that at least one of the subsections in Rule 23(b) is satisfied. *Reap*, 199 F.R.D. at 543.  Plaintiffs must satisfy these elements of Rule 23(a):

(1)   the class is so numerous that joinder of all members is impracticable,[26]

(2)   there are questions of law or fact, common to the class,

---

[26]   J&J does not contest numerosity.

   (3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

   (4)     the representative parties will fairly and adequately protect the interests of the class.

### A.   <u>Plaintiffs Have Not Demonstrated Commonality</u>

#### 1.   Plaintiffs are in reality challenging hundreds of employment policies and practices and thousands of individual decisions.

As stated before, most courts recognize that the excessive subjectivity theory is merely an attempt to erect a class action from many unrelated employment decisions made by many individuals, the analysis of which "would raise numerous individualized questions that are not amenable to generalized proof." *Reap*, 199 F.R.D. at 545. This is especially true in this case. To litigate it would require examining the different policies and practices at over 30 different and evolving companies over more than 8 years. For each company, each of the following would need to be investigated and presented at trial if J&J is to properly defend against plaintiffs' class allegations on the merits:

   (1)     the different HR policies, practices and criteria used for tens of thousands of different promotion and compensation-related decisions made at J&J subsidiaries,

   (2)     whether the HR policies, practices and criteria pursuant to which those decisions were made are excessively subjective,

   (3)     if excessively subjective, whether those HR policies, practices and criteria were motivated by discriminatory intent,

   (4)     if excessively subjective, whether those HR policies, practices and criteria had a discriminatory impact on the thousands of members of the putative class,

(5)    whether each such policy is job-related and consistent with business necessity, and

(6)    whether, on a case-by-case basis, class members were adversely affected, and, if so, by what policy.

So, for example, to litigate Nilda Gutierrez's claim of discrimination in compensation under a theory of excessive subjectivity, the parties must evaluate and litigate all of the above at J&J Shared Services, where she worked.  Such a determination, however, would resolve issues <u>only</u> with respect to certain HR practices at J&J Shared Services, at most.  This determination, once made, would have no bearing on the case of a salesperson at Ortho Biotech, Inc., a financial analyst at Vistakon, Inc., a product director at Consumer Products Company, Inc., a chemist  at Alza Corporation, or an information management specialist at Cordis Corporation, all of whom are evaluated and compensated based on entirely different sets of criteria (*See* Collins Decl.  at ¶ 13; Berle Decl.  at ¶ 16; Michalcewicz Decl.  at ¶¶ 11, 15; Gudicello Decl. at ¶ 37).  Further, the criteria on which sales employees are evaluated and compensated (based in large measure on individual sales performance) differs significantly from those used for non-sales positions.

Not only would this effort be undertaken many different times, it would yield thousands of varying results.  This cannot and should not be undertaken under the roof of one large class action.  *See Webb* v. *Merck*, 206 F.R.D. 399, 405 (E.D. Pa. 2002); *see also Cooper* v. *Southern Co.*, 390 F.3d at 715-716.

42

### 2. The diversity of the proposed class also defeats commonality

Next, the proposed class is far more diverse than any certified class of which we are aware. This, too, defeats commonality. Plaintiffs' putative class encompasses more than 30 companies in very different businesses of producing or selling consumer products, prescription and non-prescription pharmaceutical products, and surgical and other medical devices. Courts recognize that certification of a class as divergent as proposed here is unmanageable and inappropriate. As the Sixth Circuit explained in a case involving only a single company:

> We view with skepticism a class that encompasses 1) both workers and supervisors; 2) production-line workers and those in administrative positions; 3) workers in four plants with different production capabilities; and 4) workers and supervisors spread over more than 30 departments. Because class members have such different jobs, we find it difficult to envisage a common policy regarding promotion that would affect them all in the same manner.

*Bacon*, 370 F.3d at 571; *see also Cooper* v. *Southern Co.*, 390 F.3d at 715; *Appleton* v. *Deloitte & Touche LLP*, 168 F.R.D. 221, 230 n.5 (M.D. Tenn. 1996).[27]

### 3. The data does not support commonality

In order to show commonality, plaintiffs must show "the existence of an identifiable employment pattern, practice or policy that demonstrably affects all members of a class in *substantially, if not completely, comparable ways.*" *Stastny* v.

---

[27]  Even if J&J were a single company with multiple facilities, the claims of the named plaintiffs are not even typical of employees at other facilities. Named plaintiffs in one facility generally cannot represent the employees in other facilities, without considerably more homogeneity than exists here. *See Reid*, 205 F.R.D. at 671.

*Southern Bell Tel.*, 628 F.2d 267, 273-74 (4th Cir. 1980) (emphasis added); *see Wagner* v. *Taylor*, 836 F.2d 578, 589 (D.C. Cir. 1987); *Reid*, 205 F.R.D. at 677; *Abram* v. *UPS*, 200 F.R.D. at 428-29. This showing is typically made with statistics.

      The statistical analysis presented by plaintiffs' experts, Drs. Janice Madden and Alexander Vekker, is fatally flawed. To begin with, it was apparent from her deposition testimony that Dr. Madden, who plaintiffs contend is their "testifying expert," knew embarrassingly little about this case:

> Q:    So if I were to ask you what the allegations are in the complaint, would you be able to tell me?
>
> A:    No.
>
> Q:    Can you tell me what the individual plaintiffs are complaining about in this case?
>
> A:    No.

(Madden Dep. at 47). Asked about the companies whose data she purports to analyze, Dr. Madden drew a similar blank:

> Q:    Do you know what the different business units of Johnson & Johnson do?
>
> A:    Some of them, not all of them.
>
> Q:    Tell us what you do know.
>
> A.    Give me the list and I'll gladly talk about it.
>
> Q:    You can't name any of them or what they do sitting here?
>
> A:    No, not sitting here.

(Madden Dep. at 302).

      Furthermore, Drs. Madden and Vekker analyzed and purported to answer the wrong question. The central question before the Court on class certification is

whether the employees of the various J&J companies face common HR practices, and, if so, whether such practices result in a <u>pattern</u> of statistical differences consistently adverse to minorities across the companies.  Rather than investigate this question, Madden and Vekker simply assumed the companies have common practices and focused solely on the <u>merits</u> of plaintiffs' claims.[28]  This is apparent from the very first page of the expert report:

> "We have been asked to analyze whether the selections of employees for promotion, the awarding of employee compensation, and the setting of initial job assignments for salaried employees are racially and ethnically neutral."

