# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------------X

Nilda GUTIERREZ, Linda MORGAN,
Wayne BROWN and Krista MARSHALL

      Individually and as
      Class Representatives,

            Plaintiffs,

         v.

JOHNSON & JOHNSON,

           Defendant.

: Civil Action No. 01-5302

: Filed Electronically

-------------------------------------------------------- X

## PLAINTIFFS' REPLY BRIEF TO DEFENDANT'S OPPOSITION TO CLASS CERTIFICATION CONCERNING "INITIAL ASSIGNMENT"

Bennet D. Zurofsky (BZ 2005)
Reitman Parsonnet, PC
744 Broad Street, Suite 1807
Newark, NJ 07102
(973) 642-0885

Cameron Stewart (CS 7221)
The Cochran Firm
4929 Wilshire Boulevard
Suite 1010
Los Angeles, CA 90010
(323) 931-6200

Cyrus Mehri  (CM 3465)
Nicole M. Austin-Hillery (NAH 784)
Pamela Coukos (PSC 4265)
Mehri & Skalet, PLLC
1300 19th Street NW, Suite 400
Washington, DC 20036
(202) 822-5100

Bruce Ludwig (BL 4981)
Jonathan Shub (JS 2287)
Scott George (SG 0897)
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300

*Counsel For Plaintiffs And The Putative Class*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT .......................................................................................................... 3

    A.    DR. MADDEN'S FINDINGS ARE BASED ON WELL-FOUNDED
           STATISTICAL PRINCIPLES AND COMPLETE ANALYSIS WHILE DR. WISE
           ATTEMPTS TO MISCHARACTERIZE HER METHODOLOGY ....................... 3

    B.    DR. WISE INITIALLY FOCUSES HIS ANALYSIS ON DATA IN THE
           JJEMS DATABASE WHICH YIELDS STATISTICALLY SIGNIFICANT
           DIFFERENCES ......................................................................................... 6

    C.    DR. WISE FOCUSES HIS FINDINGS ON THE TALENT NAVIGATOR
           DATABASE WHICH PROVES INADEQUATE AND INACCURATE ............ 6

CONCLUSION ..................................................................................................... 11

# TABLE OF AUTHORITIES

## Cases

*Caridad v. Metro North Commuter R.R.*, 191 F.3d 283 (2d Cir. 1999) ................... 5

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ................... 8

*In Re Paoli R.R. Yard PCB Litigation*, 35 F.2d 717 (3rd Cir. 1994) ................... 4, 9

*Ingram v. The Coca-Cola Company*, 200 F.R.D. 685 (N.D. Ga. 2001) ................... 5

*Ketchum v. Sunoco*, 217 F.R.D. 354 (E.D. Pa. 2003) ................................. 5

*McReynolds v. Sodexho Marriott*, 208 F.R.D. 428 (D.D.C. 2002) ........................... 5

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company, Inc.*,
    988 F.2d 1224 (3rd Cir. 1994) .............................................................. 4

*Shores v. Publix Super Mkts., Inc.*, 1996 WL 407850
    (M.D. Fla., Mar. 12, 1996) .................................................................. 5

iii

## PRELIMINARY STATEMENT

In February 2005, Plaintiffs filed a motion for leave to file a Second Amended Complaint which included a simple request to "amplify claims with regard to discrimination in initial compensation" by adding technical language that did nothing more than clarify Plaintiffs' position with respect to claims described as "entry-level bias." *See* Order of April 18, 2005. Despite Johnson & Johnson's ("J&J," "the Company," "Defendant") assertion that Plaintiffs failed to put forth initial assignment claims in the initial complaint, the Special Master in this case found that Plaintiffs' claim of discrimination in initial assignment is an element of proof of Plaintiffs' compensation claim and therefore already part and parcel of Plaintiffs' claims.[1] Specifically, the Special Master opined that "[t]he initial hire claim is simply an amplification of the allegations with respect to discrimination in