(Madden/Vekker Report at 1; *see also* Madden Dep. at 211–12; *compare* Wise Report at 5).  Although the next sentence of the Madden/Vekker report states that Madden and Vekker studied whether the purported disparities they found "exist throughout J&J," Dr. Madden admitted that the report contains no such study (Madden Dep. at 429–30).  In fact, the Madden/Vekker Report contains <u>no</u> individual J&J company

---

[28]   In focusing on the merits, Drs. Madden and Vekker simply and improperly attribute compensation and promotion differences they find to discrimination (Madden/Vekker Report at 2–3, 6–7) after having controlled for only a few employee attributes reflected in the data analyzed by the parties (Wise Report at 57–58).  As Dr. Wise makes clear, variances that may exist after properly controlling for the limited employee attributes captured in the centrally maintained files analyzed by the parties may be explained by differences in job-related attributes of minority and white employees and other factors not adequately captured in that data (Wise Report at 21, 24–25, 29, 49, 52, 55–57).  As Dr. Wise reports, additional information such as field of study, mastery of academic subject matter, and rigor of the educational institution attended are important to understanding possible differences in employee attributes (Wise Report at 21, 51–54, 60).  So, too, is information on prior job experience and job performance over time (Wise Report at 24–25, 61).

results <u>at</u> <u>all</u>.  Consequently, Drs. Madden and Vekker's "finding" of disparities "throughout" J&J is unsupported by their own report.

Madden/Vekker's method of aggregating the data of all J&J companies as if they were one renders the Madden/Vekker report not probative on the issue before the Court and is the subject of a separate *Daubert* motion accompanied and supported by this brief.  As the court stated in *Abram* v. *UPS,* 200 F.R.D. 424, 431 (E.D. Wis. 2001):

> [T]he principal question, for certification purposes, is whether the plaintiffs can make an adequate statistical showing of a *consistent* pattern of [disparities] within the class of African-American[s] …, <u>both</u> <u>within</u> <u>their</u> <u>respective</u> <u>districts</u> <u>and</u> <u>nationally</u>.

(internal quotation omitted) (emphasis added).  In the *Abram* case, plaintiffs alleged discrimination in the compensation of African American full-time supervisors under both disparate impact and disparate treatment theories and presented aggregated statistics to support class certification.  Because the statistics supported a finding of discrimination only when aggregated nationally across sixty-five districts, *id.* at 426, the court denied class certification, explaining:

> If Microsoft-founder Bill Gates and nine monks are together in a room, it is accurate to say that on average the people in the room are *extremely* well-to-do, but this kind of aggregate analysis obscures the fact that 90% of the people in the room have taken a vow of poverty.  Likewise, focusing on the aggregate numbers with respect to supervisor pay at UPS masks differences from district to district and from supervisor to supervisor that preclude a finding of "commonality."  In short, the numbers do not reveal a "pattern or practice" of discrimination (intentional or otherwise) that unites the class.

*Id.* at 431; *accord Carson* v. *Giant Food, Inc.*, 187 F. Supp. 2d 462, at 471 n.8 (D. Md. 2002), *aff'd sub nom. Skipper* v. *Giant Food Inc.*, 68 Fed. Appx. 393 (4th Cir. 2003); *Moore* v. *Boeing Co.*, 2004 WL 3202777, *12 (E.D. Mo. Mar. 31, 2004).

Remarkably, Dr. Madden admitted that in "analyzing" the data for all J&J U.S. companies, she did not allow for the possibility that the factors that influence compensation and promotions differ among those companies (Madden Dep. at 241–42). In other words, she <u>assumed</u> that employees of all the companies face common compensation and promotion practices and processes. As should be clear above, this assumption runs counter to J&J's long-established, well-recognized, decentralized organizational structure, which includes independent HR functions at the subsidiary level with the authority to establish and administer HR policies and practices for the subsidiary. It is also wholly unsupported by the data that Drs. Madden and Vekker purport to have analyzed. As discussed in detail in Dr. Wise's report, properly analyzed by company, the data show that there are substantial differences in the determinants of compensation and promotion from company to company (Wise Report at 6, 13–16, 72–78, 102–07, 119–23, 153–57). Likewise, Dr. Outtz, opining from an industrial-organizational psychologist's perspective (*see* pp. 25-26, *supra*), reaches the same conclusion (Outtz Report at 67). Plaintiffs' experts' failure to take into account how the J&J companies in fact operate is fatal to their analysis. As Dr. Wise put it, "estimated compensation and promotion differences based on the aggregation of data from companies with dissimilar compensation and promotion processes are not statistically meaningful" (Wise Report at 6, 78, 106, 123; *see also* Outtz Report at 63–65, 67).

47

The Madden/Vekker analysis suffers the following additional deficiencies, among others:

- Madden/Vekker purport to compare differences in the compensation of minority and white employees in the "same job," but in fact compare differences in compensation of employees in broad non-homogenous groups who are often performing very dissimilar tasks; even the model that purports to adjust for job code is deficient in failing to account for differences across companies, differences in geographical areas within companies, and different hierarchical or functional titles within the job code (Wise Report at 42–48, 88-91).

- Madden/Vekker purport to compare differences in the compensation of minority and white employees who are "similarly situated with respect to their qualifications attained" and have the same "experience, education, and occupational skills," but in fact:

  - they do <u>not</u> consider prior experience at all; rather, they use age as a proxy for experience as if all employees of the same age have equivalent experience (Madden/Vekker Report at 3, 5, 30, 44; *compare with* Wise Report at 61);

  - they do <u>not</u> consider education, except degree level (*e.g.*, High School diploma, B.A., M.A.), as if field of study, the relevance of the field of study to the job held, academic achievement, or the rigor of the educational institution attended have no bearing on "qualifications" (Vekker Dep. at 117–18; Madden Dep. at 137; *compare with* Wise Report at 52–54, 60); and

  - they do <u>not</u> consider occupational skills, including licenses, certifications, and training required by law or government regulations (Madden Dep. at 439).

- Madden/Vekker purport to analyze the compensation of employees after "taking account of productivity" (Madden/Vekker Report at 17) but fail to control for performance, despite Madden's admission that performance evaluations are important to decisions regarding compensation at many companies (Madden Dep. at 151–52).