---

[1] It now turns out that the Company's original position on the issue of initial assignment claims was totally disingenuous. The Company asserted in Court that they did not understand Plaintiffs' claims concerning initial assignment. *See* Tr. of Hearing Before the Honorable Nicholas H. Politan, November 19, 2004 at 39 (counsel for the defendant, Jeh Johnson of Paul, Weiss Rifkind, Wharton & Garrison, LLP, claimed to the Court that "[a] totally new fact investigation would have to be done to defend this allegation.") In fact, Dr. James Outtz, the industrial psychologist working under the supervision of Paul, Weiss since 2002, said that his first task in this position was to examine the allegations of the Complaint and report to defense counsel. Outtz Tr. at 35-39. Dr. Outtz further testified that he understood from the outset that Plaintiffs had a claim of "entry level salary bias." Outtz Deposition Tr. at 175. *See also*, Outtz Deposition Tr., Exhibit 6 (in which Dr. Outtz lists his initial understanding of the complaints in this litigation) and the Report of Dr. William Bielby at pp.15-26.

initial compensation rates to include determinations of job placement or level."
Order of April 18, 2005 at 3.  The Court's succeeding ruling on this issue granted
Defendant the right to submit additional statistical analysis to refute this claim.
Order of July 25, 2005. Plaintiffs ask that these class claims be certified as part and
parcel of their compensation claims.  Below is Plaintiffs' response to the
supplemental brief submitted by J&J.

J&J omits one simple fact in its Reply Brief in Opposition to Class
Certification regarding initial assignment—the expert analyses for both Plaintiffs
and J&J yielded differences that are statistically significant with respect to initial
assignments given to new hires.  African American and Hispanics at J&J are
receiving inferior jobs from the start of their careers at the Company. For this
reason alone, J&J's Opposition to Class Certification concerning initial assignment
must fail.

The only instance in which J&J's expert, Dr. David Wise, does not find
racial and ethnic disparities that are not statistically significant with respect to
initial assignment is when he analyzes a highly non-representative sample of hires
that account for approximately only 25% of new hires. The Talent Navigator
dataset used by Dr. Wise for his analysis, discussed *infra*, was unreliable and
inadequate.

2

Further, although J&J challenges Dr. Madden's methodology, she in fact uses the type of analysis in her report that is routinely used and accepted among the community of scholars and experts who focus on economic research on discrimination. *See*, Brief in Support of Plaintiffs' *Daubert* Motion to Strike the Expert Report of Dr. David Wise at pp.7-13, 24-26 and footnote 4. It is Dr. Wise whose methodologies and findings are questionable with respect to initial assignment claims.

## ARGUMENT

### A. Dr. Madden's Findings are Based On Well-Founded Statistical Principles and Complete Analysis While Dr. Wise Attempts to Mischaracterize Her Methodology

Dr. Madden finds in her analysis "the initial assignments that employees received when they were hired are not racially and ethnically neutral." Madden Report at 6. Dr. Madden found an average wage differential at hire by race of 3.27% (5.62 standard deviations) for African Americans of equivalent education and years of experience to non-Hispanic whites hired between 1999 and 2003. Id. Dr. Madden also found an average wage differential at hire by ethnicity of 4.48% (6.03 standard deviations) for Hispanics of equivalent education and years of experience to non-Hispanic whites hired between 1999 and 2003. Id. These

3

findings are well beyond the levels of statistical significance required by the courts. *See In Re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 749 (3rd Cir. 1994).

The basis for Dr. Madden's findings is grounded in well-established statistical principles. Dr. Madden conducted a regression analysis of base salary at hire for employees hired between November 15, 1999 and May 22, 2003 to analyze the salary differentials.[2] Dr. Madden concluded that it is the "initial level of the job assignment—rather than any other factor—that produces most of the salary disadvantage at hire for African Americans and Hispanics." Madden Report at 45.