- Madden/Vekker fail to control for geographic location, notwithstanding that location may impact compensation due to wage

differentials from cost of living in different job markets (*see, e.g.*, Famularo Decl. at 21; Wise Report at 58).[29]

A very similar report prepared by Dr. Madden, using virtually the same methodology, in a similar excessive subjectivity case, was severely criticized in *Cooper* v. *Southern Company*, 390 F.3d 695 (11th Cir. 2004) (discussed at p. 34). In affirming the district court's decision to deny class certification, the Eleventh Circuit reiterated the district court's lengthy and detailed criticisms of Dr. Madden's report. The flaws cited are identical to many of the flaws shown here.

Most significant, the Eleventh Circuit echoed the district court's criticism of Madden's failure to consider an employee's actual job performance, "a consideration that is undeniably important in decisions relating to compensation and promotion." *Cooper*, 390 F.3d at 717. As the court noted, "without taking into account job performance at all, the fact that two employees began their employment with the defendants at the same time and have not been promoted at the same rate does not establish that discrimination is at work." *Cooper*, 390 F.3d at 717–18. The Eleventh Circuit affirmed the district court's conclusion that the "methodological deficiencies" in Madden's report rendered her analysis insufficient to support class certification. *Cooper*, 390 F.3d at 718. History repeats itself here. In conducting

---

[29]   While plaintiffs may attempt to criticize Dr. Wise for a similar failure to control for certain of these factors, Dr. Wise's analysis was conducted for the different purpose of assessing plaintiffs' commonality claims, and not to determine whether practices are "racially and ethnically neutral." An analysis of the merits of plaintiffs' discrimination claims ought to control for job-related employee attributes and other factors considered by the J&J companies in determining compensation and promotion (Wise Report at 168–75; Outtz Report at 63–65, 67).

their misplaced "merits" study, Drs. Madden and Vekker fail to account for so many variables as to render it 'impossible to determine what the [salary, promotion, and initial job assignment] gaps were, whether they were statistically significant, or whether factors other than race [or ethnicity] were involved.' *Cooper*, 390 F.3d at 718 (quoting *Cooper* v. *Southern Co.*, 205 F.R.D. 596, 615 (N.D. Ga. 2001)).

By contrast, J&J's expert, Dr. David Wise, investigated the issues to be determined by the Court for purposes of class certification, and found that there is no pattern of compensation and promotion differences adverse to blacks and Hispanics across the J&J companies. Dr. Wise is a preeminent labor economist at the John F. Kennedy School of Government at Harvard University, specializing in econometrics analysis of employment issues (Wise Report at 5). Even Dr. Madden, in her deposition, acknowledged that Dr. Wise is well respected in the field and is a "first-rate statistician, econometrician, and also public economist" whose work is "well thought out and reasonable and intellectually rigorous" (Madden Dep. at 222–23).

By using the data produced by J&J in this case, Dr. Wise found very different workforces in the companies (Wise Report at 9–11), in terms of types of jobs held, functions performed, and skill and educational requirements. For example, a company whose primary purpose is research and development generally has higher educational requirements than a company with a large sales force (Wise Report at 36). Thus, 36.5% of employees at J&J Pharmaceutical R&D have a Ph.D., as compared with none at all at J&J Sales & Logistics (Wise Report at 36).

By constructing statistical models that allow for the possibility that the jobs, job mixture, and the individual attributes of worker productivity may vary

among companies – in contrast to Madden/Vekker's method of constraining the data and glossing over differences among companies – Dr. Wise determined, through the use of statistics, that there is variation in compensation and promotion practices from company to company (Wise Report at 6, 13–16, 72–78, 102–07, 119–23, 153–57). Dr. Wise identified "similarly situated" employees (those in the same company, with same job code and title and administrative group) and then studied pay and promotions by controlling for differences in years of service at a J&J company, time in job, and performance[30] (Wise Report at 38–48). In this way, Dr. Wise studied whether and to what extent job-related factors play a role in decisionmaking at each company, and if the effect is the same or different at each company.

Based on this, Dr. Wise found that, for people in the same jobs, the primary determinants of base salary, non-salary compensation, "direct payments" and promotion vary from company to company in statistically significant ways (Wise Report at 13–16, 72–80, 102–109, 119–125, 153–159). For example, at J&J Medical there was much greater reliance on performance ratings for setting base pay (almost 10%) than at other companies (Wise Report, Figure (D.a.) 5d. at 73). Similarly, the effect on an employee's base pay of total time in a particular job depends on the

---

[30]  Dr. Wise considered performance for one year only and included employees in the analysis for whom there was at least one year's performance data. Were this case to be litigated on the merits, Dr. Wise believes more complete performance data for multiple years should be considered (Wise Report at 25, 64). Indeed, as Dr. Wise illustrates at pp. 25, 70 of his report, when additional performance data are included in the analyses, estimated disparities that were statistically significant are reduced to levels below statistical significance, that is, consistent with random chance.

company (Wise Report at 74, Figure (D.a.) 6d.).  For compensation and promotion, Dr. Wise studied whether these variations are statistically significant – in other words, whether the differences in determinants are meaningful and suggest the lack of a common process.  He concludes, based on his statistical tests, that "the commonality assumption is strongly rejected.  The many J&J companies cannot be treated as if they were all one company with a common process determining base salary," non-salary compensation, direct payments, and promotion (Wise Report at 77, 123, 157).

Dr. Wise is also critical of Dr. Madden's "analysis of initial job assignments."  In particular, he criticizes her for purporting to analyze the difference between salaries of blacks and Hispanics compared to whites at hire without knowing the job an employee applied for, with very imprecise data on employee education, and no information about the prior work experience of employees (Wise Report at 168–75).

In sum, Dr. Wise concludes, based on statistical analysis, that African-American and Hispanic employees in all of the J&J companies can <u>not</u> be assumed to be subject to common HR policies and practices for the purposes of class certification (Wise Report at 6, 107, 123, 132, 135).  Dr. Outtz, from the perspective of an industrial organizational psychologist, reaches the same conclusion.  Dr. Wise also concludes that the data reveal no statistical pattern consistently adverse to blacks or Hispanics in compensation and promotions (Wise Report at 6, 11).