Dr. Wise reaches inaccurate conclusions about Dr. Madden's approach because: (1) he confuses the models to predict job assignment at hire for individuals with models to analyze differences in job assignment across groups of individuals; and (2) he does not consider the variety of ways that individuals get placed in particular jobs. Madden Rebuttal Report at 62. Because Dr. Madden designs analysis to evaluate statistically whether African American and Hispanics are systematically assigned to jobs in a way that is different, and inferior to, the

---

[2] Regression analysis is a well-established scientific method recognized by the Third Circuit. "[W]e note that the scientific method used by the economists, multiple regression analysis, is reliable. Therefore, the results of such a study should be accepted, assuming that it was done properly." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Company, Inc.*, 988 F.2d 1224, 1238 (3rd Cir. 1994).

assignments of non-Hispanic whites, those analyses do not have to include all of the attributes by which individuals differ—doing so is unwarranted. Rather, it is more appropriate only to include the attributes by which the groups differ. Madden Rebuttal Report at 64.

Dr. Wise further attempts to mischaracterize Dr. Madden's techniques as contrary to well-recognized and accepted principles. A close review of the academic literature concerning economics supports the methodologies employed by Dr. Madden.[3] In fact, not only is Dr. Madden's methodology in line with the academic literature in this field, it is also recognized by and supported by several courts who have recognized the same or similar methodologies as being the most appropriate for analyzing discrimination.[4]

---

[3] *See*, Brief in Support of Plaintiffs' *Daubert* Motion to Strike the Expert Report of Dr. David Wise at pp. 7-13.

[4] As further explained at length in Plaintiffs' Opposition to Defendant's *Daubert* Motion to Strike the Report of Dr. Janice Madden, the typical inquiry asks whether the plaintiffs have proffered competent, admissible statistical evidence and/or other evidence at the class certification phase that can support a reasonable inference of discrimination against the class, frequently reviewing evidence very similar to that presented by Madden in this case. *See, e.g., Caridad v. Metro North Commuter R.R.,* 191 F.3d 283, 292-93 (2d Cir. 1999); *McReynolds v. Sodexho Marriott,* 208 F.R.D. 428, 441, 444-45 (D.D.C. 2002); *Shores v. Publix Super Mkts., Inc.,* 1996 WL 407850 at *6-*7(M.D. Fla., Mar. 12, 1996). *See also, Ingram v. The Coca-Cola Company,* 200 F.R.D. 685, 697-98 (N.D. Ga. 2001) (certifying class based in part on report by Madden); *Ketchum v. Sunoco,* 217 F.R.D. 354, 356 (E.D. Pa. 2003) (same)

## B. Dr. Wise Initially Focuses His Analysis on Data in the JJEMS Database Which Yields Statistically Significant Differences

Dr. Wise began his analysis by looking at data from the JJEMS database, upon which Dr. Madden relies for her initial assignment analysis. In order to try to refute Dr. Madden's approach to evaluating initial assignments, Dr. Wise used a slightly different data set for all hires and adds different additional attributes to Dr. Madden's findings. While doing this results in a slightly lower estimate of disadvantage for African Americans and Hispanics as compared to non-Hispanic whites, Dr. Wise's findings, nonetheless yield differences that are statistically significant at the levels frequently used by the courts to dismiss random variations as a cause of the disparity. Madden Rebuttal Report at 54. Dr. Wise left this critical fact out of his initial assignment report, unlike Dr. Madden who includes this key information. *See*, Table 10, Madden Rebuttal Report and Table 11, Wise Initial Assignment Report. It was not until Dr. Wise yielded results similar to Dr. Madden's that he used a new and inadequate data set.

## C. Dr. Wise Focuses His Findings on the Talent Navigator Database Which Proves Inadequate and Inaccurate

The third dataset used by Dr. Wise—and the one he eventually relies upon derives from the Talent Navigator database. Dr. Wise uses data in J&J's Talent

6

Navigator database (the only data source that refutes Dr. Madden's results of finding statistical significance) as opposed to the JJEMS database (a database containing all hires) that is relied upon by Dr. Madden.[5] This approach, however, is extremely problematic for two key reasons.