### B.   <u>Plaintiffs Have Failed to Establish Typicality</u>

Next, plaintiffs fail to show typicality.[31]

To establish typicality, the claims of the putative class representatives must have "the same essential characteristics as those of the putative class . . . , arise from a similar course of conduct *and* share the same legal theory." *Szczubelek* v. *Cendant Mortgage Corp.*, 215 F.R.D. 107, 118 (D. N.J. 2003); *see also In re LifeUSA Holding, Inc.*, 242 F.3d 136, 145-48 (3d Cir. 2001); *Liberty-Lincoln Mercury, Inc.* v. *Ford*, 149 F.R.D. 65, 77 (D. N.J. 1993); *Zenith Labs., Inc.* v. *Carter-Wallace*, 530 F.2d 508, 512 (3d Cir. 1976); *Bacon* v. *Honda*, 370 F.3d at 572-73; *Vinson* v. *Seven Seventeen HB Philadelphia Corp.*, 2001 WL 1774073, *21 (E.D. Pa. Oct. 31, 2001).

Plaintiff Linda Morgan is a perfect illustration of a named plaintiff with claims <u>atypical</u> of the claims of the putative class.  Ms. Morgan is an African American formerly employed by Ethicon, who alleges that she was discriminated against in promotions.  While the centerpiece of plaintiffs' class claims is "excessive subjectivity," Morgan does not allege that her performance evaluations were excessively subjective.  To the contrary, she admits that they were fair and non-discriminatory (Morgan Dep. at 108, 114, 118, 120, 121, 390).  Further, while plaintiffs' class claims are based on statistical evidence, Ms. Morgan's claim is not supported by the data.  There is no statistical shortfall of promotions of African Americans at Ethicon (Wise Report, Table (D.e.)1.).  To the contrary, the promotion rate of African Americans at Ethicon is <u>greater</u> than average (*id.*)**.**

---

[31]   For the same reasons discussed in this section, there is no commonality and adequacy of representation as well.

Likewise, the claim of plaintiff Nilda Gutierrez is atypical of the putative class. Ms. Gutierrez is a Hispanic formerly employed at J&J Shared Services, who alleges discrimination in compensation. While the class claim is that there is excessive subjectivity in awarding merit pay increases, Gutierrez's claim has nothing to do with excessive discretion in the range of merit increases. Her failure to get a merit increase was tied directly to her performance rating as "needs improvement," which rendered her ineligible for any merit increase at all (*see* Hamway Dep. at 203; First Am. Compl. at ¶ 104).

Krista Marshall's claims do not align with the class allegations either. For example, she does not challenge her performance ratings or reviews, and she testified she does not disagree with them (Marshall Dep. at 300–01, 255–56; 258–59; 260). In contrast to plaintiffs' allegations of excessive subjectivity, Marshall testified that her performance objectives have been "clear" and her milestones "reasonable" (Marshall Dep. at 255–56; 258–59; 260). Contrary to the class allegations of discrimination, Ms. Marshall testified that a white manager was her "champion" in the succession planning process and gave her a coveted "high potential" rating (Marshall Dep. at 203–04; 207–08).

### C. Conflicts Within the Proposed Class Defeat Adequacy of Representation[32]

Next, there are numerous conflicts within this large and complex class.

---

[32] These same reasons defeat commonality and typicality as well.

**Managers vs. Non-Managers.**  The putative class includes current and former managers.  Ms. Morgan both managed and was managed by members of the putative class.  Ms. Gutierrez was managed by a putative class member.  Both Morgan and Gutierrez complain of actions taken by supervisors who are members of the putative class (Morgan Dep. at 14, 346; Gutierrez Dep. at 352–53, 355).  Morgan also supervised and rated employees within the putative class, and testified that she took adverse actions against members of the putative class (Morgan Dep. at 82–85, 101–04).    Adequacy of representation cannot exist where the class includes both supervisors, who made the decisions that are being challenged, and the non-supervisors, who are challenging those decisions.  *See Donaldson* v. *Microsoft Corp.*, 205 F.R.D. at 568; *Abram* v. *UPS,* 200 F.R.D. at 433-34; *Appleton*, 168 F.R.D. at 233; *Vinson*, 2001 WL 1774073, *26-27 (E.D. Pa. Oct. 31, 2001); *Talley* v. *Arinc, Inc.*, 222 F.R.D. 260 (D. Md. 2004); *Wagner* v. *Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987).

**African Americans vs. Hispanics.**  In this case, African American and Hispanic putative class members have conflicting interests.  For example,  Morgan claims she was passed over for a promotion, but the job went to a Hispanic (Morgan Dep. at 42–43).    Thus, it is in Morgan's interest both to challenge the job qualifications of another putative class member, and allege there is no discrimination against Hispanics.[33]  Also, Dr. Madden's own analysis reveals there is no promotion discrimination against Hispanics; thus, it is in Hispanics' interest to see that the status quo in promotion systems is maintained.  To certify one class that contains both

---

[33]    Beal Decl., Ex. 1, "Notes" for Declarants 2, 16, 20, 23.

groups would create an intractable conflict among these groups.  *See Reid*, 205 F.R.D. at 672-73.

      **Current vs. Former Employees.**  In this action plaintiffs seek both monetary and injunctive relief, on behalf of both African Americans and Hispanics. The problem with that is all but one plaintiff are former employees.  The only plaintiff who is a current employee is Krista Marshall, who works for Health Care Services, Inc. and is suing for discrimination in compensation and promotion.

      Former and present employees do not have the same interests.  Current employees have a significant interest both in recovering monetary damages and in achieving prospective and injunctive relief, and balance one against the other, for example, in attempting to resolve their claims.  Former employees have no interest in institutional change, and thus, no interest in compromising monetary recoveries to achieve it.  A former employee's *only* potential claim is for monetary relief.[34]  Former employees do not have standing to assert claims for injunctive relief because there is no "real or immediate threat that the plaintiff will be wronged again – a likelihood of substantial and immediate irreparable injury."  *City of Los Angeles* v. *Lyons*, 461 U.S. 95, 111 (1983);  *see also Cardenas* v. *Massey*, 269 F.3d 251, 265 (3d Cir. 2001), *affirming in relevant part*, 1999 WL 33496397 (D. N.J. Dec. 2, 1999) (Brown, J.).[35] This presents an irreconcilable conflict within the class.

---

[34]   No plaintiff who is a former employee is seeking reinstatement.