First, the Talent Navigator dataset is severely inadequate. Less than a quarter of the new hires during the relevant period appear in the Talent Navigator dataset. Dr. Wise illuminates this problem with using the small sample size yielded by Talent Navigator:

> Q:     ...is your presentation of the data on this Table six, is this providing information on a company-wide basis?
> A:     No, it comes from a sample of employees who provided data to a data system called Talent Navigator...
> Q:     And how large was the sample that you were using in terms of the percentage of the overall employee population?
> A:     I think about 22 or 24 percent of all new hires over the period 2001 to 2002, I guess...
> Q:     Is it fair to say that about 22 percent of the employees chose to fill out the information for Talent Navigator?
> A:     Yes...
> Q:     And in your view, is the analysis reliable if 78 percent of the potential population did not fill it out during that time period?
> A: ...It is not the whole sample,  I just—so I don't have all this data for everyone.  As far as I know it is not available in the J&J data files, so I've used it to demonstrate that, were this information available, the answer that one would come up with could be very different from the one that Professor Madden came up with."

Wise Dep. Transcript at 133-34. (emphasis added)

---

[5] While the JJEMS database may not have all conceivably relevant attributes one would prefer to measure, it does contain data for all hires, unlike Talent Navigator.

7

As Dr. Madden found, the results using the limited Talent Navigator data that Dr. Wise relies upon differ strikingly from those using the larger, representative group of hires. Madden Rebuttal Report at 67. This suggests that the population represented in the Talent Navigator database is simply not representative of initial job assignment hires at J&J. Id. Further to this point, Dr. Wise actually admits on the record that he used an "inadequate data set" by using the Talent Navigator dataset. Wise Tr. at 138.

What is most troubling is that Dr. Wise's methodologies here run counter to the established standards of what constitutes acceptable expert testimony—he mostly relies upon a data set that contains missing data. Missing data renders Dr. Wise's conclusions suspect. Arguably, Dr. Wise's failure to meet these standards could very well have led Plaintiffs to file a *Daubert* motion to strike Dr. Wise' initial hire report. Rather, in contrast to Dr. Wise's main report in this case in which he uses highly suspect, questionable and untested methodology, with respect to his initial assignment report, Dr. Wise simply relies upon an inadequate data set that yields unreliable results.[6]

---

[6] Plaintiffs' concerns about Dr. Wise's report on initial assignment go more to the weight of the findings rather than the admissibility of his report based on the lack of reliability. As explained by the Third Circuit in applying the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Rule 702 allows expert testimony provided that "the process or technique the expert used in

8

Second, by using the Talent Navigator dataset, Dr. Wise uses data likely to be highly inaccurate to compare the amount of experience of a new hire by race and ethnicity.  Dr. Wise relies on the Talent Navigator database that lists start dates and ending dates for past jobs for new hires—information the employees report themselves.  Dr. Wise's own tables, however, indicate that this technique is problematic. *See* Wise Initial Hire Report at Table 5.  Specifically, Dr. Wise ignores evidence in his own table indicating that if all relevant information, such as "previous employer" is not listed in the database, this almost ensures that his calculations will underestimate prior experience because all previous employers will not be listed on Talent Navigator. *See* Madden Rebuttal Report at p. 67, fn 39 for further amplification of this example. There is no way to know how many hires are affected by this issue and how badly Dr. Wise may have underestimated their experience. Madden Rebuttal Report at 67.

The inaccuracy of the Talent Navigator dataset is further illuminated upon a closer examination of hierarchy reporting.[7]  Dr. Wise uses data from Talent Navigator's reporting of the hierarchy of last job held prior to coming to J&J to evaluate the quality of prior experience of new hires that are likely to be entered

---

formulating the opinion is reliable." *In Re Paoli R.R. Yard PCB Litigation*, 35 F.2d 717, 742 (3rd Cir. 1994).

[7] According to a reading of various documents produced by the Company, hierarchy codes are internal mechanisms for labeling jobs and assigning job levels.