[35]   *Accord Faibisch* v. *Univ. of Minnesota*, 304 F.3d 797, 801 (8th Cir. 2002); *Ward* v. *Johns Hopkins Univ.*, 861 F. Supp. 367, 378 (D. Md. 1994); *Jackson* v. *Motel 6 Multi-purpose, Inc.*, 130 F.3d 999, 1007 (11th Cir. 1997); *Hawkins* v. *Groot Industries, Inc.*, 2003 WL 22057238 (N.D. Ill. Sept. 2, 2003); *Lang* v.

Here, Morgan and Brown, as former employees, cannot adequately represent current African American employees seeking <u>injunctive</u> relief. Gutierrez, as a former employee, cannot represent current Hispanic employees seeking <u>injunctive</u> relief. Conversely, Marshall cannot represent former African American employees seeking <u>monetary</u> <u>relief</u> because her claims for injunctive relief and monetary damages are not co-extensive and, indeed, could involve conflicting theories. There is no current Hispanic employee asserting a claim for injunctive relief. Thus, none of the named plaintiffs can represent an alleged class including both current and former employees.

## IV.

## <u>PLAINTIFFS HAVE NOT SATISFIED</u><br><u>THE REQUIREMENTS OF RULE 23(b)</u>

Plaintiffs must satisfy each of the elements of Rule 23(a)<u>plus</u> at least one of the elements of Rule 23(b). Rule 23(b) provides for class certification (in pertinent part) where:

---

*Kansas City Power & Light Co.*, 199 F.R.D. 640, 646 (W.D. Mo. 2001). *Wetzel* v. *Liberty Mut. Ins. Co*., 508 F.2d 239, 247 (3d Cir. 1975), upon which plaintiffs rely, is no longer good law, for at least three reasons. First, *Wetzel's* conclusion that the interests of current and former employees "surely are co-extensive" rests on a presumption of shared interest in combating "class discrimination" and, therefore, does not survive *Falcon*. Second, *Wetzel* preceded the Civil Rights Act of 1991 amendments to Title VII, which made damages an available remedy. The availability of such damages increases the likelihood that a former employee would have a greater interest in seeking monetary rather than injunctive relief. Lastly, *Wetzel* did not involve the issue of standing, subsequently addressed by the Third Circuit in *Cardenas, supra,* which found that a former employee does not have standing to seek injunctive relief for himself or others. 269 F.3d at 265.

(2)    the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole, or

(3)    the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. . . .

## A.    No Class Can Be Certified Under Rule 23(b)(2)

Class certification under Rule 23(b)(2) is inappropriate in this case, because plaintiffs' request for monetary relief is more than "incidental" to their request for injunctive or declaratory relief.

Certification pursuant to Rule 23(b)(2) is reserved for cases in which the request for injunctive or declaratory relief, and not monetary relief, predominates. Certification under Rule 23(b)(2) is so limited because it is a "mandatory class" – meaning that classes certified under 23(b)(2) do not receive notice and do not have the right to opt-out of the class, rights that are considered unnecessary for Rule 23(b) classes because their interests are totally aligned.  *See Barnes* v. *American Tobacco Co.*, 161 F.3d 127, 142-43 (3d Cir. 1998); *Coleman* v. *General Motors Acceptance Corp.*, 296 F.3d 443, 447-48 (6th Cir. 2002).

Thus, certification under Rule 23(b)(2) is appropriate for a class seeking only injunctive relief affecting all employees in the same way.  Rule 23(b)(2) certification is inappropriate where, as here, requests for monetary relief predominate in the case.  This is true for two reasons.  First, in cases where requests for monetary relief predominate, class members should have the right to pursue their own claims

58

and interests, and therefore, the right to be notified and given the opportunity to opt out of the class.[36]    Second, such a class lacks the cohesiveness required for Rule 23(b)(2) certification because damages determinations require individual determinations.

The test for determining whether monetary relief "predominates" is set forth in *Allison* v. *Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir. 1998).  *Allison* held that "monetary relief predominates in (b)(2) class actions unless it is <u>incidental</u> to requested injunctive or declaratory relief."   151 F.3d at 415 (emphasis added).  Incidental damages are those "that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Allison*, 155 F.3d at 415.  Three factors, not present here, define "incidental" damages:

1)    damages to which class members would be automatically entitled once liability to the class or subclass as a whole is established;

2)    damages computable by objective standards, and not standards significantly reliant upon the intangible, subjective differences of each class member's circumstances; and

3)    damages that would not necessitate additional hearings.

*Id.* at 415.  The *Allison* test has been followed by the Third Circuit in *Barabin* v. *Aramark Corp.*, 2003 WL 355417, *1-2 (3d Cir. Jan. 24, 2003), *aff'g*, 210 F.R.D. 152 (E.D. Pa. 2002); *see also Chiang* v. *Veneman*, 385 F.3d 256, 264 n.6 (3d Cir. 2004).[37]

---

[36]    *See Miller* v. *Hygrade Food Prods. Corp.*, 198 F.R.D. 638, 642 n.5 (E.D. Pa. 2001) (citing *Ticor Title Ins. Co.* v. *Brown*, 511 U.S. 117, 120-21 (1994)) (other citations omitted).

[37]    Other decisions within this circuit have followed *Allison* as well. *See Smikle* v. *Coca-Cola Enters.*, No. 03-0431, slip op. at 21, 28-30 (D. N.J. May 17, 2004)

Plaintiffs ignore Third Circuit law that follows the *Allison* test and urge the Court to apply the Second Circuit standard from *Robinson* v. *Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001).[38] *Robinson* held that Rule 23(b)(2) certification was not necessarily precluded by claims for "non-incidental monetary damages" and proposed, instead, that courts consider, on a case-by-case basis, "the relative importance of the remedies sought, given all of the facts and circumstances of the case." *Id.* (internal quotation omitted). *Robinson* did <u>not</u> resolve the practical and constitutional issues that would arise from certifying a class under Rule 23(b)(2) when there are significant claims for damages. *See* Point IV.B.2, *infra*.