9

inconsistently, making the data set used by Dr. Wise even more unreliable. There were inadequate controls in place to ensure reasonable accuracy of hierarchy reporting since employees themselves provide this information as well.  In fact, Dr. Wise himself notes this during his deposition:

> Q:    So you controlled for hierarchy code, is that right, in your analysis?
> A:    I controlled for the hierarchy of the prior job, the just prior job, prior to being hired.
> Q:    …What efforts did you take to test whether the prior hierarchy code is accurately filled out by employees?
> A:    I have no way of knowing that because I have no way of knowing that they gave the right school that they went to or anything else, it is just provided by the employees."

Wise Deposition Transcript at 137-38.

Even one of J&J's own managers confirm that it is highly difficult to determine exactly how accurately to assign a particular hierarchy code to J&J jobs.[8] Yet, despite these difficulties, Dr. Wise relies upon these self-selected hierarchy codes to determine the correct level of prior experience for J&J new hires. On the contrary, Dr. Madden's data set is not dependent upon self-selected attributes.

Despite Dr. Wise's attempts to distinguish his methodologies as superior, he in fact only succeeds in revealing that his methodology, like Dr. Madden's, yields

---

[8]  A senior manager at J&J, Carolyn Horn, when pressed about the use of hierarchy codes and her understanding of them and how to code information using hierarchy admits to having limited knowledge about how hierarchy codes are used. See, Horn Deposition at 84-86.

10

differences by race and ethnicity in the job placement of hires at J&J that are statistically significant. This finding comes about when data is analyzed that includes, or is representative of, all J&J hires. Dr. Wise only finds racial and ethnic disparities that are not statistically significant when he analyzes a highly non-representative sample of hires from the Talent Navigator database that excludes more than 75% of hires and includes data that is likely to be inaccurate and inconsistently collected. *See* Madden Rebuttal Report at 9.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request the Court grant Plaintiffs' Motion for Class Certification with respect to claims of initial assignment disparities.

Dated:     April 28, 2006

### RESPECTFULLY SUBMITTED,

/s/ Bennet D. Zurofsky
Bennet D. Zurofsky (BZ 2005)
Reitman Parsonnet, PC
744 Broad Street, Suite 1807
Newark, NJ 07102
(973) 642-0885

Cyrus Mehri  (CM 3465)
Nicole M. Austin-Hillery (NAH 3784)
Pamela Coukos (PSC 4265)
Mehri & Skalet, PLLC

11

1300 19th Street NW, Suite 400
Washington, DC 20036
(202) 822-5100

Cameron Stewart (CS 7221)
The Cochran Firm
4929 Wilshire Boulevard
Suite 1010
Los Angeles, CA 90010
(323) 931-6200

Bruce Ludwig (BL 4981)
Jonathan Shub (JS 2287)
Scott George (SG 0897)
Sheller, Ludwig & Badey, P.C.
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300

COUNSEL FOR THE PLAINTIFFS
AND PUTATIVE CLASS

12

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing Plaintiffs' Reply Brief To Defendant's Opposition to Class Certification

Concerning "Initial Assignment" has been duly served on opposing counsel by

electronic and overnight mail to:

> Francis X. Dee
> Stephen F. Payerle
> McElroy, Deutsch, Mulvaney & Carpenter
> Three Gateway Center
> 100 Mulberry Street
> Newark, NJ 07102-4079
>
> Jeh Charles Johnson
> Paul, Weiss, Rifkind, Wharton & Garrison
> 1285 Avenue of the Americas
> New York, NY 10019-6064
>
> Donald Livingston
> Akin, Gump, Strauss, Hauer & Feld, LLP
> Robert R. Strauss Building
> 1333 New Hampshire Avenue, N.W.
> Washington, D.C. 20036

This is the 28th day of April, 2006.


Nicole M. Austin-Hillery
Mehri & Skalet, PLLC
1300 19th Street, N.W., Suite 400
Washington, DC 20036

13