Plaintiffs' case does not meet the three-part *Allison* test, or even the *Robinson* standard. In this case, monetary relief is not "incidental" to the injunctive relief sought. In their complaint, plaintiffs assert five causes of action, the first three

---

(Kugler, J.); *Reap*, 199 F.R.D. at 548 (same); *Miller*, 198 F.R.D. at 641-44; *Thompson* v. *Merck*, 2004 WL 62710, *4-5 (E.D. Pa. Jan. 6, 2004); *accord In re School Asbestos Litigation*, 789 F.2d 996, 1008 (3d Cir. 1986). Indeed, the Supreme Court itself has suggested that class actions seeking money damages cannot be certified under Rule 23(b)(2). *See Ticor Title Ins. Co.* v. *Brown*, 511 U.S. 117, 121 (1994).

[38] To try to escape *Allison*, plaintiffs also invoke *Wetzel* for the proposition that the Third Circuit recognized that "[c]ourts have held that a (b)(2) class is appropriate in a Title VII suit where both final injunctive relief and monetary relief are granted." 508 F.2d at 251. However, *Wetzel* involved an action seeking only equitable remedies of back and front pay, which at that time, before the Civil Rights Act of 1991, was the only monetary relief available under Title VII. Plaintiffs in this case are seeking broader legal damages, which cannot support class certification under Rule 23(b)(2). *See Miller*, 198 F.R.D. at 641-44 (explaining that "plaintiffs' reliance on *Wetzel* was outdated" because "*Wetzel* was decided before the 1991 Act became the law . . . . [and t]he class presented there was not seeking compensatory and punitive damages").

of which are claims of intentional discrimination under § 1981, Title VII and the NJLAD.  First Am. Compl. ¶¶ 141–53.  In their prayer for relief, plaintiffs seek "compensatory and punitive damages" as well as "lost wages, including back pay, front pay and lost fringe benefits, and including[;], without limitation, any lost [401(k)] benefits." *Id.* at p. 52–53.  In their brief, plaintiffs make clear that they seek compensatory and punitive damages, and set forth a proposal for how this case might be certified even though they are requesting this relief (Pls.' Br. at 59–64).

It is also critical to note that plaintiffs' expert, Dr. Madden, admitted in her deposition that her own analyses revealed no statistically significant disparity in promotion rates between blacks and whites for 2002–2003, the most recent period she studied (Madden Dep. at 491–93).  In her report, Dr. Madden found no statistically significant disparity adverse to Hispanics in promotion (Madden/Vekker Report at 3).  Thus, if plaintiffs' experts are to be believed, there is <u>now</u> <u>nothing</u> <u>to</u> <u>be</u> <u>fixed</u> in the promotion system by way of injunctive relief.  Thus, plaintiffs' requests for compensatory and punitive damages are the central part of their claims, and not merely incidental to injunctive relief sought.  *See Barabin* v. *Aramark Corp.*, 210 F.R.D. 152, 161 (E.D. Pa. 2002) (finding that individualized monetary relief predominated where complaint sought, <u>as</u> <u>here</u>, "compensatory damages, punitive damages, attorneys' fees, prejudgment interest, the costs of suit and any other legal or equitable relief the court deems appropriate"); *Reap* v. *Continental Cas. Co.*, 199

F.R.D. 536, 548 (D. N.J. 2001) (looking at prayer for relief to determine that monetary relief predominates).[39]

### B.    No Class Can Be Certified Under Rule 23(b)(3)

Plaintiffs also contend that all their claims, including compensatory and punitive damages, can properly be certified under Rule 23(b)(3). To maintain a class under Rule 23(b)(3), plaintiffs must show "that the questions of law or fact common to the members of the class predominate . . . , and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Plaintiffs cannot meet these requirements.

---

[39]    Certification under Rule 23(b)(2) is inappropriate for another reason.  A Rule 23(b)(2) class action must address only practices and relief that apply uniformly to the whole class.  The court must be able to enter an injunction that precisely defines the conduct being restrained.  Fed. R. Civ. P. 65(d).  As demonstrated at pp. 41-52 above, plaintiffs have failed to identify a common specific employment practice or policy applicable to all proposed class members, which practice or policy could then be the subject of injunctive relief extending to the alleged class as a whole.  Plaintiffs and the putative class are or were employed by different companies in different businesses, functions and positions, and are subject to different practices, policies, criteria, and decisionmaking.  In this regard, the case plaintiffs argue is "on all fours" with their case, *Green* v. *USX, supra*, actually underscores the problem with plaintiffs' request for a Rule 23(b)(2) class.  In *Green*, the claims were significantly more narrow and specific than plaintiffs' claims in this case – the *Green* plaintiffs challenged the hiring process for a single category of positions (production and maintenance workers) at a single plant.  Even then, the Third Circuit recognized the need for the claims to address a specific practice within that process, which the court found was done because the plaintiffs proved that the use of "wholly subjective" job interviews caused the discriminatory impact.  *Green*, 896 F.2d at 805.

### 1.    Common Questions Do Not Predominate Because Each Claim Must be Individually Adjudicated

Rule 23(b)(3) is not satisfied if adjudication would "require individualized evaluations and findings of the facts and defenses." *Barabin*, *supra*. Courts in this Circuit have uniformly held that common issues do not predominate in employment discrimination actions like this one, based on theories of excessive subjectivity or decentralized decisionmaking. *See, e.g., Smikle*, slip op. at 32; *Thompson* v. *Merck*, 2004 WL 62710, *2; *Reap*, 199 F.R.D. at 548-49.

The logic of these rulings is plain. Even if the finder of fact determined that the HR practices of J&J subsidiaries were excessively subjective, this would not avoid the need to try each class member's claim separately to determine liability. *See Dillon* v. *Coles*, 746 F.2d 998, 1004 (3d Cir. 1984); *see also Lusardi* v. *Xerox*, 118 F.R.D. 351, 376 n.41 (D. N.J. 1987). This determination of liability to each individual would still require an individual mini-trial based on the specific factual circumstances surrounding each class member. Despite plaintiffs' claim to the contrary (Pls.' Br. at 53), such a trial is necessary to determine *liability* in an excessive subjectivity case. *See Reap*, 199 F.R.D. at 549.

### 2.    Plaintiffs Cannot Rely on *Teamsters'* Two Phase Trial Paradigm to Establish Predominance

Plaintiffs argue that the predominance requirement of Rule 23(b)(3) can be satisfied simply by dividing this case into two phases: a first phase to determine liability, based on general proof of a pattern or practice, and a second phase (which plaintiffs mischaracterize as "remedial") to resolve individual allegations, aided by an

inference of discrimination based on the prior pattern or practice finding. Pls.' Br. at 52–53, 63.

For this approach, plaintiffs cite *Int'l Brotherhood of Teamsters* v. *United States*, 431 U.S. 324 (1977), which explained how individual claims for equitable relief under Title VII could be resolved in a second phase after the class-wide pattern and practice claim was determined in a first phase. *Teamsters* is inapplicable here, and plaintiffs' bifurcation idea will not work.

The individual issues in *Teamsters* were limited to equitable claims under the Civil Rights Act before it was amended in 1991, and those issues were to be tried to a judge, not a jury. As a result of the Civil Rights Act of 1991, J&J now has a Seventh Amendment right to a jury determination of liability with respect to plaintiffs' Title VII claims. To attempt to push the individual determinations of discrimination into a non-jury (or multiple jury) remedies phase would violate J&J's Seventh Amendment rights. Even if the Court could sort through the complexity of empaneling multiple juries to hear the second phase of this case, that would create a serious risk of overlapping and inconsistent determinations by juries in the first and second phases – which is prohibited by the Seventh Amendment. Similar suggestions were made and rejected in *Allison*, 151 F.3d at 423; *Reap*, 199 F.R.D. at 550; *Reid*, 205 F.R.D. at 686; and *Ramirez* v. *DeCoster*, 194 F.R.D. 348, 354 n.4 (D. Me. 2000) (explaining that the *Teamsters* bifurcation approach was no longer workable because "[t]here is no avoiding the single jury requirement" under the Seventh Amendment).

Moreover, a determination of liability encompasses both a pattern and practice element and the resolution of individual issues. Given the nature of this

excessive subjectivity case, there are remaining individualized issues of <u>liability</u> that must be resolved, and cannot simply be dumped into a "<u>remedies</u>" phase.  Even if plaintiffs could prove a general practice of excessive subjectivity, plaintiffs must also prove that class members suffered discrimination as a result.  The Third Circuit made this clear in *Dillon* v. *Coles,* 746 F.2d at 1004 (quoting *Cooper* v. *Fed. Reserve Bank*, 467 U.S. 867, 877-78 (1984)).  Because subjective decisionmaking, by its nature, affects different people in different ways, this determination must be made individual by individual.  *See Reid*, 205 F.R.D. at 683-84.  Thus, plaintiffs' attempt to segregate their claims into the pattern or practice model will not avoid the need to litigate the merits of each individual's claims separately based on the unique evidence applicable to those claims.  The resulting need for thousands of trials is incompatible with class certification.  *Reid*, 205 F.R.D. at 685; *Ramirez*, 194 F.R.D. at 352-54.

### 3.    A Class Action is Not The Superior Means of Adjudication

Plaintiffs also fail to establish superiority under Rule 23(b)(3).  The superiority requirement "balance[s], in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  *Georgine* v. *Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996) (citing *Katz* v. *Carte Blanche Corp.*, 496 F.2d 747, 757 (3d Cir. 1974) (*en banc*)).  Factors in this analysis include whether managing the litigation of cases involving multiple uncommon issues is feasible, whether the individual interests would seek to control the litigation and whether the interest of all those bound to the judgment are protected.  *Miller*, 198 F.R.D. at 643 (citing *Georgine*, 83 F.3d at 632).

Here again, the courts have denied class certification because a class action is inferior to other alternative methods of adjudicating this controversy, for the reasons stated with respect to Rule 23(b)(3)'s predominance requirement. *See Barabin*, 2003 WL 355417, *3; *Thompson* v. *Merck*, 2004 WL 62710, *5 (E.D. Pa. Jan. 6, 2004); *Allison*, 151 F.3d at 419; *Miller*, 198 F.R.D. at 643-44. The manageability problems inherent in trying thousands of individual claims are obvious. *See Reap*, 199 F.R.D. at 550.

### C. Plaintiffs' Attempts to Carve Out Various Amalgams of Rule 23(b)(2) and 23(b)(3) Classes Create More Problems Than They Solve and Are Contrary to Law

#### 1. The Court Cannot Separately Certify Equitable/Injunctive Claims Under Rule 23(b)(2) and Damages Claims Under Rule 23(b)(3)

Concerned, obviously, about the controlling precedent in this Circuit precluding Rule 23(b)(2) certification where the alleged class claims include compensatory and punitive relief, *see Barabin*, plaintiffs suggest that, in addition to bifurcating liability and damages, the Court could also "divide" portions of the suit: the Court could certify liability and claims for injunctive and equitable relief under Rule 23(b)(2), and certify claims for compensatory damages under Rule 23(b)(3). *See* Pls.' Br. at 58, 64–68. Plaintiffs also assert that their claim for punitive damages may be certified under either Rule 23(b)(2) or 23(b)(3) because such a claim involves common issues which do not implicate individual determinations unique to each class member. *See* Pls.' Br. at 59–61. These proposals, too, have been rejected by the courts as improper.

Plaintiffs claim that the appropriateness of dividing claims has not been addressed by the Third Circuit.  In fact, it was implicitly rejected in *Barabin*, 2003 WL 355417, *2-3.  There, the Third Circuit affirmed the denial of class certification under both Rule 23(b)(2) and (b)(3), and followed *Allison*, which also expressly rejected a proposal to divide certification along (b)(2) and (b)(3) lines.  *Id.*  The court in these cases held that this proposal would not work for several reasons.  *See id.*; *Reap*, *supra*; *Miller*, *supra*.

First, even if plaintiffs' claims for injunctive relief and compensatory damages were split for certification under Rule 23(b)(2) and (b)(3), respectively, plaintiffs must still satisfy the particular requirements for each subsection.  For the same reasons discussed above at pp. 57–65, plaintiffs cannot satisfy those requirements.  Injunctive relief under Rule 23(b)(2) would be impossible.  There still would be no specific practice uniformly applicable to the class.  There still would be a plethora of individual issues underlying each class member's claim.  Moreover, as demonstrated above, plaintiffs' claims for compensatory and punitive damages under Rule 23(b)(3) would still require individualized determinations that would predominate over common issues.  The damages claims would still be unmanageable.

Second, divided certification would still require bifurcating liability and damages, which, again, would violate the Seventh Amendment, as the courts in the Third Circuit, following *Allison,* have recognized.  *See Reap, supra; Miller, supra; see*

*also Pryor* v. *Nat'l Collegiate Athletic Assoc'n*, 2004 WL 1207642, *4-5 (E.D. Pa. Mar. 4, 2004).[40]

### 2.   "Hybrid Certification" with Opt Out Rights Is Not Permitted Under Rule 23(b)(2)

Finally, plaintiffs also suggest the possibility of a "hybrid certification," whereby monetary relief such as back pay or damages would be certified under Rule 23(b)(2), while providing notice and opt out opportunities.[41]   Pls.' Br. at 65.   Again,

---

[40]   The Seventh Circuit cases cited by plaintiffs do not dispute that the Seventh Amendment right to a jury poses substantial obstacles to certification in a case such as this.   Those cases merely stand for the proposition that courts should "consider" divided and hybrid certification before summarily denying class certification, but acknowledge the practical and legal difficulties that such amalgams present.   *Cf. Jefferson* v. *Ingersoll Intern. Inc.,* 195 F.3d 894, 899 (7th Cir. 1999) (divided certification would require the district judge to try the damages claims first, to preserve the right to jury trial, a step that would complicate the management of separate classes – and mean, as a practical matter, that the damages claims and the Rule 23(b)(3) class would dominate the litigation).

[41]   Plaintiffs alternatively propose, under Rule 23 (c)(4), to certify only certain unspecified questions while leaving other unspecified questions to individual adjudication.   (Pls.' Br. at 66.)   While unclear, plaintiffs seem to be proposing that only the pattern or practice liability issue would be litigated as a class action.   (Pls.' Br. at 66-67.)   This proposal seeks impermissibly to use Rule 23(c)(4) to "manufacture predominance" on the pattern or practice claim, where none exists. *Allison*, 151 F.3d at 422.   Such "partial certification" would not obviate the need for unmanageable individual determinations.   Plaintiffs' reliance on *Chiang* v. *Veneman*, 385 F.3d 256 (3d Cir. 2004) is misplaced for several reasons.   (Pls.' Br. at 67–68.)   *Chiang* involved claims of lending discrimination, not employment discrimination, and therefore implicated far less complicated individual factual issues.   More importantly, *Chiang* did not involve a jury demand, and therefore, did not present the issues the Seventh Amendment presents here.   Indeed, in *Bogosian* v. *Gulf Oil Corp.*, which plaintiffs also rely on, the Third Circuit noted the Seventh Amendment problem *sua sponte* and raised doubts whether the type of bifurcation that the plaintiffs here suggest would pass muster under the Seventh Amendment.   *See* 561 F.2d 434, 455 (3d Cir. 1977) (citing *Link* v. *Mercedes Benz of North Am.*, 550 F.2d 860 (3d Cir. 1977) (*en banc*)).

plaintiffs' argument conflicts with both Rule 23 and Third Circuit law. Rule 23(b)(2) provides no opt out right. The Third Circuit has held that opt out rights are "unnecessary for the homogeneous (b)(2) class" and, in fact, are incompatible with a (b)(2) class. *Tustin* v. *Heckler*, 591 F. Supp. 1049, 1069 (D. N.J. 1984) (citing *Kyriazi* v. *Western Elec. Co.*, 647 F.2d 388, 393 (3d Cir.1981)). Providing an opportunity to opt out "would defeat the fundamental objective of (b)(2), to bind the members of the class with one conclusive adjudication." *Wetzel* v. *Liberty Mut. Ins. Co.*, 508 F.2d at 249-50, 252-53.[42] Indeed, with the exception of one decision that does not address the Seventh Amendment issue in this respect,[43] courts within the Third Circuit have expressly followed *Allison* to hold that a Rule 23(b)(2) class cannot be certified as plaintiffs suggest by bifurcating claims, *see Reap, supra; Miller, supra; Pryor, supra*, or have implicitly done so by declining to certify a separate Rule 23(b)(2) class, *see Barabin, supra; Thompson, supra; Webb, supra*. The Seventh Amendment compels the same result here.[44]

---

[42]   The Seventh Circuit's ruling in *Allen* v. *Int'l Truck & Engine Corp.*, 358 F.3d 469 (7th Cir. 2004), upon which plaintiffs rely, is contrary to Third Circuit law. (Pls.' Br. at 66–67.)

[43]   *Osgood* v. *Harrah's Entertainment, Inc.*, 202 F.R.D. 115, 128 (D. N.J. 2001).

[44]   In addition, any bifurcation mechanism fails in this case because the fact issues regarding liability cannot be tried on a class-wide basis under 23(b)(2), any more than they could be tried under 23(b)(3). *See* pp. 63-65, *supra*.

## **Conclusion**

For all the foregoing reasons, Johnson & Johnson respectfully requests that this Court deny plaintiffs' motion for class certification in all respects.

Dated:  May 18, 2005


  /s/ Theodore V. Wells, Jr

| | |
|---|---|
| Theodore V. Wells, Jr. (TW 2830) | Francis X. Dee (FD 7739) |
| Jeh Charles Johnson | Stephen F. Payerle |
| Maria H. Keane | David B. Beal |
| Melanie H. Stein | **McELROY DEUTSCH** |
| **PAUL, WEISS, RIFKIND,** | **MULVANEY & CARPENTER LLP** |
| **WHARTON & GARRISON LLP** | Three Gateway Center |
| 1285 Avenue of the Americas | 100 Mulberry Street |
| New York, New York 10019-6064 | Newark, New Jersey 07102-4079 |
| (212) 373-3000 | (973) 622-7711 |

Donald R. Livingston
**AKIN GUMP STRAUSS HAUER
& FELD, L.L.P.**
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 887-4000

Nancy Rafuse
**ASHE RAFUSE & HILL LLP**
1355 Peachtree Street
Suite 500
Atlanta, GA 30309
(404) 253-6000

Barbara A. McCormick
**JOHNSON & JOHNSON**
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933
(732) 524-3758


Counsel for Defendant Johnson & Johnson


70





# ETHICON







## ORTHO BIOTECH









alza






Johnson & Johnson

### CONSUMER PRODUCTS COMPANY
Division of Johnson & Johnson Consumer Companies, Inc.











# ● DePuy ®







# *INDEPENDENCE*
## *TECHNOLOGY*






# Janssen Ortho-McNeil
# Primary Care

# ETHICON ENDO-SURGERY, INC.





 ADVANCED STERILIZATION PRODUCTS




























